1    G. David Godwin, No. 148272
     Raymond J. Tittmann, No. 191298
2    **CARROLL, BURDICK & McDONOUGH** LLP
     Attorneys at Law
3    44 Montgomery Street, Suite 400
     San Francisco, CA 94104
4    Telephone:    415.989.5900
     Facsimile:    415.989.0932
5    Email:        dgodwin@cbmlaw.com

6    Attorneys for Defendant
     The Continental Insurance Company
7

8                    UNITED STATES DISTRICT COURT

9                    NORTHERN DISTRICT OF CALIFORNIA

10                       SAN FRANCISCO DIVISION

11

12   Franklin Ham and Dana Ham,              No.  CV 08 1551 SC

13              Plaintiffs,               **DECLARATION OF RAYMOND J. TITTMANN
                                          IN SUPPORT OF DEFENDANT THE
14        v.                              CONTINENTAL INSURANCE COMPANY'S
                                          MOTION TO STRIKE PLAINTIFFS' CLAIM
15   The Continental Insurance Company;   FOR PUNITIVE DAMAGES**
     and Does 1 through 50,
16                                        **Date:         May 23, 2008**
                Defendants.               **Time:         10:00 a.m.**
17                                        **Courtroom:    1**

18                                        **Hon. Samuel Conti**

19

20

21

22

23

24

25

26

27

28

CBM-IPG\SF398656.1

DECLARATION OF RAYMOND J. TITTMANN IN SUPPORT OF DEFENDANT'S MOTION TO STRIKE

1    I, Raymond J. Tittmann, declare as follows:

2        1.    I am an attorney licensed to practice law in the State of California, and a

3    partner of Carroll, Burdick & McDonough, LLP, attorneys of record for Defendant The

4    Continental Insurance Company.

5        2.    Attached as Exhibit 1 is a true and correct copy of Plaintiffs Franklin and

6    Dana Ham's First Amended Complaint and exhibits filed with the San Francisco County

7    Superior Court on February 14, 2008.

8        I declare under penalty of perjury under the laws of the State of California that

9    the foregoing is true and correct.

10    Executed this 27th day of March 2008, at San Francisco, California.

11

12                                    _____
                                        Raymond J. Tittmann
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF RAYMOND J. TITTMANN IN SUPPORT OF DEFENDANT'S MOTION TO STRIKE

# EXHIBI 1

# SUMMONS (First Amended)

**SUM-100**

## (CITACIÓN JUDICIAL)

FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
THE CONTINENTAL INSURANCE COMPANY; and
DOES 1 through 50

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
FRANKLIN HAM AND DANA HAM

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff.  A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case.  There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you.  If you cannot pay the filing fee, ask the court clerk for a fee waiver form.  If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.
There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association.

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante.  Una carta o una llamada telefónica no lo protegen.  Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte.  Es posible que haya un formulario que usted pueda usar para su respuesta.  Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.courtinfo.ca.gov/selfhelp/espanol/), en la biblioteca de leyes de su condado o en la corte que le quede más cerca.  Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas.  Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.
Hay otros requisitos legales.  Es recomendable que llame a un abogado inmediatamente.  Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados.  Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro.  Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.courtinfo.ca.gov/selfhelp/espanol/) o poniéndose en contacto con la corte o el colegio de abogados locales.*

| | |
|---|---|
| The name and address of the court is: *(El nombre y dirección de la corte es):*<br>Superior Court of California<br>County of San Francisco<br>400 McAllister Street<br>San Francisco, CA  94102 | CASE NUMBER:<br>*(Número del Caso):* CGC-08-471943 |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Jack K. Clapper                                         (415) 332-4262
Clapper, Patti, Schweizer & Mason
2330 Marinship Way, Suite 140
Sausalito, CA  94965
DATE: FEB 1 4 2008                    GORDON PARK-LI    Clerk, by ROSSALY E. DE LA VEGA NAVARRO    Deputy
*(Fecha)*                                          *(Secretario)*                                       *(Adjunto)*

(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☐ on behalf of *(specify):*

   under: ☐ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)  ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)
          ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

| | | |
|---|---|---|
| Form Adopted for Mandatory Use<br>Judicial Council of California<br>SUM-100 [Rev. January 1, 2004] | **SUMMONS** | Legal<br>Solutions<br>Plus |

Code of Civil Procedure §§ 412.20, 465

1 | Jack K. Clapper, Esq. (State Bar No. 83207)
Steven J. Patti (State Bar No. 163773)
2 | Christine A. Renken (State Bar No. 232797)
Clapper, Patti, Schweizer & Mason
3 | Marina Office Plaza
2330 Marinship Way, Suite 140
4 | Sausalito, CA 94965
Telephone: (415) 332-4262
5 | Facsimile: (415) 331-5387

6 | Attorney for Plaintiffs

**F I L E D**

San Francisco County Superior Court

FEB 1 4 2008

GORDON PARK-LI, Clerk

BY: _____
Deputy Clerk

7

8 | SUPERIOR COURT OF THE STATE OF CALIFORNIA

9 | CITY AND COUNTY OF SAN FRANCISCO - UNLIMITED CIVIL JURISDICTION

10

11 | FRANKLIN HAM and DANA HAM,          )   Case No.  CGC-08-471943
                                      )
12 |          Plaintiffs,               )   FIRST AMENDED COMPLAINT FOR:
                                      )   (1)   BREACH OF INSURANCE
13 | v.                                 )         CONTRACT;
                                      )   (2)   BREACH OF THE IMPLIED
14 | THE CONTINENTAL INSURANCE         )         COVENANT OF GOOD FAITH AND
COMPANY; and DOES 1 through 50,       )         FAIR DEALING;
15 |                                    )   (3)   DECLARATORY RELIEF
         Defendants                   )
16 |                                    )

17

18 | Plaintiffs, Franklin Ham and Dana Ham (collectively "Plaintiffs") allege as follows:

19 | **GENERAL ALLEGATIONS**

20 |    1.    Plaintiffs are informed and believe and thereon allege that Glen Falls Insurance Company

21 | at all relevant times was a corporation, authorized to transact, and transacting, business in the State of

22 | California. Plaintiffs are further informed and believe and thereon allege that The Continental Insurance

23 | Company is the successor-in-interest to Glen Falls Insurance Company, and is a corporation, authorized

24 | to transact, and currently transacting business in the State of California. Both entities will collectively

25 | be referred to as "CNA."

26 |    2.    Plaintiffs are ignorant of the true names and capacities, whether individual, corporate,

27 | associate, governmental or otherwise of defendants sued as DOES 1 through 50, inclusive, and sues

28 | these defendants by such fictitious names. Plaintiffs, after obtaining leave of Court, if necessary, will

1    amend this Complaint to show such true names and capacities when the same have been ascertained.

