1     G. David Godwin, No. 148272             No. CV 08 1551 SC
    Raymond J. Tittmann, No. 191298
2     **CARROLL, BURDICK & McDONOUGH** LLP
    Attorneys at Law
3     44 Montgomery Street, Suite 400
    San Francisco, CA  94104
4     Telephone:    415.989.5900
    Facsimile:    415.989.0932
5     Email:       dgodwin@cbmlaw.com

6     Attorneys for Defendant
    The Continental Insurance Company
7

8                   UNITED STATES DISTRICT COURT

9                NORTHERN DISTRICT OF CALIFORNIA

10                     SAN FRANCISCO DIVISION

11

12     Franklin Ham and Dana Ham,         |  No. CV 08 1551 SC

13             Plaintiffs,           |  **DEFENDANT THE CONTINENTAL**
                                |  **INSURANCE COMPANY'S REQUEST**
14         v.                        |  **FOR LEAVE TO FILE REQUEST FOR**
                                |  **JUDICIAL NOTICE**
15     The Continental Insurance Company;  |
    and Does 1 through 50,           |  **[Civil L.R. 7-3(d)]**
16                            |
            Defendants.         |
17

18

19             Under Civil L.R. 7-3(d), Defendant The Continental Insurance Company

    ("Continental") hereby respectfully asks this Court for leave to file Defendant The
20

    Continental Insurance Company's Request for Judicial Notice in Support of Motion To
21

    Strike and Dismiss Certain Claims, attached as Exhibit 1 (Continental's "Request for
22

    Judicial Notice").
23

            Continental's Request for Judicial Notice seeks to provide certified copies[1] of
24

    the papers filed in the motion for summary judgment leading to the ruling by the District
25

26     ――――――――――――――――――――

27     [1] Continental has at its counsel's offices the original certified copies of the pleadings so
    that, if the request is granted, Continental may file in hard copy with the Court the original
    certified copies pursuant to General Order 48, Sec. VII (Manual Filing).  The attached e-
28     filed version obviously contains only copies of the certified copies.

of Nevada in *Pioneer Chlor Alkali Co. v. Nat'l Union*, 863 F. Supp. 1237 (D. Nev. 1994).

These papers will assist the Court with respect to the arguments in Continental's Reply

Brief[2] stating that *Pioneer* "ruled that Nevada's claims practices statute could apply to a

first-party insurance claim for contamination in Nevada. But first-party insurance claims

are vastly different from third-party insurance claims with respect to where the insurer is

asked to provide coverage. ... [T]he claims-handling in a first-party case concerns the site

of damage; in a third-party case it concerns the location of the underlying litigation."

Continental's Reply Brief at 15:7-21. The published opinion (*see Pioneer*, 863 F. Supp. at

1238-39) directly cites to these papers, which provide significantly more context to the

issues in that case than what is in the published opinion.

        Upon review of Plaintiffs' Opposition Brief[3], counsel for Continental

immediately commenced an inquiry to locate the briefs cited in *Pioneer*. This inquiry

soon led to The National Archives and Records Administration in Perris, California,

where counsel requested certified copies of the briefs cited in *Pioneer*. Counsel received

the final document requested today, July 15, 2008. Consequently, Continental had no

opportunity to submit these documents any earlier. Moreover, there is no prejudice to

submitting these documents at this time since the Court has taken the hearing date off

calendar.

---

[2] Continental's "Reply Brief" refers to Defendant The Continental Insurance Company's Reply Brief Supporting Motion To Strike Plaintiffs' Claim For Punitive Damages And To Dismiss Certain Claims, filed June 27, 2008.

[3] Plaintiffs' "Opposition Brief" refers to Plaintiffs' Opposition to Defendant The Continental Insurance Company's Motion To Strike Plaintiffs' Claim for Punitive Damages and To Dismiss Certain Claims, June 20, 2008.

1          Accordingly, Continental submits that good cause exists to permit leave to file

2  Continental's attached Request for Judicial Notice.

3

4      Dated:  July 16, 2008

5                           CARROLL, BURDICK & McDONOUGH LLP

6

7                         By_____

8                               G. David Godwin
                               Raymond J. Tittmann

9                   Attorneys for Defendant
                   The Continental Insurance Company

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

1 | G. David Godwin, No. 148272
2 | Raymond J. Tittmann, No. 191298
**CARROLL, BURDICK & McDONOUGH** LLP
3 | Attorneys at Law
44 Montgomery Street, Suite 400
San Francisco, CA  94104
4 | Telephone:    415.989.5900
Facsimile:    415.989.0932
5 | Email:    dgodwin@cbmlaw.com
rtittmann@cbmlaw.com
6 |
Attorneys for Defendant
7 | The Continental Insurance Company

8 | UNITED STATES DISTRICT COURT

9 | NORTHERN DISTRICT OF CALIFORNIA

10 | SAN FRANCISCO

11 | Franklin Ham and Dana Ham,

No. CV 08 1551 SC

12 | Plaintiff,

**DEFENDANT THE CONTINENTAL INSURANCE COMPANY'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION TO STRIKE AND DISMISS CERTAIN CLAIMS**

13 | v.

14 | The Continental Insurance Company; and Does 1 through 50, inclusive,

15 |
16 | Defendant.

17 |

18 | Defendant The Continental Insurance Company ("Continental") requests that

the Court take judicial notice of the following pleadings, pursuant to the doctrine as

19 | applied in *Holder v. Holder*, 305 F. 3d 854, 866 (9th Cir. 2002) (taking judicial notice of

20 | the pleadings filed at the trial court), in the matter of *Pioneer Chlor Alkali Co., Inc. v.*

21 | *National Union Fire Insurance Co. of Pittsburgh, Pa.*, Case No. CV-S-93-276-RLH (D.

22 | Nev.):

23 | Exhibit A:  Defendant's Notice of Motion for Partial Summary Judgment on

24 | the Issue of Alleged Bad Faith, filed June 17, 1994 (Docket # 164);

25 | Exhibit B:  Memorandum of Points and Authorities in Support of Defendant's

26 | Motion for Partial Summary Judgment on Plaintiff's Bad Faith Claims, filed June 17,

27 | 1994 (Docket # 165);

28 |

CBM-IPG\SF411508.1

1          Exhibit C:  Defendant's Statement Pursuant to Local Rule 140-7 in Support of

2    Its Motion for Partial Summary Judgment on Plaintiff's Bad Faith Claims, filed June 17,

3    1994 (Docket # 166);

4          Exhibit D:  Plaintiff's Opposition to Defendant's Motion for Partial Summary

5    Judgment on Plaintiff's Bad Faith Claims, filed July 8, 1994 (Docket # 189);

6          Exhibit E:  Plaintiff's Counter-Statement of Facts Relating to Opposition to

7    Defendant's Motion for Partial Summary Judgment on the Issue of Bad Faith, filed July

8    12, 1994 (Docket # 191);

9          Exhibit F:  Reply Memorandum of Points and Authorities in Further Support of

10   Defendant's Motion for Partial Summary Judgment on Plaintiff's Bad Faith Claims, filed

11   July 19, 1994 (Docket # 199);

12         Exhibit G:  A copy of the "all-risk" policy issued to Pioneer by National

13   Union, No. 260-20-78 (10/25/1990 – 10/25/1991), Exhibit 26 to National Union's motion

14   (i.e., Ex. 26 to Docket # 164, which is attached to the Request for Judicial Notice as

15   Exhibit A).

16         Continental does not seek judicial notice of the facts stated in these documents,

17   but rather of the pleadings themselves as they informed the District Court of Nevada

18   regarding the factual and legal issues for decision in *Pioneer Chlor Alkali Co. v. Nat'l*

19   *Union*, 863 F. Supp. 1237 (D. Nev. 1994).

20         Dated:  July 16, 2008

21

22         CARROLL, BURDICK & McDONOUGH LLP

23

24         By _____

                G. David Godwin

25                   Raymond J. Tittmann

26         Attorneys for Defendant
        The Continental Insurance Company

27

28

# EXHIBIT A

## NATIONAL ARCHIVES AND RECORDS ADMINISTRATION



 all to whom these presents shall come. Greeting:

 virtue of the authority vested in me by the Archivist of the United States, I certify on his behalf,
 the seal of the National Archives and Records Administration, that the attached reproduction(s) is
 correct copy of documents in his custody.

| SIGNATURE | |
|---|---|
| *Michael J. Kretch, Jr.* | |
| NAME | DATE |
| Michael J. Kretch, Jr. | 0 1 JUL 2008 |
| TITLE | |
| Director, Federal Records Center | |
| NAME AND ADDRESS OF DEPOSITORY | |
| National Archives and Records Administration<br>23123 Cajalco Road<br>Perris, CA  92570-7298 | |

NA FORM 13040 (10-86)

LAW OFFICES OF THOMAS D. BEATTY
601 East Bridger Avenue
Las Vegas, Nevada  89101
(702) 382-5111

MOUND, COTTON & WOLLAN
One Battery Park Plaza
New York, New York  10004
(212) 804-4200

Attorneys for Defendant

### UNITED STATES DISTRICT COURT

### DISTRICT OF NEVADA

| | |
|---|---|
| PIONEER CHLOR ALKALI COMPANY, INC. )<br>)<br>Plaintiff, )<br>)<br>-against- )<br>)<br>)<br>)<br>NATIONAL UNION FIRE INSURANCE )<br>COMPANY OF PITTSBURGH, PA. )<br>)<br>Defendant. )<br>------------------------------------ | CV-S-93-276-RLH<br><br>**DEFENDANT'S NOTICE OF<br>MOTION FOR PARTIAL SUMMARY<br>JUDGMENT ON THE ISSUE OF<br>ALLEGED BAD FAITH** |

COMES NOW Defendant NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA. ("NU"), by and through its attorneys, THE LAW OFFICES OF THOMAS D. BEATTY and MOUND, COTTON & WOLLAN, and respectfully moves this Court for its Order pursuant to Rule 56 of the Federal Rules of Civil Procedure granting partial summary judgment in favor of NU and against Plaintiff PIONEER CHLOR ALKALI COMPANY, INC. ("Pioneer").

NU is seeking partial summary judgment on the basis that NU did not act in bad faith and did not breach the duty of good faith and fair dealing under both common law and the Nevada Revised Statutes with respect to the insurance policy issued to Pioneer by

164

NU, and denying Pioneer's claims for consequential and punitive damages.    This motion is based upon the attached Affidavit of Philip C. Silverberg, Esq., dated June 16, 1994, the exhibits thereto, and the accompanying Memorandum of Points and Authorities, and any argument that may be allowed at the time of any hearing on this Motion.

DATED this 16th day of June, 1994.