2        3.    At all times herein mentioned, each of the Defendants, except as otherwise alleged, was

3    the agent, servant, employee and/or joint venturer of his co-defendants, and each of them, and at all said

4    times, each Defendant was acting in the full course and scope of said agency, service, employment

5    and/or joint venture. Certain Defendants agreed and conspired among themselves, and with certain other

6    individuals and/or entities, to act, or not to act, in such a manner that resulted in injury to the Insured;

7    and such Defendants, as co-conspirators, are liable for the acts, or failures to act, of the other conspiring

8    Defendants.    Plaintiffs are informed and believe, and allege, that at all times herein mentioned

9    Defendants FIRST DOE through FIFTIETH DOE, inclusive, were and are authorized to do business in

10   the State of California, that said Defendants have regularly conducted business in the County of San

11   Francisco, State of California, and that certain of said Defendants have designated the County of San

12   Francisco as their principal place of doing business within the State of California.

13       4.    At all times herein mentioned, each of the Defendants was the successor, successor in

14   business, assign, predecessor, predecessor in business, parent, subsidiary, alter-ego, agent and/or

15   fiduciary wholly or partially owned by, or the whole or partial owner of or member of the other

16   Defendants. Said entities shall hereinafter collectively be called "alternate entities." Each of the herein

17   named Defendants are liable for the tortious conduct of each successor, successor in business, assign,

18   predecessor, predecessor in business, parent, subsidiary, whole or partial owner, or wholly or partially

19   owned entity, or entity that it was a member of. The following Defendants, and each of them, are liable

20   for the acts of each and every "alternate entity," and each of them, in that there has been a virtual

21   destruction of Plaintiffs' remedy against each such "alternate entity;" Defendants, and each of them, have

22   acquired the assets, product line, or a portion thereof, of each such "alternate entity;" Defendants, and

23   each of them, caused the destruction of Plaintiffs' remedy against each such "alternate entity;" each such

24   Defendant has the ability to assume the risk-spreading role of each such "alternate entity;" and that each

25   such Defendant enjoys the goodwill originally attached to each such "alternate entity."

26   //

27   //

28   //

| DEFENDANT | ALTERNATE ENTITY |
|---|---|
| THE CONTINENTAL INSURANCE COMPANY | GLENS FALLS INSURANCE COMPANY CNA INSURANCE COMPANIES |
| | FIREMAN'S INSURANCE COMPANY OF NEWARK, NEW JERSEY |

## FIRST CAUSE OF ACTION

### (Breach of Insurance Contract against CNA and Does 1-50)

5.    Plaintiffs reallege and incorporate by reference the allegations of paragraphs 1 through 4 of the Complaint as set forth above.

6.    The above and below-described actions of CNA and Does 1-50 ("Defendants"), and each of them, constitute Breach of Insurance Contract.

7.    In or about June of 1964, in consideration of the payment of a premium, Defendants, by its duly authorized agents, executed and delivered to ECKLUND INSULATION, INC., hereinafter referred to as "the Insured," in the City of Reno, County of Washoe, State of Nevada, its Comprehensive General Liability Insurance policy bearing number PCL 50-09-99 with a policy limit for bodily injury of $100,000 each person and $300,000 each accident.  Plaintiffs are informed and believe and thereon allege that additional insurance policies exist that were issued by Defendants to the Insured for multiple years after 1966.  These insurance policies were also Comprehensive General Liability policies.  The policy limits for these additional insurance policies were the same or more than the 1966 Policy.  These policies will collectively be referred to as "the Policies."  Under the Policies, Defendants undertook to and did insure for both products liability and general liability and agreed to indemnify and defend the Insured in any civil action or suit seeking such damages.  Plaintiffs are informed and believe and thereon allege that the Policies did not contain any exclusions referencing asbestos, asbestos products or asbestos-related injuries.  A copy of the 1966 Policy's Certificate of Insurance is attached hereto as Exhibit "A" and incorporated by reference.

8.    While the Policies were in full force and effect, the Insured sold asbestos-containing products and performed work as a contractor using asbestos-containing products that exposed Plaintiff, Franklin Ham to asbestos dust.  Mr. Ham worked with the Insured's employees on multiple work sites

1 | from the early 1960's through the early 1970's, at least, as they exposed him to asbestos dust by their use

2 | of rigid split asbestos pipe covering and dry asbestos cement. The Insured's employees failed to warn

3 | Mr. Ham about the hazards inherent in breathing the dust from their work or take precautions to protect

4 | him from the dust. Mr. Ham breathed asbestos fibers that were created when the Insured's employees

5 | performed work as a contractor using asbestos-containing products, thereby causing injuries to Mr. Ham.

6 | Those events will hereinafter be referred to as "the Occurrence." Plaintiffs and the Insured gave

7 | Defendants due and timely notice of the Occurrence, and Defendants, through its employees and agents,

8 | failed to investigate the claim and to represent the Insured in the settlement negotiations and in the

9 | defense of the underlying action hereinafter mentioned.

10 |     9.    There was a substantial likelihood that Plaintiffs' recovery in the underlying lawsuit

11 | would exceed the Policies' limits. Plaintiffs Franklin and Dana Ham have been married for 48 years.

12 | Mr. Ham is 74 years old and Mrs. Ham is 67. They reside in Yerington, Nevada, and are Nevada

13 | citizens and have two daughters and a son. Mr. Ham was a remarkably healthy and active man before

14 | his diagnosis of mesothelioma. He is a lifetime non-smoker, apart from two years when he served in

15 | the Navy. Mr. Ham was diagnosed with malignant pleural mesothelioma in July of 2006. Malignant

16 | pleural mesothelioma is a terminal disease. Mr. Ham was told by his treating physician that he could

17 | expect to live from six to eighteen months from the time of his diagnosis. Additional details of Mr.

18 | Ham's exposure and injuries and Mrs. Ham's loss of consortium are set forth in Plaintiffs' Trial Brief

19 | in Support of Request for Entry of Default Judgment, which was served on CNA and is attached hereto

20 | as Exhibit "B" and incorporated by reference.

21 |     10.    On August 11, 2006, Plaintiffs' Complaint was filed in the Superior Court of San

22 | Francisco, entitled *Franklin Ham and Dana Ham v. Acco-Air Conditioning Company, et al.*, case

23 | number 455063, hereinafter referred to as "the Underlying Action," in which Plaintiffs sought recovery

24 | of damages for Mr. Ham's injuries as a result of his occupational exposure to asbestos. Plaintiffs named

25 | several defendants, including several DOE defendants, in the Complaint. A copy of the Complaint in

26 | the Underlying Action is attached hereto as Exhibit "C" and incorporated by reference.

27 |     11.    On August 28, 2006, Plaintiffs filed an amendment to the Complaint substituting the true

28 | name of the Insured for the Eleventh Doe. The Complaint as amended alleges that the Insured is liable

1    to Plaintiffs for damages arising out of Mr. Ham's injuries and Mrs. Ham's loss of consortium. A copy

2    of the Amendment is attached hereto as Exhibit "D" and incorporated by reference.

3         12.     The Insured is a defunct Nevada corporation, but the corporation has never dissolved.

4    Plaintiffs served the Insured with the Summons and Complaint in the Underlying Action by personally

5    serving its President, Jerry Ecklund, at his home in Allyn, Washington.

6         13.     In or about August or September of 2006, the Insured tendered the defense of the

7    Underlying Action to CNA. CNA responded, stating that it would search for any insurance policies

8    issued to the Insured and requested any documentation related to the Policies. Plaintiffs are informed

9    and believe and thereon allege that the Insured sent CNA a copy of the Certificate of Insurance for the

10   1966 Policy. Plaintiffs also attempted to begin communications and settlement negotiations with CNA

11   by sending CNA a copy of the Certificate of Insurance for the 1966 Policy. CNA never responded to

12   the Insured or to Plaintiffs.

13        14.     As a result of CNA's refusal and failure to defend the Insured, upon Plaintiffs request,

14   the Clerk of the Court entered default against the Insured on November 30, 2006. Plaintiffs provided

15   notice to Jerry Ecklund, President of the Insured,---and to Richard Solski of CNA---of the Request for

16   Entry of Default and of all hearings, trial dates, court orders and depositions taken in the Underlying

17   Action. Plaintiffs also provided Mr. Ecklund and Defendants with notice of the Default Prove-up

18   Hearing, which stated that a judgment would be sought against the Insured in the Underlying Action.

19        15.     On June 28, 2007, the Court ordered judgment be entered in favor of Plaintiff Franklin

20   Ham in the amount of $671,000 for economic damages and $1,300,000 non-economic damages and in

21   favor of Plaintiff Dana Ham in the amount of $700,000 non-economic damages, for a total judgment in

22   favor of Plaintiffs and against the Insured in the amount of $2,671,000. A copy of the Notice of Entry

23   of Default Judgment Against Ecklund Insulation, Inc. and Default Judgment, which was served on CNA,

24   is attached hereto as Exhibit "E" and incorporated by reference.