PHILIP C. SILVERBERG, Esq.
Mound, Cotton & Wollan
One Battery Park Plaza
New York, New York  10004

- and -

THOMAS D. BEATTY, Esq.
601 East Bridger Avenue
Las Vegas, Nevada  89101

Attorneys for Defendant
NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, PENNSYLVANIA

2

1

2    LAW OFFICES OF THOMAS D. BEATTY
    601 East Bridger Avenue
3    Las Vegas, Nevada  89101
    (702) 382-5111

4

5        and

6    MOUND, COTTON & WOLLAN
    One Battery Park Plaza
    New York, New York  10004
7    (212) 804-4200

8    Attorneys for Defendant

9
              IN THE UNITED STATES DISTRICT COURT
10                  DISTRICT OF NEVADA

11    -----------------------------------x
    PIONEER CHLOR ALKALI COMPANY, INC.
12
                 Plaintiff,        CV-S-93-276-RLH
13
         -against-
14                         **AFFIDAVIT OF PHILIP C.**
    NATIONAL UNION FIRE INSURANCE      **SILVERBERG IN SUPPORT OF**
15    COMPANY OF PITTSBURGH, PA.,       **DEFENDANT'S MOTION FOR**
                            **PARTIAL SUMMARY JUDGMENT**
16               Defendant.     **AND STATEMENT OF GOOD CAUSE**
    -----------------------------------x
17
    STATE OF NEW YORK     )
18                     : ss.:
    COUNTY OF NEW YORK    )
19

20        **PHILIP C. SILVERBERG**, being duly sworn, deposes and says:

21        1.   I am a member of the firm of Mound, Cotton & Wollan,

22    attorneys for defendant, National Union Fire Insurance Company of

23    Pittsburgh, Pa. ("NU").  I am fully familiar with the facts and

24    circumstances in this action and submit this Affidavit in support

25    of NU's Motion for Partial Summary Judgment.

26        2.   This is an action in which plaintiff, Pioneer Chlor

27    Alkali Company, Inc. ("Pioneer"), as the named insured, seeks to

28

recover under an all-risk property policy of insurance issued by NU (the "NU policy") for alleged property damage and business interruption loss resulting from a chlorine leak that occurred on May 6, 1991 at Pioneer's Henderson, Nevada facility.

3. NU has already filed a Summary Judgment Motion on the basis that the loss is not covered under the corrosion exclusion in the NU Policy. This Motion seeks a determination that NU acted in accordance with its duty of good faith and fair dealing under the common law and the Nevada Revised Statutes with respect to the NU policy. This Motion also requests that this Court deny Pioneer's claim for alleged consequential and punitive damages.

4. The purpose of this Affidavit is to set forth a Statement of Good Cause as required by Order of the Court (as contained in the Minutes of Court dated May 5, 1994) and to put before the Court the exhibits referred to in NU's Memorandum of Points and Authorities in support of its Motion for Partial Summary Judgment.

### STATEMENT OF GOOD CAUSE

5. This Motion for Partial Summary Judgment concerning Pioneer's bad faith causes of action has been filed and served by June 17, 1994 as permitted by Court Order. Defendant did not have an opportunity to depose Pioneer's designated expert on the issue of bad faith until May 19, 1994, almost three weeks after the close of discovery.

- 2 -

6.    Prior to the deposition of Dr. Kensicki, NU did not have a full and fair opportunity to inquire as to the underlying basis for Dr. Kensicki's opinions and the facts upon which Pioneer was relying in asserting its bad faith causes of action.  As is evident from this motion, NU has relied upon and cited to the May 19 deposition testimony of Dr. Kensicki in support of its motion.

7.    In addition, it was not until May 16, 1994 that Pioneer provided NU with the evidence upon which it intended to rely in support of its bad faith claims.   The evidence referred to in Pioneer's May 16 submission referenced hundreds of pages of documents and deposition testimony.

8.    Accordingly, it was virtually impossible to make this motion by May 31, 1994 - the cut-off date for all other summary judgment motions.


**EXHIBITS**

9.    Annexed hereto as Exhibit 1 is a GAB report to NU dated May 22, 1991.

10.    Annexed hereto as Exhibit 2 is a letter from R.J. McMullin to George Henning dated May 22, 1991.

11.    Annexed hereto as Exhibit 3 is a GAB report to NU dated June 12, 1991.

12.    Annexed hereto as Exhibit 4 is letter from R.J. McMullin to George Henning dated June 20, 1991.

13.    Annexed hereto as Exhibit 5 is a letter from Ara Nalbandian to William Rucker dated February 26, 1992.

- 3 -

14.   Annexed hereto as Exhibit 6 is a letter from J. Randall Jones to R.J. McMullin dated July 12, 1991.

15.   Annexed hereto as Exhibit 7 is a letter from Kirk Harrison to Ara Nalbandian dated July 24, 1991.

16.   Annexed hereto as Exhibit 8 is a GAB report to NU dated August 29, 1991.

17.   Annexed hereto as Exhibit 9 is a letter from R.J. McMullin to Kirk Harrison dated August 21, 1991.

18.   Annexed hereto as Exhibit 10 are excerpts of testimony from the March 15, 1994 deposition of William Rucker.

19.   Annexed hereto as Exhibit 11 is a letter from R.J. McMullin to Kirk Harrison dated October 1, 1991.

20.   Annexed hereto as Exhibit 12 is a GAB report to NU dated October 1, 1991.

21.   Annexed hereto as Exhibit 13 is a GAB report to NU dated November 7, 1991.

22.   Annexed hereto as Exhibit 14 is a letter from William Rucker to R.J. McMullin dated January 8, 1992.

23.   Annexed hereto as Exhibit 15 is a letter from Ara Nalbandian to William Rucker dated January 28, 1992.

24.   Annexed hereto as Exhibit 16 is a letter from William Rake to William Shenberger and R.J. McMullin dated January 31, 1992.

25.   Annexed hereto as Exhibit 17 is a letter from R.J. McMullin to William Rake dated February 12, 1992.

- 4 -

26.   Annexed hereto as Exhibit 18 is a GAB report to NU dated April 21, 1992.

27.   Annexed hereto as Exhibit 19 is a letter from Susan Freeman to R.J. McMullin dated May 7, 1992.

28.   Annexed hereto as Exhibit 20 is a letter from Ara Nalbandian and Susan Freeman to R.J. McMullin dated May 29, 1992.

29.   Annexed hereto as Exhibit 21 is a letter from R.J. McMullin to William Rucker dated June 4, 1992.

30.   Annexed hereto as Exhibit 22 is a letter from William Rucker to R.J. McMullin dated June 9, 1992.

31.   Annexed hereto as Exhibit 23 is a letter from R.J. McMullin to William Rucker dated July 21, 1992.

32.   Annexed hereto as Exhibit 24 is a letter from William Rucker to R.J. McMullin dated August 13, 1992.

33.   Annexed hereto as Exhibit 25 is a letter from Susan Freeman to R.J. McMullin dated September 15, 1992.

34.   Annexed hereto as Exhibit 26 is a copy of the all-risk policy issued to Pioneer by NU.

35.   Annexed hereto as Exhibit 27 are excerpts of testimony from the February 8, 1994 deposition of George Henning.

36.   Annexed hereto as Exhibit 28 are excerpts of testimony from the May 19, 1994 deposition of Peter R. Kensicki.

37.   Annexed hereto as Exhibit 29 is a copy of Plaintiff's Second Supplemental Response to Defendant's First Set of Interrogatories and Request for Production of Documents.

- 5 -

38.    Annexed hereto as Exhibit 30 is a letter to Pioneer's Bank Group dated October 7, 1991.

39.    Annexed hereto as Exhibit 31 are excerpts of testimony from the February 25, 1994 deposition of Walter McCollam.

40.    Annexed hereto as Exhibit 32 are excerpts of testimony from the April 28, 1994 deposition of Thomas H. Schnitzius.

41.    Annexed hereto as Exhibit 33 is a document previously marked as Schnitzius Exhibit 2.

42.    Annexed hereto as Exhibit 34 is a document previously marked as Schnitzius Exhibit 11.

43.    Annexed hereto as Exhibit 35 is a copy of Plaintiff's Second Amended Complaint and Application for Declaratory Judgment and Demand for Jury Trial.

44.    Annexed hereto as Exhibit 36 are excerpts of testimony from the February 8, 1994 deposition of George Henning.

45.    Annexed hereto as Exhibit 37 is a presentation by Pioneer to Pioneer's Bankers dated February 6, 1992.

46.    Annexed hereto as Exhibit 38 are Pioneer's Profit and Loss Statements from March, April, and May of 1991.

47.    Annexed hereto as Exhibit 39 is a Report on Damages Incurred Because of the Lack of Funding by Royal Insurance Company and Other Carriers.

48.  Annexed  hereto  as  Exhibit  40  are  portions  of  the Confidential Descriptive Memorandum.


Dated:     New York, New York
           June 16, 1994


_____
                 PHILIP C. SILVERBERG


Sworn to before me this

16th day of June, 1994

_____
    NOTARY PUBLIC

TARA J. GILBERT
Notary Public, State of New York
No. 31-4974053
Qualified in New York County
Commission Expires November 5, 1998

- 7 -

**RECEIPT OF COPY**

Receipt of true and correct photocopy of DEFENDANT'S NOTICE OF MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE ISSUE OF ALLEGED BAD FAITH; AFFIDAVIT OF PHILIP C. SILVERBERG IN SUPPORT OF DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND STATEMENT OF GOOD CAUSE; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFF'S BAD FAITH CLAIMS; and DEFENDANT'S STATEMENT PURSUANT TO LOCAL RULE 140-7 IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFF'S BAD FAITH CLAIMS is hereby acknowledged.

DATED this 17th day of June, 1994.

JONES, JONES, CLOSE & BROWN   **and**       HARRISON, KEMP AND JONES

KEVIN R. STOLWORTHY, Esq.            J. RANDALL JONES, Esq.
300 South Fourth St., 7th Flr        300 S. Fourth St, #600
Las Vegas, NV 89101                  Las Vegas, Nevada 89101
Attorneys for Plaintiff              Attorneys for Plaintiff

LAW OFFICES
OMAS D. BEATTY
601 EAST
RIDGER AVENUE
LAS VEGAS,
NEVADA 89101
(702) 382-5111

# EXHIBIT B

## NATIONAL ARCHIVES AND RECORDS ADMINISTRATION

𝕿 all to whom these presents shall come. Greeting:

virtue of the authority vested in me by the Archivist of the United States, I certify on his behalf,

the seal of the National Archives and Records Administration, that the attached reproduction(s) is

a true and correct copy of documents in his custody.



| SIGNATURE | |
|---|---|
| *Michael J. Kretch, Jr.* | |
| NAME | DATE |
| Michael J. Kretch, Jr. | 0 1 JUL 2008 |
| TITLE | |
| Director, Federal Records Center | |
| NAME AND ADDRESS OF DEPOSITORY | |
| National Archives and Records Administration<br>23123 Cajalco Road<br>Perris, CA  92570-7298 | |

NA FORM 13040 (10-86)

LAW OFFICES OF THOMAS D. BEATTY
601 East Bridger Avenue
Las Vegas, Nevada  89101
(702) 382-5111

    and

MOUND, COTTON & WOLLAN
One Battery Park Plaza
New York, New York  10004
(212) 804-4200

Attorneys for Defendant


                IN THE UNITED STATES DISTRICT COURT
                       DISTRICT OF NEVADA

-------------------------------------x
PIONEER CHLOR ALKALI COMPANY, INC.