25        16.     Plaintiffs sent CNA a letter via certified mail on December 26, 2007 offering to resolve

26   Plaintiffs' claims against CNA and the Insured for the Policies' limits. The December 26, 2007 letter

27   further stated that the offer to settle would remain open for 30 days from CNA's receipt of the letter.

28   CNA received the letter by January 2, 2008. CNA has not contacted Plaintiffs in response to Plaintiffs'

1  offer to settle within the Policies' limits.

2      17.    Defendants breached the Policies by (1) failing to and refusing to undertake any
3  investigation of the Occurrence; (2) failing to defend or respond to a proper request to defend the
4  Insured; and (3) failing to settle or engage in settlement discussions of the Underlying Action when
5  there was a substantial likelihood that Plaintiffs would recover an amount in excess of the Policies'
6  limits, Even after the Insured and Plaintiffs sent Defendants the Certificate of Insurance setting forth
7  the specific policy number and policy amounts, Defendants failed to respond. Defendants continued to
8  fail to respond even when Plaintiffs offered to resolve the default judgment in the Underlying Action
9  within the Policies' limits.

10      18.    As consideration for Plaintiffs' agreement not to enforce the balance due and owing on
11  the Underlying Action's judgment, the Insured has assigned to Plaintiffs all assignable claims that the
12  Insured has against the Defendants. Plaintiffs sue the Defendants as the assignee of the Insured's causes
13  of action. This included the causes of action alleged in this Complaint. A copy of the assignment is
14  attached hereto as Exhibit "F" and incorporated by reference.

15      19.    Plaintiffs and the Insured have performed and complied with all of the terms, conditions
16  precedent, obligations and provisions contained in the Policies under which coverage is now sought,
17  including the payment of premiums and the giving of notice, except as to that performance which has
18  been excused, waived or prevented by the representations, acts or omissions of the Defendants. Thus,
19  Plaintiffs, as the assignees, are entitled to the full benefit of the insurance provided by the Policies.

20      20.    As a proximate result of Defendants' (1) failure to and refusal to undertake any
21  investigation of the Occurrence; (2) failure to defend or respond to a proper request to defend the
22  Insured; and (3) failure to settle or engage in settlement discussions of the Underlying Action when
23  there was a substantial likelihood that Plaintiffs would recover an amount in excess of the Policies'
24  limits, the Insured was damaged in the sum of $2,671,000 together with interest thereon at the legal rate.

25                              **SECOND CAUSE OF ACTION**

26  **(Breach of the Implied Covenant of Good Faith and Fair Dealing against CNA and Does 1-50)**

27      21.    Plaintiffs reallege and incorporate by reference the allegations of paragraphs 1 through
28  20 of the Complaint as set forth above.

22. The above and below-described actions of CNA and Does 1-50 ("Defendants"), and each of them, constitute Breach of the Implied Covenant of Good Faith and Fair Dealing.

23. There is implied in every contract a covenant by each party not to do anything which will deprive the other party thereto of the benefits of the contract. This would include an implied obligation to reasonably investigate all claims, to respond to requests to defend, to defend all claims and to settle all claims that may result in an amount in excess of the policy limits. In addition, this covenant not only imposes upon each party the duty to refrain from doing anything that would render performance of the contract impossible by any act of his own, but also to do everything that the contract presupposes will be done to accomplish the purpose of the contract.

24. Plaintiffs are informed and believe, and thereon allege, that the Defendants breached the obligation to act fairly and in good faith toward the Insured by engaging in some or all of the following acts or omissions:

a. Defendants failed to fully and fairly investigate claims arising under the Insured's Policies.

b. Defendants failed to acknowledge and act reasonably promptly upon communications with respect to claims arising under the Insured's Policies.

c. Defendants, with full knowledge of the potentially catastrophic effect of a large judgment on the Insured, and in complete disregard of the likelihood of a judgment being entered against the Insured far in excess of the Policies' limits, refused to settle within policy limits despite its reasonable opportunities to do so. Plaintiffs are informed and believe, and thereon allege, that Defendants, in refusing to consider those settlement opportunities, were motivated by a dishonest intent to deprive the Insured of its benefits under the Policies, including the benefit of Defendants' duty to consider settlement of the action to avoid the possibility of catastrophic excess liability being imposed on the Insured.

d. Defendants were fully aware of the Insured's interest in avoiding the catastrophic effect of a judgment far in excess of the Policies' limits and that such a judgment was likely, but nevertheless refused all reasonable opportunities to settle the action. Plaintiffs are informed and believe, and thereon allege, that Defendants, in refusing to consider those settlement opportunities, did not consider the Insured's interest in avoiding an excess judgment to be as important as Defendants' interest in reducing

1    liability to below the Policies' limits.

2        e.    Defendants knew, or in the exercise of reasonable care in investigation should have

3    known, that there was a considerable likelihood that the Insured would be found liable, and that the

4    resultant damages would probably greatly exceed the Policies' limits. Despite the existence of facts

5    indicating that a large excess judgment was likely, Defendants did not settle the action when it had the

6    reasonable opportunity to do so. Had Defendants exercised due care in settling the action, the possibility

7    of an excess judgment may have been precluded.

8        25.    Plaintiffs are informed and believe, and thereon allege, that Defendants have breached

9    the duty of good faith and fair dealing owed to the Insured by other acts or omissions of which the

10    Plaintiffs are presently unaware. Plaintiffs will seek leave of the Court to amend this Complaint at such

11    time as they discover the other acts or omissions of Defendants constituting such breach.

12        26.    As a direct and proximate result of the aforementioned wrongful conduct of Defendants,

13    the Insured became personally liable to the Plaintiffs in the amount of $2,671,000 together with interest

14    thereon at the legal rate. This judgment has not been satisfied.

15        27.    In committing the alleged acts, Defendants acted with oppression, fraud, and malice. All

16    the alleged acts were performed or ratified by Defendants' managerial employees, who acted with

17    knowledge that Defendants' conduct would cause the Insured harm. Plaintiffs are therefore entitled to

18    recover punitive damages.

19                            **THIRD CAUSE OF ACTION**

20                    **(Declaratory Relief against CNA and Does 1-50)**

21        28.    Plaintiffs reallege and incorporate by reference the allegations of paragraphs 1 through

22    27 of the Complaint as set forth above.

23        29.    The above and below-described actions of CNA and Does 1-50 ("Defendants"), and each

24    of them, necessitate Declaratory Relief.

25        30.    An actual controversy has arisen and now exists relating to the rights and duties of the

26    parties herein in that Plaintiffs contend that Defendants have breached the Policies by (1) failing to and

27    refusing to undertake any investigation of the Occurrence; (2) failing to defend or respond to a proper

28    request to defend the Insured; and (3) failing to settle or engage in settlement discussions of the

1 | Underlying Action when there was a substantial likelihood that Plaintiffs would recover an amount in

2 | excess of the Policies' limits, whereas Defendants, through their refusal to respond, appear to contend

3 | that the Policy does not cover the Occurrence.

4 |      31.    Plaintiffs now desire a judicial determination of their rights and duties, and a declaration

5 | as to which party's interpretation of the Policies are correct.