                    Plaintiff,          CV-S-93-276-RLH

          -against-

NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, PA.,

                    Defendant.
-------------------------------------x


        **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
          OF DEFENDANT'S MOTION FOR PARTIAL SUMMARY
           JUDGMENT ON PLAINTIFF'S BAD FAITH CLAIMS**

1

2                               **TABLE OF CONTENTS**

3    TABLE OF AUTHORITIES  . . . . . . . . . . . . . . . . . . . .   ii

4    PRELIMINARY STATEMENT  . . . . . . . . . . . . . . . . . . .   iv

5    STATEMENT OF FACTS  . . . . . . . . . . . . . . . . . . . .    1

6    ARGUMENT  . . . . . . . . . . . . . . . . . . . . . . . . .    6

7    POINT I . . . . . . . . . . . . . . . . . . . . . . . . . .    6

8    NO FACTS EXIST TO SUPPORT PIONEER'S BAD FAITH CLAIM . . . . .   6

9         A.    Pioneer Cannot Meet Its Burden of Making a <u>Prima</u>
                <u>Facie</u> Showing of Bad Faith  . . . . . . . . . . . .  6

10
11        B.    National Union Has At All Times Handled Pioneer's
                Claim In Accordance With the Duty of Good Faith and
                Fair Dealing  . . . . . . . . . . . . . . . . . . . .  12

12
13              1.    National Union Has Met Its Obligations Under
                      the Common Law . . . . . . . . . . . . . . . .  12

14              2.    National Union Has Not Violated Any Part of
                      Chapter 686A of the Nevada Revised Statutes  .  14

15
16   POINT II  . . . . . . . . . . . . . . . . . . . . . . . . .   17

17   ASSUMING, <u>ARGUENDO</u>, THERE IS A QUESTION OF FACT AS
     TO BAD FAITH, THE DAMAGES SOUGHT BY PIONEER UNDER ITS
     BAD FAITH CLAIMS ARE NOT SUPPORTED BY THE EVIDENCE  . . . . .   17

18
19        A.    Both the Cause and the Amount of Pioneer's Alleged
                Consequential Damages Are Speculative and
                Uncertain . . . . . . . . . . . . . . . . . . . . .  17

20
21        B.    Under Either Common Law or the Nevada Revises
                Statutes, National Union's Alleged Conduct Does Not
                Entitle Pioneer To An Award of Punitive Damages . .  28

22   CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . .   30

23

24

25

26

27

28                                   i

**TABLE OF AUTHORITIES**

**Cases**

Ainsworth v. Combined Ins. Co. of Am., 104 Nev. 587, 763 P.2d
        673 (1988), Reh'g denied, 105 Nev. 237, 774 P.2d 1003
        cert. denied, 493 U.S. 958 (1089) . . . . . . . . . . . 28

Alper v. Stillings, 80 Nev. 84, 87, 389 P.2d 239 (1964) . . . 19

American Excess Ins. Co. v. MGM Grand Hotels, Inc., 102 Nev.
        601, 729 P.2d 1352 (1986) . . . . . . . . . . . . . . 11,28

Conam Alaska v. Bell Lavalin, Inc., 842 P.2d 148
        (Ala. 1992) . . . . . . . . . . . . . . . . . . . . 18,19

Duncan v. Cessna Aircraft Co., 665 S.W.2d 414 (Tex. 1984) . . 6,7

Ferens v. John Deere Co., 494 U.S. 516 (1990) . . . . . . . . 6

Franceschi v. American Motorists Ins. Co., 852 F.2d 1217 (9th
        Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . 11

Klaxon v. Stentor Electric Mfg. Co., 313 U.S. 487 (1941) . . . 6

Knier v. Azores Const. Co., 78 Nev. 20, 368 P.2d 673 (1962) . 19

Ossorio v. Leon, 705 S.W.2d 219, 223 (Tex. Ct. App. 1985) . . . 7

Pemberton v. Farmers Ins. Exchange, 109 Nev. 789, 858 P.2d 380
        (1993) . . . . . . . . . . . . . . . . . . . . . . . 10

Pioneer Chlor Alkali Co., Inc. v. Royal Indemnity Co., No.
        A14-93-00391-CV, 1994 WL 106311 (Tex. Ct. App. 1994) . 8-10

Rawlings v. Apodaca, 726 P.2d 565 (Ariz. 1986) . . . . . . 28-29

Safeco Ins. Co. of Am. v. Guyton, 692 F.2d 551 (9th Cir.
        1982) . . . . . . . . . . . . . . . . . . . . . . . . . 9

St. Paul Lloyd's Ins. Co. v. Fong Chung Huang, 808 S.W.2d 524
        (Ct. App. Tex. 1991) . . . . . . . . . . . . . . . . . 8,9

State Farm Fire and Casualty Co. v. Simmons, 857 S.W.2d 126
        (Ct. App. Tex. 1993) . . . . . . . . . . . . . . . . . 8

Sutter Home Winery, Inc. v. Vintage Selections, Ltd., 971 F.2d
        401 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . 7

Transportation Ins. Co. v. Moriel, No. D-1507, 1994 WL 246568
        (Tex. June 8, 1994) . . . . . . . . . . . . . . . . . 8,30

ii

<u>United Fire Ins. Co. v. McClelland</u>, 105 Nev. 504, 780 P.2d 193
   (1989) . . . . . . . . . . . . . . . . . . . . . . . 10

<u>United States Fidelity & Guaranty Co. v. Peterson</u>, 91 Nev.
   617, 540 P.2d 1070 (1975) . . . . . . . . . . . . . . 10

<u>Zurich Ins. Co. v. Killer Music, Inc.</u>, 998 F.2d 674 (9th Cir.
   1993) . . . . . . . . . . . . . . . . . . . . . . . . 10

**<u>Statutes</u>**

N.R.S. 686A.010 . . . . . . . . . . . . . . . . . . . iv

N.R.S. 686A.020 . . . . . . . . . . . . . . . . . . . 14

**<u>Other Authorities</u>**

Restatement (Second) of Conflict of Laws §145 . . . . . . . . . 7

iii

### PRELIMINARY STATEMENT

The defendant, National Union Fire Insurance Company of Pittsburgh, Pa. ("NU"), submits this Memorandum of Points and Authorities, along with the accompanying Affidavit of Philip C. Silverberg, sworn to June 16, 1994[1], in support of its motion for partial summary judgment, seeking a determination that NU did not act in bad faith and dismissing Pioneer's claims for consequential and punitive damages.

It is submitted that Pioneer's efforts to recover $11,360,846.32 in consequential damages, together with punitive damages, based on The Nevada Unfair Claim Practices Act (Nevada Revised Statutes 686A.010, et seq.) and the implied covenant of good faith and fair dealing cannot be supported by the pertinent facts as to how this claim developed and was addressed. The claims are wholly without merit.

---

[1] All references to Exhibits are to the Exhibits annexed to the Silverberg Affidavit.

iv

## STATEMENT OF FACTS

In this action, Pioneer seeks recovery under the NU policy (the "Policy") for a loss that resulted from a leak of liquid chlorine at Pioneer's Henderson, Nevada plant on May 6, 1991 ("the chlorine leak"). On May 7, 1991, shortly after receiving notice of the chlorine leak, NU retained the services of Robert J. McMullin of GAB Business Services, Inc. ("GAB") to investigate the circumstances surrounding the leak. (See Exhibit 1.) An inspection was conducted by Mr. McMullin at the loss site the following day, May 8, 1991. (See Exhibit 1.) He subsequently retained Ara Nalbandian, P.E. of Thielsch Engineering Associates, Inc. ("Thielsch"), an engineering firm, to conduct a causal investigation on behalf of NU. (See Exhibit 1.)

Shortly after the chlorine leak, Pioneer retained three law firms to represent it in connection with claims arising from the chlorine leak: Andrews & Kurth; Jones, Jones, Close & Brown; and Rucker, Short & Lopez. Pioneer also retained Failure Analysis Associates ("Failure Analysis") and Rimkus Consulting Group, Inc. ("Rimkus") to investigate the loss and evaluate the cause. (See Exhibit 1.) Additionally, in or about July 1991, Pioneer retained Adjusters International, a public adjuster, to assist in the preparation and presentation of its insurance claims.

On May 22, 1991, following his initial site inspection, Mr. McMullin wrote to Pioneer, acknowledging notice of the loss and reserving NU's rights pending completion of the investigation. (See Exhibit 2.) A week later, on May 29, 1991, Mr. McMullin, an

1

engineer from Thielsch, and representatives from Failure Analysis inspected the facility and conducted some limited metallurgical testing.  (See Exhibit 3.)  By letter dated June 20, 1991, Mr. McMullin requested that Thielsch be provided with certain specific documents that it needed to conduct its investigation into the cause of the loss.  (See Exhibit 4.)  Attached to his letter was a June 6, 1991 letter from Thielsch listing the requested documents. A copy of Mr. McMullin's letter was also sent directly to Pioneer's attorneys.  (See Exhibit 4.)

On July 12, 1991, counsel for Pioneer responded to Mr. McMullin's request for documents stating that they would not be produced until a confidentiality agreement had been signed.  (See Exhibit 6.)[2]   On or about July 24, 1991, counsel for Pioneer forwarded a confidentiality agreement to Thielsch to be signed. (See Exhibit 7.)  The confidentiality agreement was then forwarded to Mr. McMullin, who, on the advice of counsel, determined some of its language was problematic.  (See Exhibit 8.)

On August 21, 1991 Mr. McMullin wrote to counsel for Pioneer requesting certain revisions in the confidentiality agreement. (See Exhibit 9.)  After waiting to no avail for more than a month for a response, on October 1, 1991 Mr. McMullin sent another letter to counsel, pointing out that NU's investigation was being delayed. (See Exhibits 11 and 12.)  Eventually, on or about October 9, 1991

---

[2]  While Pioneer allowed the engineers to obtain certain documents during and shortly after the site inspection, Pioneer failed to respond to subsequent requests by the engineers to obtain reports and other technical information prior to obtaining a signed confidentiality agreement.  (See Exhibit 5.)

Pioneer's attorneys sent a revised confidentiality agreement to GAB which GAB signed, as did Thielsch, and returned to Pioneer. (See Exhibit 13.) It was not until January 8, 1992, two months later -- more than eight months after the chlorine leak -- that Pioneer finally signed the confidentiality agreement and returned it to GAB. (See Exhibit 14.) At that point William Rucker, counsel for Pioneer, asked Mr. McMullin to advise him "with as much advance notice as possible" of what documents Thielsch wanted to review. (See Exhibit 14.) In response, on January 28, 1992, Mr. Nalbandian sent Mr. Rucker a copy of Thielsch's original document request, which was dated June 6, 1991. (See Exhibit 15.)