6 |      32.    A judicial declaration is necessary and appropriate at this time under these circumstances

7 | in order that Plaintiffs may ascertain its rights and duties vis-à-vis the Policies.

8 |

9 | **PRAYER**

10 |      1.    For the sum of $2,671,000, together with interest thereon at the legal rate from June 28,

11 | 2007 until paid;

12 |      2.    For exemplary damages;

13 |      3.    For attorneys' fees;

14 |      4.    For a declaration that the Occurrence fell under the Policies and that as Defendants failed

15 | to settle within the Policies' limits, Defendants are liable for the entire judgment of $2,671,000;

16 |      5.    For costs of suit herein incurred; and

17 |      6.    For such other and further relief as the Court may deem proper.

18 | Dated: February 11, 2008.                   Clapper, Patti, Schweizer & Mason

19 |

20 |                                         By:

21 |                                         Jack K. Clapper, Esq.
                                        Steven J. Patti, Esq.

22 |                                         Christine A. Renken, Esq.
                                        Attorneys for Plaintiffs

23 |

24 |

25 |

26 |

27 |

28 |

EXHIBIT A



# RICHARD J. NEUTRA · F.A.I.A.

### IN COLLABORATION WITH LOCKARD, CASAZZA & PARSONS

#### and ASSOCIATES, ARCHITECTS & ENGINEERS

WEST FIRST ST. • RENO, NEVADA • PHONE FA 2-9475

June 6, 1964

Washoe County Fair and [Recreation]
P. O. Box 837
Reno, Nevada

Subject:   Reno-Sparks Arena-Convention Hall
           Reno, Nevada

Gentlemen:

We are enclosing the following certificates of insurance for the
subject project:

        Comprehensive Liability Insurance:

                Ecklund Insulation, Inc.
                1400 Montello Street
                Reno, Nevada

                Geremia Concrete
                1327 - 65th Street
                Sacramento, California

      Workmen's Compensation*:

                Cupples Products Corp.
                1450 Rincon Street
                Corona, California

    * In lieu of the N.I.C. Certificate

                Very truly yours,

                RICHARD J. NEUTRA, F.A.I.A.
                In Collaboration with
                LOCKARD, CASAZZA & PARSONS AND
                ASSOCIATES, ARCHITECTS & ENGINEERS

                By *Mary Johnson*
                    Mary Johnson, Secretary

1 cc
3 cc Stolte Inc.
1 cc Project Engineer

E. KEITH LOCKARD, A.I.A., Manager  •  RALPH CASAZZA, A.I.A.  •  EDWARD S. PARSONS, A.I.A.  •  PETER G. GUISTI, C.E.



### CERTIFICATE OF INSURANCE

GLENS FALLS INSURANCE COMPANY. Glens Falls N Y
KANSAS CITY FIRE & MARINE INS CO . Kansas City Mo

NAME AND ADDRESS OF INSURED
**ECKLUND INSULATION, INC., 1400 MONTELLO STREET, RENO, NEVADA**

LOCATION OF OPERATIONS TO WHICH THIS CERTIFICATE APPLIES
**RECREATION CENTER, RENO, NEVADA**

McNEILL - McNEAR
Real Estate-Insurance
1195 So. Wells Ave.
Reno, Nev.-Ph.: FA 3-3167

DESCRIPTION OF OPERATIONS OR AUTOMOBILES
**PIPE AND DUCT INSULATION**

This certifies that the policies of insurance described below have been issued and are in force. The insurance afforded is only with respect to the coverages indicated by specific limits of liability and is subject to all the terms of the policy having reference to those coverages. If such policies are canceled or changed, written notice will be mailed to the party to whom this certificate is issued, **10 days prior to such change or cancellation**

STOLTE, INC.
501 N. VIRGINIA STREET
RENO, NEVADA

← NAME AND ADDRESS OF PARTY TO
WHOM THIS CERTIFICATE IS ISSUED

| POLICY NUMBER | EXPIRATION DATE | BODILY INJURY each person | each accident | | PROPERTY DAMAGE each accident | aggregate | KIND OF INSURANCE |
|---|---|---|---|---|---|---|---|
| | | $ | $ | x x x | $ | $ | Manufacturers or Contractors Liability |
| | | $ | $ | x x x | $ | $ | Owners/Contractors Protective Liability |
| | | $ | $ aggregate | $ | $ | Products Liability |
| | | $ | $ | x x x | $ | $ | Contractual Liability |
| | | $ | $ | x x x | $ | x x x | Owners, Landlords & Tenants Liability |
| | | $ | $ | x x x | $ | x x x | Automobile Liability |
| PCL 50-09-99 | 11/14/66 | $ 100,000. | $300,000. | $300,000. aggregate | $ 10,000. each accident | $ 25,000. aggregate | Comprehensive General Liability |
| PCL 50-09-99 | 11/14/66 | $ 100,000. | $300,000. | x x x | $ 10,000. each accident | x x x | Comprehensive Automobile Liability |
| | | $ | $ aggregate | $ | $ aggregate | |
| | | As provided by the Workmen's Compensation Law of the State(s) of | | | | | Workmen's Compensation |

DATE SIGNED
**June 4, 1964**

SIGNATURE OF AUTHORIZED REPRESENTATIVE

Form 10209  Rev 11-62   *Applies to the Products Hazard only. Absence of an entry means the Products Hazard is not insured

EXHIBIT $\mathcal{B}$

1  Jack K. Clapper, (State Bar No. 83207)
   Steven J. Patti, (State Bar No. 163773)
2  Clapper, Patti, Schweizer & Mason
   Marina Office Plaza
3  2330 Marinship Way, Suite 140
   Sausalito, CA 94965
4  Telephone: (415) 332-4262
   Facsimile: (415) 331-5387
5
   Attorney for Plaintiffs
6

7

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9        CITY AND COUNTY OF SAN FRANCISCO - UNLIMITED CIVIL JURISDICTION

10

11  FRANKLIN HAM and DANA HAM,              )  Case No. 455063
                                           )
12           Plaintiffs,                   )  PLAINTIFFS' TRIAL BRIEF IN SUPPORT OF
                                           )  REQUEST FOR ENTRY OF DEFAULT
13  v.                                     )  JUDGMENT; DECLARATION OF STEVEN J.
                                           )  PATTI; PLAINTIFFS' REQUEST FOR
14  ACCO-AIR CONDITIONING COMPANY et       )  JUDICIAL NOTICE
    al,                                    )
15                                         )
             Defendants.                   )
16  _____       )  Date: June 28, 2007
                                              Time: 10:00 a.m.
17                                            Dept: 502

18                          I. __Procedural Background__

19        This is an action for personal injuries and loss of consortium. The plaintiffs are Franklin and

20  Dana Ham, husband and wife. On August 11, 2006, their complaint was filed alleging that Mr. Ham

21  sustained injuries as a result of his occupational exposure to asbestos. He named several defendants,

22  including several DOE defendants, in the complaint. On August 29, 2006, plaintiffs filed an

23  amendment to the complaint substituting the true name of Ecklund Insulation, Inc. (hereinafter

24  "Ecklund Insulation") for the Eleventh Doe. The complaint as amended alleges that Ecklund

25  Insulation is liable to plaintiffs for damages arising out of Mr. Ham's injuries and Mrs. Ham's loss of

26  consortium. Plaintiffs allege that Ecklund Insulation sold asbestos-containing products and

27  performed work as a contractor that exposed Mr. Ham to asbestos dust, thereby causing his injuries.