By letter dated January 31, 1992, almost nine months after the loss, Adjusters International provided NU with Pioneer's claim. (See Exhibit 16.) Although the confidentiality agreement had just been finalized, and NU still had not been provided with information it had been requesting, Adjusters International requested that a partial payment be made in the amount of $1,000,000. (See Exhibit 16.) In response, Mr. McMullin sent Adjusters International a letter dated February 12, 1992, which stated in pertinent part:

> At this time I would like to go on record with you, stating that since May 22, 1991, we have been proceeding and working under a Reservation of Rights letter ....

> From the preliminary information which was developed in my initial inspections at the Henderson site, I had a serious question as to coverage in reference to this particular loss. This was brought to light to the insured and their legal counsel in the Las Vegas area, and, in view of that fact, we provided them with a Reservation of Rights letter.

*     *     *

3

Following a preliminary investigation by our consultant, Ara Nalbandian, he filed a list of documents and historical data in reference to various items of equipment, asking that the documentation be provided to him. Shortly thereafter, J. Randall Jones of the law firm of Jones, Jones, Close & Brown, advised us that we could not obtain that documentation without executing a [Confidentiality Agreement ("CA")]. One was drafted by that firm and provided to us, however, upon review by our own legal counsel, they indicated that the document was too binding in reference to our utilization of information in the event this matter went to litigation.

The agreement was rejected and returned to the law firm, asking that they please draft it with a more liberal approach, and certain recommendations were made. It was not until October 9, 1991 that an amended CA was provided to us by Kirk R. Harrison of the same law firm.

On December 17, I followed up with Mr. Harrison, asking for a copy of the signed contract and also that we now be provided with the documentation that had originally been requested. We were then referred to a William Rucker at the insured's Houston location, and, according to my consultant, we are just now obtaining the documentation that was requested months and months ago.

(See Exhibit 17.)

Despite the fact that the confidentiality agreement had been finalized in January 1992, NU was made to wait several months more before any documents were provided to its engineers. Finally, in April 1992, more than eleven months after the chlorine leak, and more than ten months after the documents had initially been requested, an engineer at Thielsch received notice that the requested materials were available for inspection. (See Exhibit 18.)

Upon reviewing the information, Thielsch concluded that certain additional information was necessary to complete the investigation. Specifically, Thielsch needed access to materials,

4



mostly equipment and machinery, listed in an "evidence log" and sent to Thielsch. (<u>See</u> Exhibit 19 and Exhibit 20.)

By letter dated June 4, 1992, Mr. McMullin made a formal request for access to the materials. (<u>See</u> Exhibit 21.) By letter dated June 9, 1992, William Rucker, counsel for Pioneer, denied the request. (<u>See</u> Exhibit 22.) Mr. Rucker gave the following reason for denying the request:

> You will hopefully understand that Pioneer is currently involved in numerous lawsuits and I am loathe to lose custody of valuable evidence.

(<u>See</u> Exhibit 22.) In an effort to address Pioneer's concerns and enable the investigation to proceed, Mr. McMullin modified the request, and even offered to pay to have an engineer from Failure Analysis personally transport the requested items from Failure Analysis' offices in California to the Thielsch facility in Rhode Island. (<u>See</u> Exhibit 23.) More than fifteen months after the chlorine leak, in mid-August 1992, Mr. Rucker finally agreed to allow Thielsch to inspect the requested items. (<u>See</u> Exhibit 24.) The testing was commenced at Thielsch's laboratory in mid-September. (<u>See</u> Exhibit 25.) Pioneer commenced this action against NU in November 1992. At the time, Thielsch engineers were completing their analysis in an effort to arrive at a final opinion.[3]

---

[3] The Thielsch report which sets forth in detail its analysis and opinions is over 435 pages. It has been produced to plaintiff. Because of its size, it is not annexed to these papers. National Union will be happy to provide a complete copy to the Court if the Court requests.

5

It is this chain of events and circumstances, as well as NU's failure to pay the claim, that Pioneer contends amount to bad faith.

## ARGUMENT

### POINT I

### NO FACTS EXIST TO SUPPORT PIONEER'S BAD FAITH CLAIMS

**A.    Pioneer Cannot Meet Its Burden of Making a _Prima Facie_ Showing of Bad Faith**

As a preliminary matter, it must first be decided which state's law should apply to the determination of whether NU acted in bad faith.  As a general matter, in a diversity case, a court must apply the choice of law rules of the forum state.  Klaxon v. Stentor Electric Mfg. Co., 313 U.S. 487 (1941).  However, this case was transferred from the United States District Court for the Southern District of Texas.  Where an action has been transferred for the convenience of the parties and witnesses, the transferee court must look to the law of the transferor court.  Ferens v. John Deere Co., 494 U.S. 516, 530-531 (1990).  Thus, Texas choice of law rules apply.

Texas has replaced traditional choice of law rules with the "most significant relationship" test set forth in the Restatement (Second) of Conflict of Laws.  Duncan v. Cessna Aircraft Co., 665 S.W.2d 414 (Tex. 1984).  Under that test, courts look to four factors in determining what law to apply:

1.    the place where the injury occurred;

2.    the place where the conduct causing the injury occurred;

6

3.    the domicile of the parties; and

4.    the place where the parties' relationship is centered.
See <u>Sutter Home Winery, Inc. v. Vintage Selections, Ltd.</u>, 971 F.2d
401, 407 (9th Cir. 1992); Restatement (Second) of Conflict of Laws
§145.

Considering the foregoing factors in the light of the
allegations comprising the bad faith claims one is constrained to
apply Texas law to this dispute.  See <u>Sutter</u>, 971 F.2d at 407;
<u>Duncan</u>, 665 S.W.2d 414, 420; <u>Ossorio v. Leon</u>, 705 S.W.2d 219, 223
(Tex. Ct. App. 1985).  Pioneer is a Delaware corporation, with its
principle place of business in Texas.  (<u>See</u> Exhibit 35, ¶1.)  NU is
a Pennsylvania corporation, with its principal place of business in
New York.  (<u>See</u> Exhibit 35, ¶2.)  The Policy was negotiated and
issued in Texas.  (<u>See</u> Exhibit 26.)  The investigation was
conducted by GAB out of its Arizona office and by Thielsch out of
its Rhode Island office.  All claims handling decisions were made
by NU's authorized representative, Starr Technical Risks Agency,
out of its New York offices.  The injury complained of with respect
to the bad faith claim is the consequential damages sustained by
Pioneer as a result of NU's failure to pay its insurance claim.
The alleged wrongful conduct (i.e. denial of Pioneer's claim)
occurred when NU served its answer on Pioneer and filed it with the
court in Texas.  (<u>See</u> Exhibit 35, ¶21.)

The law of bad faith in Texas was recently summarized by the
Texas Supreme Court as follows:

> The threshold of bad faith is reached when a breach of
> contract is accompanied by an independent tort.  Evidence

7

that merely shows a bona fide dispute about the insurer's liability on the contract does not rise to the level of bad faith.  Nor is bad faith established if the evidence shows the insurer was merely incorrect about the factual basis for its denial of the claim, or about the proper construction of the policy.  A simple disagreement among experts about whether the cause of the loss is one covered by the policy will not support a judgment for bad faith.  To the contrary, an <u>insured claiming bad faith must prove that the insurer had no reasonable basis for denying or delaying payment of the claim, and that it knew or should have known that fact</u>.

<u>Transportation Ins. Co. v. Moriel</u>, No. D-1507, 1994 WL 246568, *5 (Tex. June 8, 1994) (emphasis added) (citations omitted); <u>see also</u> <u>State Farm Fire and Casualty Co. v. Simmons</u>, 857 S.W.2d 126, 133 (Ct. App. Tex. 1993) (To establish bad faith "A claimant must show that its insurer knew or should have known there was no reasonable basis for its denial . . . "); <u>St. Paul Lloyd's Ins. Co. v. Fong Chung Huang</u>, 808 S.W.2d 524, 526 (Ct. App. Tex. 1991) ("An insured states a cause of action for breach of the duty of good faith and fair dealing when the insured alleges there is no reasonable basis for denial of the claim or delay in payment, or a failure on the part of the insurer to determine whether there is any reasonable basis for the denial or delay ....")

In <u>Pioneer Chlor Alkali Co., Inc. v. Royal Indemnity Co.</u>, No. A14-93-00391-CV, 1994 WL 106311 (Tex. Ct. App. 1994) ("the <u>Royal</u> action"), the action commenced by Pioneer against its boiler and machinery carrier, the court noted that:

The plaintiff in a bad faith case must prove that no reasonable basis existed for denying the insurance claim. It is not enough for the insured to show that the insurer should have known to pay the claim, or that there were other facts suggesting the claim was valid;  rather the insured must show that no reasonable basis existed for denying coverage.

8

Id. at *18 (citations omitted).

Thus, the mere denial of benefits does not give rise to a claim of bad faith, even if it is later determined that the loss was covered. Where a genuine question as to the insurer's liability under the policy exists, the reasonableness requirement is met. See Safeco Ins. Co. of Am. v. Guyton, 692 F.2d 551, 557 (9th Cir. 1982). In Safeco, because there was a genuine issue of law as to the insurer's liability under the policy, the Ninth Circuit held that the district court properly refused to hold the insurer liable in tort for an alleged bad faith refusal to pay. Likewise, the court in St. Paul Lloyd's stressed that:

> Insurance carriers maintain the right to deny questionable claims without being subject to liability for an erroneous denial of the claim . . . . A bona fide controversy is a sufficient reason for failure of an insurer to make a prompt payment of a loss claim . . . .

808 S.W.2d at 526 (citations omitted).

In the Royal action, the court noted that the resolution of an insured's claim for breach of that duty should not be based on the insurer's success or failure in court on the issue of coverage.

> The denial of coverage may be erroneous but still be in good faith if it was based upon information which was available to the insurer at the time coverage was denied and the information supported denial. When there is a bona fide controversy, the insurer has a right to have its day in court without facing a bad faith claim.

1994 WL 106311, at *18.

In the Royal action, Pioneer argued that because it believed the policy could and should be construed as it contended, fact questions were presented as to whether the insurer breached its duty. The court rejected this argument, finding that despite some

9

jurisdictions' having interpreted the policy language according to Pioneer's position, as long as Royal had some reasonable basis to deny the claim there was no breach.  The court further noted that bad faith is not established:

> [W]hen a trier of fact, using hindsight, decides the insurer was simply wrong about the proper construction of the terms of the policy.  The issue in bad faith focuses not on whether the claim was valid, but on the reasonableness of the insurer's conduct in rejecting the claim.

Id. at *19.