28  Plaintiffs' causes of action alleged against Ecklund Insulation include negligence and strict products

CPSM
2330 Marinship Way, #140
Sausalito, CA 94965
(415) 332-4262

PLAINTIFFS' TRIAL BRIEF IN SUPPORT OF REQUEST FOR ENTRY OF DEFAULT JUDGMENT; DECLARATION OF STEVEN J. PATTI; PLAINTIFFS'
REQUEST FOR JUDICIAL NOTICE

1  liability (design defect and failure to warn). Along with the summons and complaint plaintiffs
2  served Ecklund Insulation with a Statement of Damages, which specified that plaintiffs sought
3  compensatory damages in this action totaling $18,500,000. (See Plaintiffs' Request for Judicial
4  Notice.)

5       Ecklund Insulation is a defunct Nevada corporation. Its charter was revoked in the State of
6  Nevada in 1981, but the corporation has never dissolved. (See Exhibit A to the Declaration of
7  Steven J. Patti ("SJP Decl").) Plaintiffs served Ecklund Insulation with the summons and complaint
8  in this action by personally serving its President, Jerry Ecklund, at his home in Allyn, Washington.
9  (See Exhibit B to SJP Decl.) Although Mr. Ecklund apparently tendered the defense of the lawsuit
10 to the CNA Insurance Companies (see Exhibit C to SJP Decl.), no responsive pleading was ever
11 filed on behalf of Ecklund Insulation. Upon plaintiffs' request, the Clerk of the Court entered default
12 against Ecklund Insulation on November 30, 2006. (See Request for Judicial Notice.) Plaintiffs
13 provided notice to Jerry Ecklund---and to Richard Solski of CNA insurance---of the Request for
14 Entry of Default and of all hearings, trial dates, court orders and depositions taken in this matter.
15 Most recently, plaintiffs provided Mr. Ecklund and CNA insurance with notice of the instant Default
16 Prove-up Hearing, which stated that a judgment would be sought against Ecklund Insulation in this
17 matter. (See Exhibit D to SJP Declaration.)

18                                    II. <u>Standard of Proof.</u>
19      The correct standard of proof in a default prove-up setting requires that the plaintiff merely
20 establish a prima facie case. *Johnson v. Stanhiser* (1999) 72 Cal.App. 4th 357, 361. "Generally
21 speaking, the party who makes default thereby confesses the material allegations of the complaint.
22 [Citation.] It is also true that *where a cause of action is stated* in the complaint and evidence is
23 introduced to establish a prima facie case the trial court may not disregard the same, but must hear
24 the evidence offered by the plaintiff and must render judgment in his favor for such sum, not
25 exceeding the amount stated in the complaint...as appears from the evidence to be just." *Id.*, quoting
26 *Taliaferro v. Damvis* (1963) 216 Cal.App.2d 398, 408-409 (original italics). In *Johnson,* the court
27 held that the trial court incorrectly applied a preponderence of the evidence standard, and ordered the
28 court to reconsider the issue of damages after the trial court declined to award damages to the

CPSM
2130 Marinship Way, #140
Sausalito, CA  94965
(415) 332-4262

PLAINTIFFS' TRIAL BRIEF IN SUPPORT OF REQUEST FOR ENTRY OF DEFAULT JUDGMENT; DECLARATION OF STEVEN J. PATTI. PLAINTIFFS'
REQUEST FOR JUDICIAL NOTICE
                                                        2

1  plaintiff.

2

3                        III.  **Statement of Facts**

4        Franklin and Dana Ham have been married for 48 years.  He is 74 years old and she is 67.
  They reside in Yerington, Nevada.  They have two daughters and a son.  Mr. Ham was a remarkably

5  healthy and active man before his diagnosis of mesothelioma.  He is a lifetime non-smoker, apart

6  from two years when he served in the navy.  He was in the process of building a solar-powered home

7  made of straw bales and other recycled materials when he was diagnosed with malignant pleural

8  mesothelioma in July of 2006.  Malignant pleural mesothelioma is a terminal disease.  Mr. Ham was

9  told by his treating physician that he could expect to live from six to eighteen months from the time

10  of his diagnosis.

11    1.    **Mr. Ham's Exposure**

12        The only established cause of mesothelioma in the United States is occupational exposure to

13  asbestos.  Mr. Ham had asbestos exposure over his long career as a plumber and pipe fitter.  After

14  serving as a cook for three years in the United States Navy, he began in the plumbing trade in

15  approximately 1957.  From 1963 to 1973, he lived in the Reno area and worked for several different

16  employers at job sites in Nevada and Northern California where he installed plumbing and heating

17  systems.  Much of his work was in mechanical rooms where he installed boilers and other high-heat

18  equipment.  This work was often done in the proximity of insulation contractors who would install

19  rigid split asbestos pipe covering and dry asbestos cement on pipes, boilers and fittings

20        Mr. Ham testified that, during the 1963 to 1973 period, he became familiar with three

21  insulators in particular because of the large number of jobs at which he saw them: Bill Brokavich,

22  Lonnie Treadway and Ernie Schoppe.  Mr. Ham stated that these insulators performed almost all of

23  their work for Jerry Ecklund of Ecklund Insulation.  Mr. Ham also became familiar with Jerry

24  Ecklund, whom he would see on jobs.  Mr. Ecklund brought the asbestos insulation materials that

25  the other three would work with in Mr. Ham's presence.  Their work caused Mr. Ham to be exposed

26  to asbestos dust from the mixing of the dry cement with water and from the cutting of the rigid split

27  asbestos pipe covering.  This work occurred in confined spaces that Mr. Ham shared with the

28  insulators, so that he would be forced to breathe the dust.  The Ecklund Insulators never warned him

1    about the hazards inherent in breathing the dust from their work, or took precautions to protect him

2    from the dust. (See Plaintiffs' Deposition of Franklin Ham at 49:17 to 53:1, Exhibit E to SJP Decl.).

3        During the defense portion of his deposition, Mr. Ham testified about a number of specific

4    projects during which he recalled working with Ecklund Insulation workers as they exposed him to

5    asbestos dust by their use of rigid split asbestos pipe covering and dry asbestos cement. In particular,

6    he recalled working in the same room with Ecklund Insulation workers at the Washoe Medical

7    center in the 1959-1964 when he was employed by Johnson Controls. The Ecklund Insulators used

8    asbestos insulation materials to cover pipes. (See Deposition of Franklin Ham at 469:24 to 472:15,

9    Exhibit E to SJP Decl.). He also recalled working with Ecklund insulators on another Johnson

10   Controls job at the University of Nevada Reno's girls' dormitory during the same period. Again, the

11   Ecklund insulators used asbestos cement and split pre-formed asbestos pipe covering. (See id. at

12   845:7 to 847:23.) Mr. Ham also recalled working with Ecklund Insulators on the new construction

13   of the University's sports complex during the 1959 to 1964 period. He worked in the same

14   mechanical room with Ecklund Insulators as they used asbestos-containing insulation materials.