In considering the facts here, there can be no question that NU undertook an appropriate investigation and any delays were caused by Pioneer's actions or inaction.  Apart from any allegations of delay, as NU's motion for summary judgment on the corrosion exclusion demonstrates, a bona fide dispute as to coverage existed.  Accordingly, NU is entitled to summary judgment.

Even under Nevada law, NU would still be entitled to summary judgment.  Under Nevada law, an insured seeking to recover from an insurer on a common law claim of bad faith must show a breach by the insurer of its duty of good faith and fair dealing.  See Pemberton v. Farmers Ins. Exchange, 109 Nev. 789, 858 P.2d 380, 382 (1993); United Fire Ins. Co. v. McClelland, 105 Nev. 504, 511, 780 P.2d 193, 197 (1989); United States Fidelity & Guaranty Co. v. Peterson, 91 Nev. 617, 619-20, 540 P.2d 1070, 1071 (1975).  "Breach of the implied covenant of good faith and fair dealing involves something beyond breach of the contractual duty itself." Zurich Ins. Co. v. Killer Music, Inc., 998 F.2d 674, 680 (9th Cir. 1993) (citations omitted).  An insured has the burden of proving that the

10

insurer failed to pay the claim <u>without proper cause</u>, <u>i.e.</u>, that the insurer was aware of the absence of a reasonable basis for not paying its claim.    <u>See</u> <u>American Excess Ins. Co. v. MGM Grand Hotels, Inc.</u>, 102 Nev. 601, 605, 729 P.2d 1352, 1354-55 (1986); <u>Pemberton v. Farmers Ins. Exchange</u>, 109 Nev. 789, 858 P.2d 380, 381 (1993) ("An insurer fails to act in good faith when it refuses 'without proper cause' to compensate the insured for a loss covered by the policy").

In <u>American Excess</u>, the court stated that "bad faith involves an actual or implied awareness of the absence of a reasonable basis for denying benefits of the policy."  102 Nev. at 605, 729 P.2d at 1354-55 (citations omitted).    In reversing the lower court's finding that the defendant acted in bad faith, the court held that "[b]ecause we conclude that [defendant's] interpretation of the contract was reasonable, there is no basis for concluding that [defendant] acted in bad faith."  <u>Id.</u>

Finally, whether an insurer's denial is reasonable is properly the subject of a summary judgment motion.    <u>See</u> <u>Franceschi v. American Motorists Ins. Co.</u>, 852 F.2d 1217 (9th Cir. 1988).    In <u>Franceschi</u>, the court found that an insurer's failure to pay a claim based on its reasonable but erroneous interpretation of a policy term was not grounds for a bad faith claim and that "a court can conclude as a matter of law that an insurer's denial of the claim is not unreasonable, even if the court concludes the claim is payable under the policy terms, so long as there existed a genuine issue as the insurer's liability."  <u>Id.</u> at 1220.

11

Thus, under the applicable law, unless Pioneer can show that no reasonable basis existed upon which NU could have refused to pay Pioneer's claim, and that no genuine coverage issue exists, Pioneer is not entitled to a finding in its favor.  As the record in this case clearly shows, Pioneer cannot do that; it cannot make a prima facie showing of bad faith.  One need look no further than NU's motion for summary judgment on the issue of the applicability of the corrosion exclusion to see that NU's failure to pay Pioneer's claim was not unreasonable.

B.    National Union Has At All Times Handled Pioneer's Claim In Accordance With the Duty of Good Faith and Fair Dealing

1.    National Union Has Met Its Obligations Under the Common Law

Examination of NU's conduct with respect to the handling of Pioneer's claim reveals that without question NU acted in good faith.  Robert McMullin, NU's adjuster, conducted an inspection of the site one day after receiving notice; he promptly retained an engineer, Ara Nalbandian, P.E., of Thielsch to investigate. Approximately three weeks after the incident, Mr. McMullin once again visited the loss site along with Mr. Nalbandian.  Upon observing the site, they both suspected that the chlorine leak had been caused by corrosion, which is excluded by the terms of the NU policy.  (See Exhibit 1 and Exhibit 26.)  Accordingly, NU issued a reservation of rights letter informing Pioneer that a substantial coverage question existed, but that NU intended to conduct a full

investigation of the cause of the loss before making a coverage determination.[4]

After sending the reservation of rights letter, NU had the engineers at Thielsch commence an investigation into the cause of the loss. The investigation was not complete until the middle of September 1992. Pioneer brought this action, which it claims it was forced to do by a "lack of response" to its claim, barely two months following the investigation's completion, and before NU's engineers had been able to complete their analysis and report.

The duration of the investigation clearly was not unreasonable under the circumstances, especially in view of Pioneer's refusal to allow NU's representatives access to critical information until a confidentiality agreement had been executed.[5] In addition, despite the signing of the confidentiality agreement, it was not until mid-September 1992 that NU's engineer was finally provided access to all the materials and information he had requested.

Pioneer's counsel admitted that Pioneer's own engineers, who had access to all information and materials, took "an incredibly long time" to reach a final conclusion as to the cause of the loss. (Exhibit 10, at 34-5). Clearly, given that Pioneer hired two separate engineering consultant firms to investigate the cause of

----

[4] Pioneer's counsel and designated insurance expert have testified as to the well recognized purpose behind the reservation of rights letter. (See Exhibit 10, at 65 and Exhibit 28, at 291-93.)

[5] Pioneer required a confidentiality agreement because of the class action suit that was pending against Pioneer. (See Exhibit 10, at 75-7; see also Exhibit 28, at 303.)

13

the alleged loss and that, even with no restrictions on access, both firms were not prepared to provide a professional opinion as to the cause of the loss for "an incredibly long time," Pioneer cannot reasonably now assert that NU's investigation took too long.

Had Pioneer timely permitted NU's engineers' access to the necessary materials -- rather than impeding the process for some fifteen months -- the investigation would not have been ongoing in the Fall of 1992 when NU's engineers were finally permitted to conduct testing.

###    2.    National Union Has Not Violated Any Part of Chapter 686A of the Nevada Revised Statutes

In Plaintiff's Second Amended Complaint, Pioneer has alleged that NU violated Nevada's Unfair Claims Practices Act.   Chapter 686A of the Nevada Revised Statutes ("the Act") denotes specific acts as unfair practices.   Under 686A.020 "[a] person shall not engage in this state in any practice which is defined in [the Act] to be an unfair method of competition or an unfair or deceptive act or practice in the business of insurance."    N.R.S.  686A.020 (emphasis added).   Thus, the Act only applies when the alleged wrongful acts were committed in Nevada.

According to Pioneer, the acts that allegedly give rise to this cause of action were NU's: 1) "refusal to pay the benefits to which Pioneer is entitled"; 2) "failure to affirm or deny coverage within a reasonable time after proof of loss requirements were submitted by Pioneer"; and 3) "failure to provide promptly to Pioneer a reasonable explanation of the basis in the insurance

14



policy, with respect to the facts of Pioneer's claim and the applicable law, for the denial of its claim." (See Exhibit 35, ¶¶19-24.) However, none of the alleged acts constituting Pioneer's statutory claim could have taken place in Nevada.

As noted above, Pioneer is a Delaware corporation, with its principal place of business located in Houston, Texas.  NU is a Pennsylvania corporation, with its principal place of business in New York.  The Policy was negotiated and issued in Texas.

In addition, this action was initially commenced by Pioneer in Texas state court.[6]  As set forth in the Second Amended Complaint, at the time of the commencement of this action, NU had not yet made a decision concerning coverage and/or whether or not to pay Pioneer's claim.  (See Exhibit 35, ¶21.)  Once this action was commenced, NU made a determination to deny Pioneer's claim and this denial was set forth in NU's Answer, which was served on Pioneer and filed with the court in Texas.  The only activity that took place in Nevada was NU's preliminary on-site investigation of loss.  However, this act does not - and cannot - form the basis for Pioneer's statutory claim.  The Act clearly does not apply because none of the alleged acts could have taken place in the State of Nevada.

Moreover, even if the Court determines that the Act does apply, NU is still entitled to summary judgment because there is no

---

[6] It should be noted that Pioneer's lawsuits against its boiler and machinery carrier as well as its liability carriers and broker were all commenced in Texas state court, and Pioneer argued that Texas bad faith law applied.

evidence that NU violated its provisions. While there is a relative dearth of Nevada decisions that interpret the provisions of Chapter 686A, it appears from the statute itself that a reasonableness standard applies to claims of unfair practices brought under the Act. Given the decisions dealing with the reasonableness standard, and the facts as set forth in Point I A., above, Pioneer cannot show that NU's conduct violated the duty of good faith and fair dealing. In fact, Peter R. Kensicki, Pioneer's bad faith expert, testified that he could not point to any act or omission by NU that violated any single prescribed standard of industry conduct. (See Exhibit 28, at 315.)

As discussed above, Pioneer itself is responsible for the considerable delays in NU's investigation. The irony of this is inescapable because Pioneer bases its bad faith claims on NU's alleged delay in conducting its investigation and making a coverage determination. Even in the absence of all of the facts that demonstrate the way that the investigation process was delayed through no fault of NU, no allegation that NU completed the investigation in anything other than a timely fashion could be supported here.

Despite this reality, Pioneer has alleged that it was unreasonable for NU not to pay Pioneer's claim before the Fall of 1992 when Pioneer instituted this action. This allegation, however, simply is not supported by the evidence. The record here demonstrates beyond cavil that Pioneer's allegations of bad faith are entirely baseless. There can be little doubt that the

16

perceived "windfall" Pioneer wishes to recover under its bad faith causes of action is the motivating force behind this action, particularly when one considers that a Texas appellate court has already ruled that Royal covers this same loss, but that no bad faith claim exists against it.


## POINT II

**ASSUMING, _ARGUENDO_, THERE IS A QUESTION OF FACT AS TO BAD FAITH, THE DAMAGES SOUGHT BY PIONEER UNDER ITS BAD FAITH CLAIMS ARE NOT SUPPORTED BY THE EVIDENCE**

**A.     Both the Cause and the Amount of Pioneer's Alleged Consequential Damages Are Speculative and Uncertain**

Based on its bad faith claims, Pioneer is seeking to recover $11,360,846.32 in alleged consequential damages, as well as punitive damages.[7]  It is well-settled that one cannot recover under a claim for consequential damages unless and until he has met his burden of showing that the alleged damages were in fact caused by the defendant's wrongful act.   It will be demonstrated below

---

[7]  Pioneer's consequential damages claim is comprised of the following elements:

|  |  |  |  |
|---|---|---|---|
| a. | Interest cost on Property Replacement Expenditures | | $237,297.43 |
| b. | Bank waiver fees | | $75,303.15 |
| c. | Increased Maintenance Cost | | $2,854,000.00 |
| d. | Debt Restructure Costs | | |
| | Success Fee | $5,000,000.00 | |
| | Contingent Fee | $1,461,329.00 | |
| | Costs to Restructure | $163,462.74 | |
| | Total | | $6,624,791.74 |
| e. | Black Mountain Power Co. Debt. | | $1,569,454.00 |
| | | | --------------- |
| | Total | | $11,360,846.32 |

(See Exhibit 29.)

both through documents produced and the testimony of Pioneer's witnesses that Pioneer cannot establish that any of the elements comprising its consequential damages claim were the result of NU's alleged acts of bad faith.