15   (See id. at 855:2 to 858:25)

16       Mr. Ham also recalled working under similar circumstances with Ecklund Insulation at the

17   Nugget Casino during the 1959 to 1964 period. (See Deposition of Franklin Ham at 529:3 to

18   538:21). At the Nugget, he specifically recalled that the Ecklund Insulators suppled and used Kaylo

19   high temperature insulation. (See id. at 531:21 through 540:5). Kaylo insulation was, at the time,

20   an Owens Corning Fiberglas product that contained 15% asbestos. (See Request for Judicial Notice,

21   EPA product information published in accordance with Asbestos Information Act, at 55 Federal

22   Register 5144(20).)

23       From 1972 to 1973, Mr. Ham worked for a plumbing contractor called H.L. Murphy (See

24   Social Security records of Franklin Ham, at Exhibit F to SJP Decl.) Mr. Ham testified that Murphy

25   subcontracted almost all of his insulation work to Ecklund Insulation. (See Deposition of Franklin

26   Ham at 722:2-13, Exhibit E to SJP Decl.) Mr. Ham worked with Ecklund Insulators as they created

27   dust from their use of asbestos products at the Colonial Motor Lodge during the 1972 to 1973 period,

28   when he was employed by H.L. Murphy. (See id. at 695:21 to 702:16.) Mr. Ham worked for

CPSM
2150 Marmebip Way, #140
Sausalito, CA  94965
(415) 332-4262

PLAINTIFFS' TRIAL BRIEF IN SUPPORT OF REQUEST FOR ENTRY OF DEFAULT JUDGMENT; DECLARATION OF STEVEN J. PATTI; PLAINTIFFS'
REQUEST FOR JUDICIAL NOTICE

4

1    Murphy during the same period on the construction of the Park & Walk hotel, where he also worked

2    in the presence of Ecklund insulators who were creating dust with asbestos products. (See id. at

3    708:3 to 711:6.) He recalled working at Titanium West in the early 1970's, where he spent three or

4    four days in the presence of Ecklund insulators who were installing insulation. (See id. at 713:9-

5    715:25.) Mr. Ham worked at the Overland Hotel in Reno on an H.L. Murphy remodel job where

6    Ecklund Insulation workers used asbestos insulation materials in his presence. (See id. at 719:7 to

7    725:15.)

8         Jerry D. Ecklund, President of Ecklund Insulation signed a declaration for this case (an

9    admission of a party within the meaning of Evidence Code § 1220). (See Declaration of Jerry D.

10   Ecklund at Exhibit G to SJP Decl.) In it, he states that his company was engaged in both the

11   installation and the sale of insulation from the 1960's through 1977. He states that his company

12   installed asbestos-containing rigid split pipe insulation and asbestos-containing insulating cement.

13   He confirms that Bill Brokavich, Lonnie Treadway and Ernie Schoppe were in fact employed by his

14   company. Mr. Ecklund recalls working with Frank Ham, whom he recalls as an instrument tech and

15   plumber who worked on jobs in the Reno during the 1964 to 1977 time period. Moreover, Mr.

16   Ecklund recalls installing asbestos rigid split pipe insulation and asbestos insulating cement on job

17   sites during this period where Mr. Ham was present. He identified several job sites that he had in

18   common with Mr. Ham, at which Ecklund installed asbestos insulating products: Fallon Naval Air

19   Station, Proctor Hug High School, Harvey's Wagon Wheel Casino, Harold's Club Casino, Harrah's

20   Casino, University of Nevada-Reno and St. Mary's Medical Center. (See Declaration of Jerry D.

21   Ecklund at Exhibit G to Patti Decl.)

22   2.    <u>Liability and Causation</u>

23         Allan Smith is a Professor of Epidemiology at the U.C. Berkeley School of Public Health.

24   He testified in deposition in this case that Mr. Ham's mesothelioma is caused by exposure to

25   asbestos. (See Deposition Excerpt and Curriculum Vitae of Allan Smith at Exhibit H to Patti

26   Declaration.) Barry Horn, M.D., is a board-certified pulmonary specialist who testified on behalf of

27   plaintiffs in deposition in this case. He testified that his opinions in the case are summarized in his

28   report, which was attached to the deposition as an exhibit. In the report, he states that he reviewed

CPSM
2130 Mariposa Way, #140
Sausalito, CA 94965
(415) 332-4262

PLAINTIFFS' TRIAL BRIEF IN SUPPORT OF REQUEST FOR ENTRY OF DEFAULT JUDGMENT; DECLARATION OF STEVEN J. PATTI; PLAINTIFFS'
REQUEST FOR JUDICIAL NOTICE
5

1  Mr. Ham's medical records and pathology reports, and he confirms the diagnosis of malignant

2  pleural mesothelioma. He states that Mr. Ham's illness is incurable, and that he will die from the

3  disease. He states that, after reviewing Mr. Ham's deposition testimony, it is clear that he had "both

4  direct and bystander exposure to asbestos." He specifies that Mr. Ham was exposed to asbestos,

5  "when insulators were installing molded insulation and mixing up asbestos cement." He states that

6  Mr. Ham's asbestos exposure is confirmed pathologically by the presence of pleural plaques.

7  Finally, he opines that, "All of Mr. Ham's asbestos exposure should be considered a contributing

8  factor in the development of his malignancy."

9      An expert called by one of the defendants in the case, Industrial Hygienist Joel Cohen, opined

10  about the relative importance of Mr. Ham's various exposures. He testified that, "Mr. Ham's

11  greatest likelihood of what I'll refer to as significant exposure would have occurred from his work or

12  the work of others handling half-round type insulation material by far...." (See Deposition of Joel

13  Cohen at 19:3-9, Exhibit I to SJP Decl.)

14      Dr. Horn also testified about the medical and scientific "state of the art" concerning asbestos

15  hazards at his deposition. He defined this testimony as encompassing, "what was knowable to

16  anyone who would have been interested based upon what was published in the medical literature."

17  (Deposition of Barry Horn at 13:10-19, Exhibit J to SJP Decl.) He stated that, although much of the

18  relevant literature was medical in its focus, "there's plenty of literature that nonphysicians could

19  certainly understand." (Id. at 14:15-20.) Dr. Horn reviewed a vast array of such literature at his

20  deposition, going back to a 1918 publication by Hoffman which stated that the insurance industry

21  had already recognized the problem of asbestosis. (Id. at 20:8-13.) By 1924, an article by Cooke in

22  the *British Medical Journal* reported on a fatal case of asbestosis. Cooke wrote another article in

23  1927 in which he coined the term "asbestosis," and in the late 20's several more reports of asbestosis

24  appeared in the literature. (Id. at 21:7 - 17.)

25      In 1930 Merewether published a landmark study in the *Journal of Industrial Hygiene* looking

26  at the incidence of asbestosis among a population of asbestos workers. Also in 1930, Lynch and

27  Smith reported on four cases of asbestosis in the *Journal of the American Medical Association*. This

28  was widely distributed throughout the United States. In the same year, Wood and Gloyne published

CPSM
255G Marinship Way, #140
Sausalito, CA 94965
(415) 332-4262

PLAINTIFFS' TRIAL BRIEF IN SUPPORT OF REQUEST FOR ENTRY OF DEFAULT JUDGMENT; DECLARATION OF STEVEN J. PATTI; PLAINTIFFS' REQUEST FOR JUDICIAL NOTICE.

6

1   an article on the clinical presentation of asbestosis, what caused the disease, the symptoms people

2   had, and how asbestosis could be prevented. According to Dr. Horn, the information in the Wood

3   and Gloyne article would still be valid if presented in a textbook today. (See Deposition of Barry

4   Horn at 23:1-25:12, Exhibit J to SJP Decl.)

5          After 1930, the publications concerning asbestos continued to mushroom, with epidemiologic

6   studies looking at the incidence of disease in various asbestos-exposed populations, including Lynch

7   and Smith (1935) and Dreesen (1938). Both Dreesen and Lynch and Smith wrote about how to

8   prevent asbestos diseases from occurring. By the late 30's, case reports were published of lung

9   cancer in asbestos workers. By 1944 Gloyne published the results of Dr. Wedler's research in

10  Germany. Dr. Wedler published a number of reports of lung cancer in individuals with asbestos

11  exposure. In 1949, a monograph was published in the *Journal of the American Medical Association*

12  linking lung cancer to asbestos exposure. By 1955 Sir Richard Doll had written his article

13  establishing the link between lung cancer and asbestos exposure epidemiologically. By 1960

14  Wagner had written his article establishing the link between asbestos and mesothelioma. Then, in

15  1964, Dr. Irving Selikoff held his international conference in New York City, the proceedings of

16  which were published in 1965, on the incidence of mesothelioma and lung cancer in insulators.