The case of <u>Conam Alaska v. Bell Lavalin, Inc.</u>, 842 P.2d 148 (Ala. 1992), illustrates this point.  In <u>Conam</u> a subcontractor sought to recover for damages alleged to have arisen from several causes including the contractor's breach of the duty of good faith and fair dealing and the engineer's negligence.  The court noted "[t]here are two aspects to damages.  The first is causation, that is, the evidence must prove that the loss was caused by the tort.  The second is amount."  <u>Id.</u> at 154.  The court further observed that "causation is the major concern."  <u>Id.</u>

The court in <u>Conam</u> found that while the evidence (consisting of expert testimony) provided various explanations for cost overruns, the plaintiff did not provide direct causal links between a specific delay by the defendant and a specific cost.  <u>Id.</u> at 156. Conam's expert admitted that others may have contributed to the cost overruns, although the expert was unable to separate out which delays others may have caused.  "Basically, all [the expert] could testify to was that a 'portion' of the cost overrun was attributable to the engineering negligence."  <u>Id.</u> at 157.  The court, viewing the evidence in the light most favorable to Conam, concluded that the cause of the damage that Conam claimed was never satisfactorily proven; the cause remained too speculative to submit

18

the issue of damages to the jury.  <u>Id.</u> at 157; <u>see</u> <u>also</u> <u>Alper v.</u>
<u>Stillings</u>, 80 Nev. 84, 87, 389 P.2d 239, 240-41 (1964).

In addition to the requirement that damages alleged be caused
by the defendant's wrongful act, only those damages the amount of
which can be established with reasonable certainty may be awarded.
In <u>Alper</u>, the court noted:

> It is established law in this state, as in most
> jurisdictions, that to justify a money judgment the
> amount, as well as the fact of damage, must be proved;
> that there must be substantial evidence as to the amount
> of damage, as <u>the</u> <u>law</u> <u>does</u> <u>not</u> <u>permit</u> <u>arriving</u> <u>at</u> <u>such</u>
> <u>amount</u> <u>by</u> <u>conjecture</u>; that to prove a right to damages
> without proving the amount, entitles a plaintiff to
> nominal damages only.

80 Nev. at 86-7, 389 P.2d at 240 (emphasis added) (citation
omitted); <u>see</u> <u>also</u> <u>Knier v. Azores Const. Co.</u>, 78 Nev. 20, 24, 368
P.2d 673, 675 (1962) (existence of damage in action to foreclose
lien for labor and materials furnished to move and rehabilitate
motel units, that is loss of prospective profits, was too uncertain
and speculative to form basis for recovery.)

The party seeking damages bears the burden of proving them
beyond speculation.  <u>Conam</u>, 842 P.2d at 154.  Where the precise
amount of damages cannot be ascertained, the party seeking damages
must provide the jury with a "reasonable basis" for computing the
award.  <u>Id.</u>

Based on the documents produced by Pioneer and the testimony
of its witness, it is apparent that the items comprising Pioneer's
consequential damages claim are attributable to many factors that
had nothing to do with NU's failure to pay Pioneer's claim.  In
fact many of the factors that impact its consequential damages

19

claim have absolutely nothing to do with the May 6, 1991 chlorine release. For example, following the loss, two of Pioneer's affiliated companies (All-Pure and Imperial West) were performing well below expectations. (See Exhibit 32, at 23-4.)[8] At the same time, the market price for Pioneer's products suffered a "drastic" decrease. (See Exhibit 32, at 23, 41-43.)  The price of chlorine dropped from $120 a ton to zero.  (See Exhibit 27, at 64.) According to Mr. Henning, "[h]ad the price of chlorine not decreased, Pioneer might have been able to withstand the effects of the chlorine release and the accident, even without payment by its insurance companies." (See Exhibit 27, at 63.)  The decline in the price of chlorine had a significant effect on Pioneer's financial condition.[9]  (See Exhibit 27, at 64.)  Also, Pioneer had sustained a major loss in connection with a write-off of $2.4 million as a result of the bankruptcy of one of its customers. (See Exhibit 32, at 23-4.)

---

[8] It should be noted that Pioneer's acquisition of All-Pure and Imperial West had the effect of more than doubling its long-term debt from approximately $37 million to approximately $77 million. (See Exhibit 32, at 67, 71.) Moreover, these subsidiaries were treated as customers of Pioneer.  In that regard, they collectively owed Pioneer $8.7 million in the eight month period following the chlorine leak.  When questioned as to whether these sums were paid back, Mr. Schnitzius testified that he is "sure there is a substantial amount outstanding." (See Exhibit 32, at 73-4.)

[9] Despite the subsequent downturn in the market and the drop in the price of chlorine, Pioneer did not sustain a loss of sales as a result of the chlorine leak.  (See Exhibit 37; Exhibit 36, at 65-7.)  In fact, Pioneer's sales actually increased substantially following the incident.  For instance, its total sales during the month of May, 1991 were 54% higher than its sales in March, 1991 and 45% higher than its sales in April, 1991.  (See Exhibit 38.)

Other factors that had a negative impact on Pioneer's financial status included a write-off of $2.5 million in insurance claims in exchange for payment of $3.7 million from its liability insurers. (See Exhibit 32, at 76-7.) In addition, Pioneer received a $9.2 million arbitration award on a cancelled contract claim which it valued at between $15 and $20 million, leaving a shortfall of between $5.8 million and $10.8 million. (See Exhibit 32, at 89-90, 94.)

In addition, as noted above, when calculating its alleged damages, Pioneer did not take into consideration the effect that coinsurance, other insurance, or policy deductibles would have on the amount recoverable. (See Exhibit 36, at 81.) Moreover, as Pioneer admits, it would not have incurred these alleged damages if it had received reimbursement from Royal, its boiler and machinery insurer who has been found liable for this loss. (See Exhibit 36, at 77-81.) In short, Pioneer cannot prove that the consequential damages were sustained as a result of NU's actions, as opposed to the actions of some other party or event.

Each of the specific items that comprise Pioneer's consequential damages claim are considered below.

1.  <u>Interest Cost on Property Replacement Expenditures</u>

Pioneer seeks to recover $237,297.43 for interest costs on expenditures related to property replacement. According to Pioneer's Chief Financial Officer, George Henning, this element of Pioneer's damages claim consists of interest payments that Pioneer made on money that it borrowed under a revolving loan following the

21

chlorine leak.   (See Exhibit 36, at 75-6.)   Apart from all the factors unrelated to the chlorine leak mentioned above, Mr. Henning was unable to identify what portion of the interest costs are actually attributable to money borrowed to perform repairs following the chlorine leak.   According to Mr. Henning:

> Our dollars are fungible.  I can't tell you on any one day what I'm borrowing for or not borrowing for.

(See Exhibit 36, at 75-81.)   Thus, Pioneer is unable to identify what percentage of the interest costs are attributable to costs incurred to perform repairs and what percentage are attributable to other things.

        2.   Bank Waiver Fees

        Pioneer claims that as a result of its insurers' failure to reimburse it for its losses, it was forced to request waivers to the covenants in its senior loan agreement from the participating banks.   The banks, in turn, allegedly required Pioneer to pay $75,303.15 in fees before agreeing to the waivers. According to Pioneer, "[c]onditions relating to the covenants . . . were aggravated by the lack of reimbursement of expenses and payment of business interruption claims by the insurance companies, particularly Royal Insurance Company for these covenants, which dealt with tests relating to income."  (See Exhibit 39 (emphasis added).)

        According to documents produced by Pioneer, the request for the waivers was necessitated by several factors:  1) the chlorine leak; 2) a compressor failure at another of Pioneer's facilities; 3) start-up costs associated with the building of a cogeneration

22

plant; 4) poor performance of two of Pioneer's sister companies; 5) increased costs incurred in connection with the purchase of the two sister companies; and 6) Royal's failure to pay Pioneer's claim. (<u>See</u> Exhibit 30.)    Indeed, as Pioneer freely admits, the lack of reimbursement by its insurers, particularly <u>Royal</u>, merely "aggravated" other problems.    Thus, Pioneer cannot meet its burden of showing that these damages are attributable to NU's actions.

### 3.    Increased Maintenance Costs

Pioneer seeks to recover $2,854,000 from NU for increased maintenance costs.    According to Pioneer, because of the failure on the part of Royal and NU to reimburse Pioneer for its losses, Pioneer had to reduce capital spending in 1991, 1992, and 1993. (<u>See</u> Exhibit 39; Exhibit 36, at 123-25, 128-29.)    Pioneer claims that "[t]he lack of capital spending was not directly apparent in the volume of output of the plants, but increased maintenance costs occurred as old equipment that was not replaced had to be maintained." (<u>See</u> Exhibit 39.)

To calculate the sum of $2,854,000 Pioneer:

> [D]etermine[d] the shortfall in capital spending budgeted for the years 1991 and 1992[10] and use[d] 30% of the shortfall as the increased cost of maintenance required. The 30% figure is a rule of thumb used by plant maintenance management for deciding priority of capital replacement.

(<u>See</u> Exhibit 39.)

It is evident that this element of Pioneer's damages is not based on an actual increase in maintenance costs.    (<u>See</u> Exhibit 36,

---

[10] Pioneer has since revised its claim to add the alleged shortfall for the year 1993.

23

at 128-129.)   Rather, according to Mr. Henning, it is based on nothing more than an assumption that a reduction in capital spending would result in an increase in maintenance costs. (See Exhibit 36, at 123-25.)   However, it appears that following the loss Pioneer's maintenance costs actually <u>decreased</u>. (See Exhibit 31, at 26.)   In addition, this portion of Pioneer's claim is calculated based on an expected capital shortfall of over $9.5 million, yet Pioneer's claim against NU is only a little over $3.3 million.   Thus, this portion of its damage claim is not supported by the evidence -- indeed, it is refuted!

Moreover, with respect to the 30% "rule of thumb," this percentage was an arbitrary one that had no logical or empirical basis.   According to Mr. Henning, he is willing to "debate" what percentage should be used. (See Exhibit 36, at 128-29.)   According to Walter McCollam, the current plant manager at the Henderson facility, "it would be very difficult to project what impact it would have on maintenance if a capital item was not done." (See Exhibit 31, at 20.)   Mr. McCollam further testified that he is not aware of any "rule of thumb" for calculating this amount. (See Exhibit 31, at 20.)