17  (Deposition of Barry Horn at 26:1-33:17, Exhibit J to SJP Decl.) By the mid-1960's, according to

18  Dr. Horn, the state-of-the-art with regard to asbestos disease was completely developed, and there

19  were no significant developments that occurred thereafter. (Id. at 33:18-22.)

20         At least as early as 1949, California's Division of Industrial Safety enacted General Industry

21  Safety Orders that governed the handling of hazardous dusts, including asbestos, in the workplace.

22  They required employers handling asbestos at potentially harmful levels to employ general

23  ventilation, local exhaust ventilation, isolation of dusty work, wetting down the work are to control

24  dust and substitution of nonhazardous material to prevent harmful exposures. Where such control

25  measures were impossible or impracticable, respiratory protection equipment was to be supplied and

26  worn. Workers potentially exposed to exposed to hazardous dust were to be trained in the use of

27  such equipment, and were to be provided with change rooms and sanitation facilities to prevent them

28  from taking hazardous dusts home on their person. Asbestos was specifically listed in the

LPSM
2112 Morsehay Way, #140
Sausalito, CA 94965
(415) 332-4262

1  regulations one such hazardous dust to which the rules applied.  These rules were in effect through

2  the 1960's.  (See California Division of Industrial Safety General Industry Safety Orders, Title 8,

3  §§4100 et seq., attached to Request for Judicial Notice.)

4      No one from Ecklund Insulation ever warned Mr. Ham about the potential hazards of

5  exposure to the insulation products the company sold and installed.  (Deposition of Franklin Ham at

6  52:23-53:1, Exhibit E to SJP Decl.)  Nor did Ecklund Insulation take steps to protect Mr. Ham from

7  exposure to dust from their work.  Nor did they employ wet-down, isolation, ventilation or the use of

8  respiratory equipment to prevent workers such as Mr. Ham from being exposed.  Mr. Ham testified

9  in his deposition that he had no expectation that the asbestos products on his job sites could cause

10  him to develop cancer.  (See Id. at 65:7-15.)

11  3.      **Damages**

12          A. **Economic Damages**

13      Barry Ben-Zion, PhD., a Professor of Economics at Sonoma State University, testified in this

14  case about his analysis of Mr. Ham's economic damages.  His analysis was based upon a review of

15  documentation concerning Mr. Ham's income from pension and social security benefits, and upon

16  published data estimating the value of home services rendered by retired married men.  Dr. Ben-Zion

17  prepared a report that summarized his findings.  The components of economic damage that he

18  evaluated were future loss of Social Security retirement income ($171,700, reduced to present

19  value), future loss of union pension ($78,000), future loss of Sierra Pacific Power Company pension

20  ($77,575), and past and future loss of home services ($114,550).  All of these amounts reflect a

21  reduction of the real figures to actuarial present value.  Thus, the total economic damages calculated

22  by Dr. Ben-Zion are $441,825.  (See excerpts from Deposition of Barry-Ben Zion, attached report

23  and supporting documents, Exhibit K to SJP Decl.)  Dr. Ben-Zion's report states that his report does

24  not address Mr. Ham's past and future medical expenses, which are additional components of his

25  economic loss.

26      Dr. Barry Horn testified about the value of medical treatment that Mr. Ham was reasonably

27  likely to require in the future relating to his mesothelioma.  He estimated these costs at between

28  $75,000 and $150,000.  (Deposition of Barry Horn, p. 66, at Exhibit J to SJP Decl.)  Dr. Ben-Zion

CPSM
2130 Mainship Way, #140
Sausalito, CA 94965
(415) 332-4262

PLAINTIFFS' TRIAL BRIEF IN SUPPORT OF REQUEST FOR ENTRY OF DEFAULT JUDGMENT; DECLARATION OF STEVEN J. PATTI; PLAINTIFFS'
REQUEST FOR JUDICIAL NOTICE

8

1    explained that, due to the fact that the increase in the costs of health care over time will likely exceed

2    the short term interest rate, no discount of those future costs to present value is necessary.

3    (Deposition of Barry Ben-Zion at p. 18:11-19:15.) Plaintiffs' bills for past medical expenses relating

4    to his mesothelioma total over $79,500. (See Summary and Copies of Medical Bills, at Exhibit L to

5    SJP Decl.) Thus, Mr. Ham has established **$671,000 in total economic damages.**

6        **B.  Non-economic Damages**

7        Mr. Ham's non-economic damages are related to his pain, discomfort, fears, anxiety, loss of

8    enjoyment of life and other mental and emotional distress caused by his mesothelioma. See CACI

9    3905 A. Mesothelioma is an exceptionally painful and unpleasant disease. Dr. Horn testified that

10   the disease is terminal. There is no cure. Mesothelioma will kill Mr. Ham. Mr. Ham testified that

11   he has been advised by his doctors that he has a life expectancy of between 6-18 months from

12   diagnosis. (Deposition of Franklin Ham at 72:12-23, Exhibit E to SJP Decl.) His tumor, which first

13   occurs in the pleura (the lining of the lung), will eventually grow to the point where it

14   circumferentially involves the lung, trapping and crushing the lung tissue to the point where the lung

15   cannot become oxygenated. As a result, Mr. Ham can expect to experience increasing shortness of

16   breath, essentially a slow suffocation.

17       Dr. Horn has testified in the past about the extreme physical pain that a mesothelioma patient

18   can expect to experience as a result of the tumor growing in the chest wall, which eventually

19   involves the sensitive nerve roots between the ribs. The tumor contacts and irritates the nerves, and

20   as a result Mr. Ham will have increasing pain and will require increasing doses of narcotics over

21   time. Moreover, as the tumor gets larger it will consume more and more of Mr. Ham's resources and

22   energy. He will lose weight, he will lose muscle mass, and eventually will be able to do less and less

23   for himself, requiring care 24 hours a day, 7 days a week. (Deposition of Dr. Barry Horn in Rebecca

24   and Jess Soria, San Francisco Superior Court No. 429989, p. 33:22 - 35:10, at Exhibit M to SJP

25   Decl.)

26       Mr. Ham testified to already having experienced some of the physical pain and suffering that

27   Dr. Horn predicts. Before being diagnosed he experienced constant fatigue and nagging pain in the

28   right lung and chest wall. This was upsetting to him, as he had always been active and in excellent

CPSM
2130 Marrship Way, #140
Sausalito, CA 94965
(415) 332-4262

PLAINTIFFS' TRIAL BRIEF IN SUPPORT OF REQUEST FOR ENTRY OF DEFAULT JUDGMENT; DECLARATION OF STEVEN J. PATTI; PLAINTIFFS'
REQUEST FOR JUDICIAL NOTICE