Certainly, to the extent that Pioneer did not actually sustain an increase, in maintenance costs following the chlorine leak, it cannot recover from NU.   Furthermore, even if maintenance costs increased without a showing that such increase is the result of NU's actions (as opposed to all of the other factors effecting

24

Pioneer's financial condition), Pioneer is not entitled to recover this sum from NU.

### 4. Debt Restructure Costs

The cost of restructuring Pioneer's debt makes up the bulk of its claim for consequential damages.  Pioneer's expert, Thomas H. Schnitzius, was deposed on this aspect of Pioneer's consequential damages claim.  Mr. Schnitzius, a member of the investment banking firm retained by Pioneer to restructure its debt, testified as to his opinion on the cost and the need for restructuring the debt at Pioneer. (See Exhibit 32, at 13-14.)

Based on the documents produced by Pioneer and the testimony of its witness, it has been established that the need to restructure the debt was prompted by a number of factors that had nothing to do with the chlorine release.  (See Exhibit 40.)  These factors, which are discussed above, include the poor performance of All-Pure and Imperial West (see Exhibit 32, at 23-4); the drop in the market price for Pioneer's products (see Exhibit 32, at 23, 41-43); the write-off of $2.4 million as a result of the bankruptcy of one of Pioneer's customers (see Exhibit 32, at 23-4); the write-off of $2.5 million in insurance claims (see Exhibit 32, at 76-7); and a shortfall of between $5.8 million and $10.8 million in the recovery on an arbitration claim (see Exhibit 32, at 89-90, 94).

25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

According to Mr. Schnitzius, all of the items discussed above were factors in the restructuring.  (See Exhibit 32, at 25.)[11] Mr. Schnitzius further testified as follows:

> Q:   Is it fair, however, to say, sir, that even with receipt of the $3 million or even 3.5 million that Pioneer claims, if that money had been received in December '91 or September 1992, as you sit here today you can't say that would have avoided the debt restructure of Pioneer?
>
> A:   I cannot.

(See Exhibit 32, at 35.)

Mr. Henning, Pioneer's expert on the company's financial condition prior and subsequent to the alleged loss, similarly responded:

> Q:   As you sit here today, is there any way for you to say one way or the other that had National Union given you $3.5 million in late 1992 it would not have been necessary for you to restructure your debt?
>
> A:  No.

(See Exhibit 27, at 107.)

Mr. Schnitzius was able to provide some information concerning the amounts claimed in Plaintiff's Second Supplemental Responses to Defendant's First Set of Interrogatories and Request for Production of Documents.  He testified that the contingent fee of $1.4 million may or may not be paid to the banks.  This fee is based on the profitability of the restructuring.  Notably, this fee has not been

---

[11] It is significant that even with respect to the costs Pioneer contends are attributable to the May 6, 1991 chlorine release, many of the items are not related to the coverage under the National Union policy.  For example, Pioneer claims that costs arising out of the tort claims brought against it by third parties, legal costs, and the costs relating to consultants hired by it to investigate the loss were a large part of its expense.  These costs would not be compensable under the National Union policy even if the claim were otherwise covered.

26

incurred and, in fact, may never be incurred.  (<u>See</u> Exhibit 32, at 47, 49.)  The amount listed as a success fee ($5 million) also may or may not ever be paid.  (<u>See</u> Exhibit 32, at 54.)  Indeed, Mr. Schnitzius had no idea how the $5 million figure was calculated. (<u>See</u> Exhibit 32, at 47-8.)  As of the date of Mr. Schnitzius' deposition, the success fee agreement had not even been signed. (<u>See</u> Exhibit 32, at 81.)

Considering all of the factors listed above, it is clear that as a matter of law Pioneer cannot prove that any act or omission by NU, in and of itself, caused Pioneer to incur any of the alleged debt restructure costs or even whether the costs themselves will ever be incurred.

5.  <u>Black Mountain Power Co. Debt</u>

Mr. Henning was also questioned about that element of Pioneer's consequential damages claim that is referred to as "Black Mountain Power Co. Debt."  Black Mountain Power Company ("Black Mountain") is a subsidiary of Pioneer that owns an interest in a partnership that operates a cogeneration station. (<u>See</u> Exhibit 36, at 10-11.)  Mr. Henning testified that the Black Mountain debt arises from a computation that is based on negotiations with Heller Financial to obtain a loan of approximately $3 million in exchange for guaranteed payments out of the income of Black Mountain of $1.5 million. (<u>See</u> Exhibit 27, at 81-2.)  This arrangement, however, had not yet been entered into as of April 13, 1994.  Thus, Pioneer cannot show a direct link between these alleged damages and NU's

27

alleged bad faith failure to pay the claim, or even that these alleged damages were actually sustained by Pioneer.

**B.     Under Either Common Law or the Nevada Revised Statutes, National Union's Alleged Conduct Does Not Entitle Pioneer To An Award of Punitive Damages**

In order to recover punitive damages, an insured must show more than a breach of the duty of good faith and fair dealing. Under Texas law, it must show that the insurer acted in bad faith <u>and</u> that the insurer's conduct was malicious, intentional, fraudulent, or grossly negligent.   <u>Moriel</u>, 1994 WL246568, *5. Similarly, under Nevada law, the standard imposed requires a showing that the insurer acted in a malicious, oppressive, or fraudulent fashion.   <u>Ainsworth v. Combined Ins. Co. of Am.</u>, 104 Nev. 587, 590, 763 P.2d 673, 675 (1988), <u>reh'g denied</u>, 105 Nev. 237, 774 P.2d 1003, <u>cert. denied</u>, 493 U.S. 958 (1989).  "Oppression has been defined as 'a conscious disregard for the rights of others which constitute[s] an act of subjecting plaintiffs to cruel and unjust hardship.'"   <u>Id.</u> at 590, 763 P.2d at 675.   In <u>American Excess</u>, the court reversed the lower court's award of punitive damages concluding that "awards of punitive damages are improper where the evidence fails to show either a willful wrong or the damage as an intended or necessary consequence."  102 Nev. at 605, 729 P.2d at 1355.

In discussing when an insurer's conduct would warrant the imposition of punitive damages, the Arizona Supreme Court has stated:

28

> Such damages are recoverable in bad faith tort actions
> when, and only when, the facts establish that defendant's
> conduct was aggravated, outrageous, malicious or
> fraudulent. Indifference to facts or failure to
> investigate are sufficient to establish the tort of bad
> faith but may not rise to the level required by the
> punitive damage rule. The difference is no doubt harder
> to articulate in legalistic terms than it is to
> differentiate on the facts. To obtain tort damages, for
> instance, the plaintiff must prove only that defendant
> ... [acted without] the reasonable basis required for
> denying the claim. To obtain punitive damages, plaintiff
> must also show that the evil hand that unjustifiably
> damaged the objectives ... [of] the insurance contract
> was guided by an evil mind which either consciously
> sought to damage the insured or acted intentionally,
> knowing that its conduct was likely to cause unjustified,
> significant damage to the insured.

Rawlings v. Apodaca, 726 P.2d 565, 578 (Ariz. 1986) (citations

omitted.)

Here, there are no facts that would support a claim by Pioneer

that NU's conduct was oppressive, malicious, fraudulent, or even

grossly negligent. NU responded immediately to Pioneer's notice of

the loss and conducted a thorough investigation into the cause of

the loss. Moreover, NU never led Pioneer to believe that its loss

was covered. Furthermore, NU's position regarding coverage under

the policy was and is based on a good faith interpretation of the

policy language. Ample case law supports NU's position, and a

motion is now pending with this Court on the issue of coverage.

Pioneer cannot deny that a genuine legal issue with respect to

coverage exists. Its claim for recovery of punitive damages should

be denied.

29

1

2                              <u>CONCLUSION</u>

3          For the foregoing reasons, NU respectfully requests that the

4    Court grant partial summary judgment in favor of NU and dismiss

5    Pioneer's bad faith claims and its claims for consequential and

     punitive damages.
6
     Dated: June 16, 1994
7
8                                    MOUND, COTTON & WOLLAN

9                                    By:

                                         PHILIP O. SILVERBERG
10                                       WILLIAM D. WILSON
                                     One Battery Park Plaza
11                                   New York, New York 10004
                                     (212) 804-4200
12
                                          - and -
13
                                     LAW OFFICES OF THOMAS D. BEATTY
14                                   601 East Bridger Avenue
                                     Las Vegas, Nevada  89101
15                                   (702) 382-5111

16                                   ATTORNEYS FOR DEFENDANT

17
     Of Counsel:
18
     DIANA E. GOLDBERG
19

20

21

22

23

24

25

26

27

28                            30

**RECEIPT OF COPY**

Receipt of true and correct photocopy of DEFENDANT'S NOTICE OF MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE ISSUE OF ALLEGED BAD FAITH; AFFIDAVIT OF PHILIP C. SILVERBERG IN SUPPORT OF DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND STATEMENT OF GOOD CAUSE; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFF'S BAD FAITH CLAIMS; and DEFENDANT'S STATEMENT PURSUANT TO LOCAL RULE 140-7 IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFF'S BAD FAITH CLAIMS is hereby acknowledged.

DATED this 17th day of June, 1994.

JONES, JONES, CLOSE & BROWN    **and**    HARRISON, KEMP AND JONES

KEVIN R. STOLWORTHY, Esq.          J. RANDALL JONES, Esq.
300 South Fourth St., 7th Flr      300 S. Fourth St, #600
Las Vegas, NV 89101                Las Vegas, Nevada  89101
Attorneys for Plaintiff            Attorneys for Plaintiff

LAW OFFICES
)MAS D. BEATTY
601 EAST
RIDGER AVENUE
LAS VEGAS,
NEVADA 89101
702) 382-5111

# EXHIBIT C

## NATIONAL ARCHIVES AND RECORDS ADMINISTRATION

### To all to whom these presents shall come, Greeting:

 virtue of the authority vested in me by the Archivist of the United States, I certify on his behalf,

the seal of the National Archives and Records Administration, that the attached reproduction(s) is

and correct copy of documents in his custody.

| SIGNATURE | |
|---|---|
| *Michael J. Kretch, Jr.* | |
| NAME<br>Michael J. Kretch, Jr. | DATE<br>0 1 JUL 2008 |
| TITLE<br>Director, Federal Records Center | |
| NAME AND ADDRESS OF DEPOSITORY<br><br>National Archives and Records Administration<br>23123 Cajalco Road<br>Perris, CA  92570-7298 | |

NA FORM 13040 (10-86)

1

LAW OFFICES OF THOMAS D. BEATTY
2    601 East Bridger Avenue
Las Vegas, Nevada  89101
3    (702) 382-5111

4         and

5    MOUND, COTTON & WOLLAN
One Battery Park Plaza
6    New York, New York  10004
(212) 804-4200
7
Attorneys for Defendant
8

9              IN THE UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA
10
    ------------------------------------x
11   PIONEER CHLOR ALKALI COMPANY, INC.