9

1   health.  Although he made repeated trips to doctors in the months leading up to his diagnosis, they
2   could not find what was wrong.  (Deposition of Franklin Ham at 67:18-67:21, Exhibit E to SJP
3   Decl.)  Eventually, he had surgery in the form of a CT-guided biopsy, which itself was painful.  That
4   surgery led to Mr. Ham's diagnosis.  After the CT-guided biopsy he had a thoracentesis, which
5   involved multiple biopsies of the lymph nodes.  Emotionally, being diagnosed with mesothelioma
6   was devastating to both Mr. and Mrs. Ham.  (Deposition of Franklin Ham at 70:15-73:8, Exhibit E to
7   SJP Decl.)  Chemotherapy was recommended to Mr. Ham as the only available treatment.  He
8   underwent chemotherapy beginning in October of 2006.  The treatment causes him extreme nausea
9   and weakness, which lasts for at least three days.  (Deposition of Franklin Ham at 75:1-76:8, Exhibit
10  E to SJP Decl.)  He also experiences inability to eat, severe pain and constipation following the
11  chemotherapy.  (Deposition of Dana Ham at 25:14-18, Exhibit N to SJP Decl.)
12          Mr. Ham's mesothelioma has permanently and dramatically changed the quality of the Hams'
13  lives.  Before the disease, Mr. Ham was active and helpful, performing home maintenance,
14  housework and cooking in the household.  His primary avocation, however, was building their home,
15  which consumed about 40 or 50 hours of his time each week.  The home was planned as an
16  alternative, "green" residence made of straw bales and heated and powered using solar panels.  As
17  explained by Mrs. Ham, their plans for the home were inspired by their dream of "living a better
18  way."  Mr. Ham himself had done the underground wiring, the septic system, the rebar and the hay
19  bale construction.  (Deposition of Dana Ham at 16:8-18, and 26:13-27:8 Exhibit N to SJP Decl.)
20  Mrs. Ham explained that Mr. Ham, "loves to make things and do things, build things.  It makes him
21  very happy."  He recently helped his son Eric build his house in Winnemuca, Nevada.  Mr. Ham did
22  all of the electrical work and the heating system installation.  Mr. Ham even derived satisfaction
23  from helping neighbors and friends with electrical, piping and plumbing projects.  Since his
24  diagnosis, however, he has been unable to do household chores, unable to work on the house, and
25  unable to build things.  (Id. at 30:9-32:16.)
26          Before Mr. Ham became sick he and Mrs. Ham enjoyed raising and riding their Arabian
27  horses.  They enjoyed taking walks together and traveling around the country.  Mr. Ham was an avid
28  fisherman and hunter.  In terms of their future, they planned to travel to Australia for an outback

LPSM
2130 Maraship Way, #140
Sausalito, CA  94965
(415) 332-4262

PLAINTIFFS' TRIAL BRIEF IN SUPPORT OF REQUEST FOR ENTRY OF DEFAULT JUDGMENT; DECLARATION OF STEVEN J. PATTI; PLAINTIFFS'
REQUEST FOR JUDICIAL NOTICE
10

1  horseback riding tour, and Mr. Ham was looking forward to showing his wife some parts of the
2  United States that she had not yet seen. Now, however, Mr. Ham is unable to walk, or hike, ride,
3  fish or hunt.   The Hams' traveling plans are on permanent hold.  His day generally consists of the
4  following, according to Mrs. Ham: "He has no activities to speak of now...[He] goes out to the
5  house, builds a fire and does a lot of contemplating. He sits there. I leave him alone, let him do
6  what he wants to do, and that's pretty much it." (Id. at 27:24-28:5 and 32:2-16.)
7          Obviously, this has been devastating for both of them emotionally as well. Mr. Ham is
8  suffering from emotional trauma, according to his wife. He is frustrated by his inability to walk  or
9  work without shortness of breath or fatigue. (Id. at 28:25-29:5.) He has bouts of moodiness and
10  irritability, which was never the case before his diagnosis: "One minute he's as sweet as he's always
11  been and the next minute he's cantankerous and irritable." Mrs. Ham understands that this is a
12  consequence of the suffering Mr. Ham is undergoing with his illness: "I know what he's going
13  through. I know he wouldn't be that way if he could help it." (Id. at 27:6-23.)
14          In terms of the impact on her, Mrs. Ham explained how happy and appreciative she was of
15  her husband before his illness. "We had a great life together, and I thought about how lucky I was to
16  have him. And how–being a stupid teenager when I got married, how lucky I was that it turned out
17  so well. And I counted my blessings every day." (Id. at 29:6-23.) Now, her thoughts are consumed
18  with worries about how long Frank will be around, and she spends time praying for Frank rather than
19  counting her blessings. (Id. at 29:6-23.) She is no longer making any plans for her future with her
20  husband. Instead, Mrs. Ham explains, "I'm just living day to day and doing the best I can, and I'm
21  trying to be there for him." (Id. at 34:1-4.)

22                                    **IV.  Conclusion**

23          Plaintiffs have presented more than a prima facie case supporting their prayer for damages.
24  In fact, plaintiffs have presented the court with overwhelming evidence, including an admission from
25  the President of Ecklund Insulation, of Mr. Ham's exposure to the work, activities and products of
26  Ecklund Insulation. According to the medical experts proffered by plaintiffs, this exposure was a
27  cause of Mr. Ham's mesothelioma. According to at least one expert who was deposed, his exposure
28  to the sorts of products used by Ecklund Insulation was "far and away" his most significant.

CPSM
2741 Marenship Way, #140
Sausalito, CA 04965
(415) 332-4262

PLAINTIFFS' TRIAL BRIEF IN SUPPORT OF REQUEST FOR ENTRY OF DEFAULT JUDGMENT; DECLARATION OF STEVEN J. PATTI; PLAINTIFFS'
REQUEST FOR JUDICIAL NOTICE

11

1   Plaintiffs have presented evidence establishing economic damages in this case of $671,000.

2   Plaintiffs have also presented evidence of both Mr. and Mrs. Hams' extreme non-economic damages

3   and loss of consortium.  This evidence is sufficient to establish a prima facie case for the

4   $15,000,000 in non-economic damages prayed for in plaintiffs' Statement of Damages ($5,000,000

5   pain, suffering and inconvenience; $5,000,000 emotional distress; $5,000,000 loss of consortium),

6   which, in the absence of any kind of denial, should be awarded.   Thus, plaintiffs respectfully request

7   that the court enter judgment in favor of plaintiffs in the amount of $15,671,000.

8   Dated:  June 25, 2007.

9                                          Clapper, Patti, Schweizer & Mason

10

11                                         By: _____
                                               Steven J. Patti
12                                             Attorney for Plaintiff

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CPSM
2330 Marinship Way, #140
Sausalito, CA 94965
(415) 332-4262

PLAINTIFFS' TRIAL BRIEF IN SUPPORT OF REQUEST FOR ENTRY OF DEFAULT JUDGMENT; DECLARATION OF STEVEN J. PATTI; PLAINTIFFS'
REQUEST FOR JUDICIAL NOTICE

12

## PROOF OF SERVICE

I declare that I am employed in the County of Marin, California; I am over the age of eighteen years and not a party to the within action; my business address is 2330 Marinship Way, Suite 140, Sausalito, California 94965.

On June 26, 2007, I served PLAINTIFFS' TRIAL BRIEF IN SUPPORT OF REQUEST FOR ENTRY OF DEFAULT JUDGMENT; DECLARATION OF STEVEN J. PATTI; PLAINTIFFS' REQUEST FOR JUDICIAL NOTICE on the interested parties in this action by placing a true copy thereof, enclosed in a sealed box, all charges paid, addressed as follows:

ECKLUND INSULATION, INC.
Jerry D. Ecklund
141 E. Olympic Ct
Allyn, WA  98524

Richard J. Solski
Law Department
Environmental & Mass Tort Claims
CNA Plaza - 19 South
333 S. Wabash Avenue
Chicago, IL  60685

I am readily familiar with the business practice of my place of employment in respect to the collection and processing of correspondence, pleadings and notices for pick up and delivery by United Parcel Service.

The foregoing sealed box was placed for pick up and delivery this date consistent with the ordinary business practice of my place of employment, so that it will be picked up this date with all charges thereon fully paid with United Parcel Service at Sausalito, California, in the ordinary course of such business.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this declaration was executed on June 26, 2007, at Sausalito, California.

Lenette Lew