12                  Plaintiff,          CV-S-93-276-RLH

13        -against-

14   NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, PA.,
15
                  Defendant.
16   ------------------------------------x

17

18         **DEFENDANT'S STATEMENT PURSUANT TO LOCAL RULE 140-7**
       **IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT**
19           **ON PLAINTIFF'S BAD FAITH CLAIMS**

20
         Pursuant to Rule 140-7 of the Local Rules for the District of
21
Nevada, defendant, National Union Fire Insurance Company of
22
Pittsburgh, Pa. ("NU"), by its attorneys, Law Offices of Thomas D.
23
Beatty and Mound, Cotton & Wollan, submits the following statement
24
of material facts that are not genuinely in issue in support of its
25
motion for partial summary judgment on plaintiff's bad faith
26
claims:
27

28

RECEIVED
AND FILED

JUN 17  3 02 PM '94

CAROL C. FITZGERALD
CLERK

BY_____
DEPUTY

166

1.    This is an action in which plaintiff, Pioneer Chlor Alkali Company, Inc. ("Pioneer"), as the named insured, seeks to recover under an All-Risk property policy of insurance issued by NU (the "Policy") for, among other things, alleged property damage and business interruption loss resulting from a chlorine leak that occurred on May 6, 1991 at Pioneer's Henderson, Nevada facility ("the chlorine leak").

2.    On May 7, 1991, shortly after receiving notice of the chlorine leak, NU retained the services of Robert J. McMullin of GAB Business Services, Inc. to investigate the circumstances surrounding the chlorine leak.  (<u>See</u> Exhibit 1.)[1]

3.    An inspection was conducted by Mr. McMullin at the loss site the following day on Wednesday, May 8, 1991.  (<u>See</u> Exhibit 1.)

4.    Mr. McMullin subsequently retained the services of Ara Nalbandian, P.E. of Thielsch Engineering Associates, Inc. ("Thielsch"), an engineering firm, to conduct a causal investigation on behalf of NU.  (<u>See</u> Exhibit 1.)

5.    Shortly after the chlorine leak, Pioneer retained three law firms to represent it in connection with claims arising from the chlorine leak: Andrews & Kurth; Jones, Jones, Close & Brown; and Rucker, Short & Lopez.  Pioneer also retained Failure Analysis Associates ("Failure Analysis") and Rimkus Consulting Group, Inc. ("Rimkus") to investigate the loss and evaluate the cause.  (<u>See</u> Exhibit 1.)

---

[1] All references to Exhibits are to the Exhibits attached to the Affidavit of Philip C. Silverberg, sworn to June 16, 1994, submitted in support of this motion.

2

6.    In or about July 1991, Pioneer retained Adjusters International, a public adjuster, to assist Pioneer in the preparation and presentation of its insurance claims.

7.    On May 22, 1991, following his initial site inspection, Mr. McMullin sent a letter to Pioneer, acknowledging notice of the loss and reserving NU's rights pending completion of the investigation.  (See Exhibit 2.)

8.    On May 29, 1991, Mr. McMullin, an engineer from Thielsch, and representatives from Failure Analysis inspected the facility and some metallurgical testing was conducted.  (See Exhibit 3.)

9.    By letter dated June 20, 1991, Mr. McMullin requested that Thielsch be provided with certain specific documents that were necessary in order for Thielsch to conduct its investigation into the cause of the loss.  Attached to his letter was a June 6, 1991 letter from Thielsch setting forth in detail the specific documents that were needed.  (See Exhibit 4.)

10.    Pioneer was unwilling to provide the materials that were requested unless NU and its agents agreed to sign a confidentiality agreement.  (See Exhibit 6.)

11.    On August 21, 1991, a letter was sent by Mr. McMullin to counsel for Pioneer suggesting that a revision of the confidentiality agreement was in order and requesting a response. (See Exhibit 9.)

12.    Pioneer's attorneys sent a revised version of the confidentiality agreement to GAB.  The revised agreement was signed

3

by GAB and Thielsch and returned to Pioneer on November 7, 1991. (See Exhibit 13.)

13.    Pioneer signed the confidentiality agreement and returned it to GAB in January 1992.  (See Exhibit 14.)

14.    On January 28, 1992, Mr. Nalbandian sent Mr. Rucker a copy of Thielsch's original document request, which was dated June 6, 1991.  (See Exhibit 15.)

15.    In April 1992, an engineer at Thielsch first received notice that the materials he requested were available for inspection.  (See Exhibit 18.)

16.    By letter dated June 4, 1992, Mr. McMullin made a formal request for access to additional materials.  (See Exhibit 21.)

17.    By letter dated June 9, 1992, William Rucker, counsel for Pioneer, denied Mr. McMullin's request for additional information. (See Exhibit 22.)

18.    Mr. Rucker subsequently agreed to allow Thielsch to inspect and test the requested items in mid-August 1992.  (See Exhibit 24.)

19.    The testing was commenced in mid-September. (See Exhibit 25.)

20.    On or about November 10, 1992, Pioneer commenced this action against NU.  (See Exhibit 35.)

21.    Peter R. Kensicki, Pioneer's bad faith expert, testified that he could not point to any act or omission by NU that violated any single prescribed standard of industry conduct.  (See Exhibit 28, at 315.)

4

22.   Pursuant to its bad faith claims, Pioneer is seeking to recover $11,360,846.32 in damages, in addition to punitive damages. Pioneer's damage claim is comprised of the following elements:

| | | |
|---|---|---|
| a. | Interest cost on Property Replacement Expenditures | $237,297.43 |
| b. | Bank waiver fees | $75,303.15 |
| c. | Increased Maintenance Cost | $2,854,000.00 |
| d. | Debt Restructure Costs | |

|  |  |
|---|---|
| Success Fee | $5,000,000.00 |
| Contingent Fee | $1,461,329.00 |
| Costs to Restructure | $163,462.74 |
| Total | $6,624,791.74 |

| | | |
|---|---|---|
| e. | Black Mountain Power Co. Debt. | $1,569,454.00 |
| | Total | $11,360,846.32 |

(See Exhibit 29.)

23.   The interest costs on expenditures related to property replacements allegedly consist of interest payments that Pioneer made on money that it borrowed under a revolving loan. (See Exhibit 27, at 756.)

24.   Pioneer is unable to identify what portion of the interest costs are actually attributable to money borrowed to perform repairs following the chlorine leak. (See Exhibit 36, at 75-81.)

25.   When calculating the interest costs, Pioneer did not take into consideration the effect that coinsurance, other insurance, or policy deductibles would have on the amount recoverable. (See Exhibit 36, at 81.)

5

26.   Pioneer admits that it would not have incurred these alleged damages if it had received reimbursement from Royal, its boiler and machinery insurer who has been deemed liable for this loss.  (See Exhibit 36, at 77-81.)

27.   Pioneer claims that as a result of its insurers' failure to reimburse it for its losses, Pioneer was forced to request waivers to the covenants in its senior loan agreement from the participating banks.   The banks, in turn, allegedly required Pioneer to pay $75,303.15 in fees before agreeing to the waivers. (See Exhibit 39.)

28.   Pioneer seeks to recover $2,854,000.00 from NU for increased maintenance costs.  (See Exhibit 29.)

29.   To calculate the sum of $2,854,000 Pioneer determined the shortfall in capital spending budgeted for the years 1991, 1992, and 1993  and used 30% of the shortfall as the increased cost of maintenance required.  (See Exhibit 39.)

30.   The maintenance costs element of Pioneer's damages is not based on an actual increase in maintenance costs.  (See Exhibit 36, at 128.)

31.   Following the loss, Pioneer's maintenance costs actually decreased.  (See Exhibit 31, at 26.)

32.   The restructuring may not have been necessary if All Pure and Imperial West (Pioneer's new acquisitions) had performed according to Pioneer's expectations.  (See Exhibit 32, at 23-4.)

33.   Pioneer sustained a major loss in connection with a write-off of $2.4 million as a result of the bankruptcy of one of

6

Pioneer's customers which occurred before the refinancing took place.  (See Exhibit 32, at 23-4.)

34.  Black Mountain Power Company ("Black Mountain") is a subsidiary of Pioneer, which owns an interest in a partnership that operates a cogeneration station.  (See Exhibit 36, at 10-11.)

35.  Pioneer contends that the Black Mountain Power debt arises from a computation that is based on negotiations with Heller Financial to obtain a loan of approximately $3 million in exchange for guaranteed payments out of the income of Black Mountain of $1.5 million.  This arrangement, had not been entered into as of April 13, 1994.  (See Exhibit 27, at 81-2.)


Dated:  June 16, 1994


                              MOUND COTTON & WOLLAN

                              By: _____
                                  Philip C. Silverberg, Esq.
                                  William D. Wilson, Esq.
                              One Battery Park Plaza
                              New York, New York 10004
                              (212) 804-4200

                                  - and -

                              LAW OFFICES OF THOMAS D. BEATTY
                              601 East Bridger Avenue
                              Las Vegas, Nevada  89101
                              (702) 382-5111

                              ATTORNEYS FOR DEFENDANT

Of Counsel:

DIANA E. GOLDBERG

                                       7

**RECEIPT OF COPY**

Receipt of true and correct photocopy of DEFENDANT'S NOTICE OF MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE ISSUE OF ALLEGED BAD FAITH; AFFIDAVIT OF PHILIP C. SILVERBERG IN SUPPORT OF DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND STATEMENT OF GOOD CAUSE; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFF'S BAD FAITH CLAIMS; and DEFENDANT'S STATEMENT PURSUANT TO LOCAL RULE 140-7 IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFF'S BAD FAITH CLAIMS is hereby acknowledged.

DATED this 17th day of June, 1994.

JONES, JONES, CLOSE & BROWN    **and**    HARRISON, KEMP AND JONES


KEVIN R. STOLWORTHY, Esq.          J. RANDALL JONES, Esq.
300 South Fourth St., 7th Flr      300 S. Fourth St, #600
Las Vegas, NV 89101                Las Vegas, Nevada  89101
Attorneys for Plaintiff            Attorneys for Plaintiff

LAW OFFICES
IOMAS D. BEATTY
601 EAST
BRIDGER AVENUE
LAS VEGAS,
NEVADA 89101
(702) 382-5111

# EXHIBIT D

## NATIONAL ARCHIVES AND RECORDS ADMINISTRATION

### 𝔄ll to whom these presents shall come. Greeting:

By virtue of the authority vested in me by the Archivist of the United States, I certify on his behalf, under the seal of the National Archives and Records Administration, that the attached reproduction(s) is a true and correct copy of documents in his custody.

| SIGNATURE | |
|---|---|
| *Michael J. Kretch, Jr.* | |
| NAME | DATE |
| Michael J. Kretch, Jr. | 0 1 JUL 2008 |
| TITLE | |
| Director, Federal Records Center | |
| NAME AND ADDRESS OF DEPOSITORY | |
| National Archives and Records Administration<br>23123 Cajalco Road<br>Perris, CA  92570-7298 | |

NA FORM 13040 (10-86)