J. RANDALL JONES, ESQ.
WILL KEMP, ESQ.
HARRISON, KEMP & JONES
Sixth Floor - Bank of America Plaza
300 South Fourth Street
Las Vegas, Nevada 89101
Telephone: (702) 385-6000

KEVIN R. STOLWORTHY, ESQ.
JONES, JONES, CLOSE
& BROWN, CHARTERED
Seventh Floor - Bank of America Plaza
300 South Fourth Street
Las Vegas, NV 89101-6026
Telephone: (702) 385-4202

ATTORNEYS FOR PLAINTIFF

RECEIVED
JUL - 5 1994
CLERK, U. S. DISTRICT COURT
DISTRICT OF NEVADA
BY_____ DEPUTY

FILED
JUL 8 1994
CLERK, U. S. DISTRICT COURT
DISTRICT OF NEVADA
BY_____ DEPUTY

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| PIONEER CHLOR ALKALI COMPANY, INC., <br><br> Plaintiff, <br><br> vs. <br><br> NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PENNSYLVANIA. <br><br> Defendant. | CASE NO.  CV-S-93-276-RLH |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR
PARTIAL SUMMARY JUDGMENT ON PLAINTIFF'S BAD FAITH CLAIMS**

COMES NOW Plaintiff, by and through its counsel of record, and hereby opposes

Defendant National Union Fire Insurance Company of Pittsburgh, PA's Motion For Partial

Summary Judgment On Plaintiff's Bad Faith Claims.  This opposition is made and based upon the

attached deposition excerpts and exhibits, the Affidavit of George Henning submitted herewith, the

attached points and authorities and all papers and pleadings on file.

189

# I. ARGUMENT

**A.    Nevada Law Applies To the Bad Faith/Unfair Practices Act Claim**

     *1.    Defendant Is Estopped From Arguing That Texas Law Applies Because It Filed A Sworn Statement Claiming That Nevada "Has The Most Significant Relationship" and That "It Is Anticipated That The Applicable Law . . . <Is> Nevada"*

Defendant concedes that this action was initially instituted in Texas and that Defendant moved to transfer the action to Nevada.  Defendant has failed to advise this Court, however, that Defendant obtained the transfer by informing the Texas United States District Court that Nevada has the "most significant relationship" and that Nevada law would be applicable. In Defendant's Motion to Transfer Venue, p. 2, it argued as follows:

> The only nexus between this <Texas> Court and this lawsuit is that the Policy of Insurance in question was issued to Plaintiff in Houston, Texas.  However, the site of the alleged accident <and> the location of the alleged property and business interruption . . . are in Clark County, Nevada.  (Exhibit "1").

Defendant also stated that "<t>he Texas 'contacts' with this case have little to do with the issues in this litigation."   Reply Memorandum of Law in Fourth Support of Defendant's Motion to Transfer Pursuant to 28 U.S.C. Sec. 4104, p. 4.  (Exhibit "2").  Defendant also stated to the Texas court that "there is no matter at issue in this lawsuit with regard to the circumstances surrounding the execution and delivery of the policy. Id., pp. 4-5. (Exhibit "2").  These very same "contacts" that had "little to do" with the issues in the litigation when Defendant was presenting arguments to the Texas federal judge are the ones now offered by Defendant to this Court as decisive in support of Texas law. (Memorandum, p. 7; arguing that "<t>he policy was negotiated and issued in Texas.").

Defendant's sudden devotion to Texas law directly contradicts the statement that it made to the Texas Court about which law would apply to this controversy.[1]  Defendant now states that "one

---

[1]    Defendant's penchant for Texas law only materialized after the Court allowed Plaintiff leave to amend to add the bad faith claim against Defendant.  What has obviously occurred is that Defendant has now focused on the applicable bad faith laws in both states and has decided that Texas law favors it.

1   is constrained to apply Texas law to this dispute" (Memorandum, p. 7).  However, in the affidavit

2   offered in support of the Motion to Transfer Venue, Defendant stated that Nevada law applied

3   because it had "the most significant relationship."  In the Affidavit of William Waidler, paragraph

4   7, Defendant stated:  "Given all of the above, Nevada clearly has the most significant relationship

5   to the events underlying this litigation."  (Exhibit "3").  Defendant then concluded in the affidavit

6   as follows:  "It is anticipated that the applicable law relevant to the adjudication of this action will

7   be that of Nevada, with which the federal courts in Nevada are most familiar."  (Exhibit "3").

8   Based upon the foregoing, Plaintiff submits that Defendant is estopped from arguing that Texas law

9   applies.

10          2.      *Nevada Law Applies Under the "Most Significant Relationship" Test*

11          The insurance policy in this case does not have a choice-of-law provision in it.  Hence, the

12  applicable law must be ascertained by traditional conflicts analysis.  Both Nevada and Texas follow

13  the "most significant relationship" test set forth in the Restatement of Conflict of Laws.  See Ferdie

14  Sievers and Lake Tahoe Land Co., Inc. v. Diversified Mortg. Investors, 95 Nev. 811, 603 P.2d

15  270 (Nev. 1979).

16          Restatement (Second) of Conflict of Laws Sec. 193 (1971) expressly provides that Nevada

17  law is applicable because the insured plant is located in Nevada:

18          Sec. 193.  Contracts of Fire, Surety or Casualty Insurance

19          The validity of a contract of fire, surety or casualty insurance and the rights created
            thereby are determined by the local law of the state which the parties understood was
20          to be the principal location of the insured risk during the term of the policy, unless
            with respect to the particular issue, some other state has a more significant
21          relationship under the principles stated in Sec. 6 to the transaction and the parties,
            in which event the local law of the other state will be applied.  (Emphasis supplied.)
22
    Applying this test,[2] as Defendants stated " <t>he Texas 'contacts' with this case have little to do
23
    with the issues in this litigation."  Reply Memorandum of Law in Fourth Support of Defendant's
24

25  _____

26          [2]  In Industrial Indemnity Ins. Co. v. United States, 757 F.2d 982 (9th Cir. 1985), the Ninth
    Circuit noted that "the place of contracting is relatively insignificant when there is no other
27  significant relationship between the transaction and that place . . . .  When insurance is involved
    the principal location of the insured risk normally is the state whose law applies."  Id. at 985 (citing
28  Restatement Sections 188, 193).

- 3 -

1    Motion to Transfer Pursuant to 28 U.S.C. Sec. 4104, p. 4. (Exhibit "2").

2        Defendant itself made a compelling argument to the Texas Court that Nevada had the most

3    significant relationship to the coverage dispute:

4        The only nexus between this Court and this lawsuit is that the Policy of Insurance
         in question was issued to Plaintiff in Houston, Texas. However, the site of the
5        alleged accident, the location of the alleged property damage and business
         interruption, and the location of most of the witnesses with knowledge of facts
6        relevant to the alleged "duty to make reimbursement", are in Clark County, Nevada.
         Defendant's Motion To Transfer Venue and Original Answer, p. 2. (Exhibit "1").

7    As stated previously, Defendant concluded: "Given all of the above, Nevada clearly has the most

8    significant relationship to the events underlying this litigation." (Exhibit "3"). Based upon the

9    Restatement, the Ninth Circuit caselaw and Defendant's own argument, this Court should apply

10   Nevada law to the bad faith claim.[3]

11       3.    Nevada Law Provides A Remedy For Numerous Acts of Bad Faith

12       Although Plaintiff believes that Texas law is not as proscribed as Defendant portends, it is

13   clear that Nevada law provides a bad faith remedy for numerous diverse types of wrongful acts by

14   insurers. Under Nevada law, every insurer is bound to act fairly and in good faith as a matter of

15   law. U.S. Fidelity & Guar. vs. Patterson, 91 Nev. 617, 619-620, 540 P.2d 1070, 1071 (1975).

16   "The duty violated is not from the terms of the insurance contract, but is a duty imposed by law,

17   the violation of which is a tort." Id. The insurer, who without proper cause, refuses to

18   compensate the insured for its losses is subject to a cause of action for breach of implied covenant

19   of good faith and fair dealing. Id.

20

21   _____

22       [3] Defendant suggests without offering any supporting authority that it is immune from the
     Nevada Unfair Practices Act because "none of the alleged acts constituting Pioneer's statutory claim
23   could have taken place in Nevada." (Memorandum, pp. 14, 15). At the outset, this argument is
     apparently addressed only at the limited statutory claim as opposed to the more expansive bad faith
24   claim. Further, Defendant is in error when it argues that because it finally filed its initial coverage
     denial in an answer filed in a Texas Court, "none of the alleged acts could have taken place in the
25   State of Nevada." Id. The state wherein Defendant filed its answer is not pertinent to the inquiry
     as to whether the unfair practices act applies. The test is whether or not Nevada has a significant
26   relationship to the involved claim processing and handling; a point Defendant conceded in the
     pleadings filed with the Texas Court. Plaintiff also observes that the plant (the insured risk) was
27   located in Nevada, the adjustor came to the plant to conduct the investigation and dozens of pieces
     or correspondence regarding the claim were sent to and from Nevada.
28

- 4 -

1      Section 686A.310(1)(a) of the Nevada Revised Statutes imposes this same duty on insurers.

2   NRS 686.310 has been held to imply "<a> private right of action to the insured for breaches of

3   a list of unfair practices in settling claims." Crystal Bay General Imp. Dist. vs. Aetna Cas. & Sur.,

4   713 F.Supp. 1371, 1376 (D.Nev. 1989).[4]  N.R.S. 686A.310 (d) provides that "failing to affirm or

5   deny coverage of claims within a reasonable time after proof of loss requirements have been

6   completed and submitted by the insured" is an unfair practice.   For this reason, failing to deny

7   coverage within a reasonable time period is an act of bad faith.

8      In addition to the timeliness of a coverage determination, other acts may constitute bad faith

9   by an insurer.  For example, in Ainsworth v. Combined Ins. Co. of America, 763 P.2d 673, 676

10  (Nev. 1988), the Court held that bad faith liability also attaches to the failure to adequately

11  investigate all possible grounds for coverage before denying coverage (e.g., Defendant's failure to

12  investigate coverage by virtue of the rag's involvement).[5]   See also Pemberton v. Farmers

13  Insurance Exchange, 858 P.2d 380 (Nev. 1993) (holding that "an insured may institute a bad faith

14  action against his <UM> insurer once the insured establishes 'legal entitlement' and unreasonable

15  conduct by the insurer concerning its obligations to the insureds.").  Bad faith liability has also been

16  imposed for improper claims handling practices.  See Republic Ins. Co. v. Hires, 810 P.2d 790

17

18      [4]   See Shernoff, et al., Insurance Bad Faith Litigation, Sec. 6.04<2><d><i>, 6-39 (1993)
    (stating that "<a>n action by the insured for the violation of the unfair practices statute is
19  essentially a remedy that is supplemental to a common law action for the breach of the duty of good
    faith and fair dealing.  One would have difficulty in imagining any statutory violation that would
20  not also constitute a breach of the covenant of good faith and fair dealing to the insured.").  A
    violation of NRS 686.310 also constitutes bad faith per se.  See Cobeaga, et al., Nevada Bad Faith
21  Law and Practice, 8-9 (1988).

22      [5]   In Ainsworth, the Court focused on the failure of the insurer to investigate facts that would
23  create coverage as a central element of the bad faith liability:

24         The initial claim was denied immediately without any investigation, although
           Combined claimed in its letter that it had been given "careful consideration."  In
25         fact, Combined made no independent inquiry concerning Thomas' accident, whether
           by telephone or letter.  763 P.2d at 675.
26

27  Plaintiff submits that the same principle applies if an insurer failed to adequately investigate a
    potential coverage argument advanced by the insured--despite the fact that the insurer may have
28  investigated and attempted to prove its exclusion.

1  (Nev. 1991) (citing the insurer's policy of offering 65% of the claims value as a negotiating tactic

2  as the wrongful conduct that supported the punitive award).  The obstinate and continued reliance

3  by an insurer on an ambiguous policy term was also held to constitute bad faith in Ainsworth.[6]

4          The Nevada Supreme Court has stated that an issue of fact regarding bad faith exists either

5  when relevant facts are in dispute or when they permit differing inferences regarding the conduct

6  of the insured.  See United Fire Ins. Co. v. McClelland, 780 P.2d 193, 197 (Nev. 1989) ("a jury

7  question on insurer's bad faith arises when relevant facts are in dispute or when facts permit

8  differing inferences as to the reasonableness of insurer's conduct.").  In the present case, Plaintiff

9  submits that there is an issue of fact regarding several distinct and independent acts of bad faith.

10  **B.     The Bad Faith Claim Is Based Upon Numerous Distinct And Independent Acts Of Unreasonable Conduct In Addition To The Nineteen (19) Month Delay In Denying Coverage**

11

12

13          National Union employees have conceded that the nineteen (19) month delay that occurred

14  before it denied coverage in this case is unprecedented in the history of the company.[7]  Despite this

15  testimony and the corresponding denial by Royal Insurance Company nine (9) full months earlier,

16  Defendant attempts to justify its nineteen (19) month delay in denying coverage and argues that the

17  excuses that it offers merit dismissal of the bad faith claim.  Plaintiff's response is two-fold.  First,

18  the amazing delay in denying coverage is only one of the acts that support the bad faith claim.

19  Because there are numerous other acts that justify a finding that the conduct of the insurer was not

20  reasonable under the circumstances, the bad faith claim should not be dismissed.  Second, the

21  excuses offered for the nineteen (19) month delay do not withstand scrutiny.  The facts support the

22  inferences that the Thielsch artifact testing was nothing more than a pretense to delay the

23

24      [6]  The Ainsworth Court held as follows:

25          The insurer may not rely on its own ambiguous contract as the sole basis for denial. Indeed, our law has held that any ambiguity will be construed against the insurance company, and rightly so.  (Emphasis supplied).  763 P.2d at 675.

26

27      [7]  Waidler Deposition, p. 156, lines 2-10; stating that he can not think of any claims during his entire career that took longer than 13 months to consider whether or not to deny coverage.) (Exhibit "4").

28

- 6 -

1   investigation and bolster the defense for the coverage case; which Defendant concedes that it was

2   preparing as early as May 1991. Plaintiff first addresses the independent acts of bad faith that

3   Defendant has ignored.

4          *1.     The Bad Faith Claim Is Supported By Numerous Acts Of Unreasonable Conduct*

5
6          In addition to the nineteen (19) month delay in making a coverage determination addressed

    below, Plaintiff has cited numerous other acts of unreasonable conduct in its bad faith claim for
7
    relief.[8] Of particular interest, Plaintiff has alleged that Defendant: (1) failed and refused to
8
    adequately and seasonably investigate the pertinent facts of the claim, particularly the rag theory,
9
    before denying benefits; (2) failed to ensure that claims personnel adequately monitored the claim;
10
    and (3) adopted an arbitrary and capricious interpretation of the exception on page 6, section F
11

12

13

14   _____

15       [8] Defendant miscites Dr. Kensicki's bad faith testimony when it claims that "he could not

16   point to any act or omission by NU that violated any single prescribed standard of industry
     conduct." (Memorandum, p. 15, lines 8-11). In actuality, Dr. Kensicki stated that he gave "many"
     standards that National Union violated but had not correlated them to "Nevada law or <a> model
17   code":

18       Q.    Just so I understand, as you sit here today, are you able to give me any single
19             prescribed standard of industry conduct that in your view National Union has clearly
               violated in its handling of this claim?
20       A.    <u>I think I have given evidence of many</u> - -
         Q.    I am asking, can you assign that to any prescribed standard <u>under Nevada law</u>
21       <u>or model code</u> or anything else?
         A.    I have not done that, no. (5/19/94 Kensicki Deposition, p. 315, lines 3-12)
22       (Exhibit "5").

23   Dr. Kensicki's general bad faith opinion is as follows:

24
         National Union failed to make an adequate investigation, that they failed to make a
25       timely accept of deny decision, that they failed to examine for coverage for
         corrosion. (4/7/94 Kensicki Deposition, pp. 96, 97) (Exhibit "5")
26

27   Plaintiff submits that this expert opinion alone creates an issue of fact, especially given Defendant's
     inexplicable failure to either hire an insurance expert for trial or support its motion with an expert
28   affidavit.

1  from its standard form policy . . . .[9]  In addition to timeliness, Plaintiff submits that there is an

2  issue of fact regarding the liability of National Union on each one of these three independent bad

3  faith claims.[10]

4      Starting with the allegation regarding the inadequacy of the coverage investigation, National

5  Union failed and refused to make an adequate investigation before denying benefits due under the

6  policy because it failed to give adequate consideration to Plaintiffs' argument that the rag caused

7  the accident and that this met the exception on page 6, section F.  <u>Waidler, the primary claims</u>

8  <u>manager, was not even familiar with the general rag theory</u>.  Waidler Deposition, p. 114, lines 23-

9  25; stating that "I don't know what the rag was . . ." (Exhibit "4")  Similarly, McMullin, the

10  adjustor, testified that he never made any determination regarding the role of the rag.   (See

11  McMullin Deposition, p. 139, line 25; p. 140, lines 140, lines 1-5; stating that he never formed

12  any opinion regarding what impact the rag had on the liquefier system). (Exhibit "6").  Further,

---

13

14      [9]  The amended complaint alleges in pertinent part:

15      a.    National Union failed and refused to make an adequate investigation before denying

16  benefits due under the policy, including but not limited to the failure to adequately and seasonably
    investigate the pertinent facts of the claim....

17                                . . . .

18      e.    National Union failed to ensure that claims personnel adequately monitored the claim
    or adequately communicated regarding the status of the claim, responsibility for the claim and

19  pertinent facts concerning the claim;

20      f.    National Union has adopted arbitrary and capricious interpretations to the provisions
    of the Insurance Policy and has failed to provide a reasonable application of such provisions to

21  Pioneer's claim and has acted to protect its own financial interest at the expense of Pioneer,
    including but not limited to the following:

22                                . . . .

23      (4)    National Union has based its decision to deny coverage on an unreasonable
    interpretation of the exception on page 6, section  F from its standard form policy . . . .

24

25      [10]  Defendant's motion addresses only the failure to make a coverage determination in a
    reasonable time period.  Because Defendant has not asked for summary judgment regarding any

26  of the other acts that Plaintiff has alleged constitute bad faith, Plaintiff believes that Defendant has
    waived its right to seek dismissal of the entire bad faith claim by failing to file a motion for

27  summary judgment on this point by the filing deadline.  Despite such waiver, in addition to the
    timeliness issue, Plaintiff sets forth three (3) prominent bad faith claims and the evidence supporting

28  the same out of an abundance of caution.

1   McMullin testified that he did not discuss whether or not the rag caused the loss with Thielsch.

2   (See McMullin Deposition, p. 144, lines 1-6).  (Exhibit "6").

3           While Plaintiff suspects that the recent decision by the Court outlining for Defendant how

4   it should have applied the exception to the facts of this case may motivate Defendant to finally look

5   at the merits of Plaintiff's long-standing argument regarding the role of the rag during trial, the

6   undisputed facts establish that Defendant did <u>not</u> adequately investigate this point before coverage

7   was denied.   Defendant placed blinders over its search for coverage by taking the position

8   expressed to Plaintiff and the Court that "corrosion is corrosion" and therefore excluded regardless

9   of the role of the rag.  For these reasons, the jury could properly conclude that Defendant failed

10  to adequately consider whether or not the rag's involvement came within the exception in exclusion

11  F.[11]

12          Plaintiff also submits that ample evidence supports the allegation that National Union's

13

_____

14  [11]  If Defendant had done an adequate investigation and made an honest coverage determination
    before its back was up against the wall defending a bad faith and punitive damages claim, there is
15  reason to believe that it may have determined that there was coverage.  Waidler, the first claims
    manager, testified that Pioneer would have a good argument for coverage under the factual scenario
16  that replicates this case:

17          "Q.   Using the same hypothetical, what if there had been some corrosion in the
                pipes and the rag caused the pressure to build up, the pipe burst, but if there had
18              been absolutely no corrosion the pipe would have not burst, would there be coverage
                in that scenario?
19

20          A.    <u>The insured might have an argument</u>.  Whether the insurance company would
                reject the argument and still say no coverage, I can't answer it."  (See Waidler
21              Deposition, p. 118, lines     16-21, p. 119, 8-10) (Emphasis supplied) (Exhibit
                "4"").
22

23  <u>Defendant's expert; Nalbandian, conceded that the rag had some impact on the holes found in the
    secondary liquefier</u>. (3/4/94 Nalbandian Deposition, pp. 163, 164; Q.  ". . . . isn't it fair to say
24  that the rag had some impact on the holes that were found in the secondary liquefier?  A.  It has
    some impact to the extent - <u>yes, it has some impact to the presence</u> . . . .") (Exhibit "7").
25  However, McMullin did not bother to discuss this issue with Defendant's expert.  (<u>Id</u>, p. 250, lines
    14-18) ("Q.  Did you have any discussions with Mr McMullin as to whether or not the rag was a
26  cause, potential cause of the holes that were found in the tubes of the secondary liquefier?  A.  I
    don't recall that.").  (Exhibit "6").  As said above, Waidler, the claims manager, did not "know
27  what the rag was . . . ."  (Waidler Deposition, p. 114, lines 23-25) (Exhibit "4").  The failure of
28  National Union to seriously consider the application of the exception to the exclusion is bad faith.

1   decision to deny coverage was based on an unreasonable interpretation of the exception in exclusion

2   F. It is beyond dispute that Defendant knew that the exception was, at best, ambiguous. The

3   testimony of Murphy, Defendant's underwriter for this specific risk, is startling because he admits

4   both that <u>he did not understand the exception</u> and also that different persons could interpret it

5   differently:[12] In addition to Murphy's concession that the exception was ambiguous, other present

6   and former employees of National Union have provided contradictory testimony and examples

7   regarding the exception in exclusion F.[13]    Accordingly, in addition to failing to adequately

8   _____

9   [12] Murphy Deposition, p. 214, lines 23-25; p. 215, lines 1-7; stating "I don't know what it
    might be" regarding "unless such loss is caused directly by physical damage not otherwise
10  excluded"; Murphy Deposition, p. 216, lines 4-12; stating that he can not interpret the exception
    because he does not understand it;  Murphy Deposition, p. 218, lines 12-13; stating regarding
11  exception that "I don't have an understanding of what it means";  Murphy Deposition, p. 209, lines
12  18-22; stating that he does not know if the persons who wrote the exception might have one
    interpretation of this language and he has another because he doesn't know what their interpretation
13  is and "I can't read their mind";  Murphy Deposition, p. 213, line 25; p. 214, lines 1-6; stating
    that I can't say if others would have the same understanding; "Human nature being what it is, I
14  don't know." (Exhibit "8").

15  [13] For example, Pinson (the policy draftsman) gave the following as an example of the
16  exception:

17      If we have an explosion damaging a tank full of acid, the acid sprays over the
        equipment, and there is some corrosion determined now or later, that's the purpose
18      of the last part of that." (Pinson Deposition, p. 68, lines 17-22) (Exhibit "9").

19  Waidler, the first claims manager, disagreed that the exception would apply in the exact same
20  example:

21      Q.    Well, what if a vat of acid tipped over and corroded a pipe and caused the
        pipe to allow gases out, in your view would that be accelerated corrosion that would
22      be excluded by the policy?

23      A.    Well, as long as it was corrosion, it would be excluded.
24
        <u>There's no exceptions as far as I can see</u>.
25
26      Q.    Even if it was an acid accident and the corrosion took place in 10 to 15
        seconds?
27
28      A.    Not even if it was one second. (Waidler Deposition, p. 103, lines 11-14; p.
        104, lines 1-3) (Exhibit "4").

1  investigate the role of the rag, Defendant denied coverage despite the ambiguity in the exception.

2  The Nevada Supreme Court has expressly held that the obstinate and continued reliance by an

3  insurer on an ambiguous policy term constituted bad faith.  See Ainsworth v. Combined Ins. Co.

4  of America, 763 P.2d 673, 676 (Nev. 1988).[14]

5       Using the third general bad faith point above as the final example, there is ample evidence

6  that "National Union failed to ensure that claims personnel adequately monitored the claim or

7  adequately communicated regarding the status of the claim, responsibility for the claim and

8  pertinent facts concerning the claim . . . ."  It is an undisputed fact that Waidler believed that

9  Smith had assumed responsibility for the file in October or November 1992 but Smith did not even

10  know that the claim existed until one (1) full year later.  Waidler testified at three (3) different

11  points in his deposition that Smith took over the file in October or November 1992.[15]  Smith,

12  however, testified that Smith did not even know that the Pioneer claim existed until October or

13  November 1993.[16]

14

15  ───────────────

16  [14]  The simple reason that the underwriter (Murphy) admitted that he did not know what the
   exception meant and that Pinson (the policy drafter) and Waidler (the claims manager) applied the
17  exception differently to the exact same hypothetical is that Defendant provided absolutely no
   training whatsoever to its employees regarding the exception.  Dennis Smith, the second claims
18  manager, specifically stated that he had received no training regarding the exception.  (See Smith
   Deposition, p. 64, lines 3-12; stating that National Union gave him no training regarding what
19  exclusion F meant or what fell within that exclusion); (Smith Deposition, p. 67, lines 17-22; stating
   that National Union gave him no training regarding exclusion F including the clause "unless
20  loss") (Exhibit "10").  The adjustor provided similar testimony.  (McMullin Deposition, p. 39, lines
   17-22; stating that he had no specific training regarding interpretation of the perils excluded in an
21  all risk policy; "it's just been experience.") (Exhibit "6").  Plaintiff has alleged the failure to
   properly train employees regarding policy terms as another element of the bad faith claim.
22

23  [15]  See Waidler Deposition, p. 95, lines 3-5; stating that Dennis Smith took over the file and
   was reviewing it, and handled it from October or November of 1992 forward; Waidler Deposition,
24  p. 159, lines 4-7; stating that Dennis Smith took over the file in September 1992; Waidler
   Deposition, p. 159, lines 13-23; stating that he thought Smith was getting the 19th report dated
25  September 17, 1992 and the 20th report dated October 22, 1992 (Exhibit "4").

26  [16]  See Smith Deposition, p. 14, lines 21-23; stating that he did not become aware that there
27  was a claim involving Pioneer until November of 1993; Smith Deposition, p. 14, lines 24-25; p.
   15, lines 1-5; stating that prior to October or November of 1993 he had no involvement with the
28  Pioneer claim and did not even know that it existed (Exhibit "10").

1       The reason for this incredible gaffe is that National Union failed to ensure that Waidler

2   provided Smith with any sort of review session regarding the files in general or the Pioneer claims

3   file in particular.  (See Smith Deposition, p. 15, lines 16-19; stating that Waidler did not discuss

4   the Pioneer claim with him prior to Waidler leaving and that no one else discussed the claim with

5   him; see also Smith Deposition, p. 13, lines 5-14; stating that Waidler did not provide him with

6   any specific training regarding the files that Waidler was administering other than "advice on

7   procedural matters like checks, where the files were kept, how the files were set up, how a claim

8   was recorded.  That's it.") (Exhibit "10").   The failure to provide Smith with some sort of general

9   orientation regarding the outstanding claims was outrageous given that Smith stated that he was

10  assigned to "hundreds of claims", that "it was sort of overwhelming" to him and that he was forced

11  to resort to a "hunt-and-pick operation" to handle the claims.[17]   Needless to say, Smith was

12  completely unfamiliar with even the most rudimentary aspects of the Pioneer claim.  For example,

13  Smith didn't know that long-term versus short-term corrosion had been raised as an issue in the

14  case, had not discussed the case with Nalbandian at Thielsch Engineering, Smith did not even know

15  that McMullin was involved until 1994 and did not even know whether or not the claim had been

16  denied when Smith was deposed.[18]  This is a classic case of an insurance company dropping the

17  ball and failing to ensure that a claims manager monitored the file for an entire year.  Given this

18

19

_____

20      [17] See Smith Deposition, p. 13, lines 15-25; p. 14, lines 1-3; stating that there were
21  "hundreds" of claims; Smith Deposition, p. 13, lines 15-25; p. 14, lines 1-3; stating that he doesn't
    know the number of files because it "was sort of overwhelming.  There were many, many large
22  cases of various dimensions that Mr. Waidler was involved in and I was sort of a hunt-and-pick
    operation." (Exhibit "10").

23      [18] See Smith Deposition, p. 36, line 25; p. 37, lines 1-5; stating that he never became aware
24  at any time that there was an issue being raised by the insured regarding accelerated corrosion as
    opposed to gradual corrosion; Smith Deposition, p. 21, lines 22-25; p. 23, lines 1-3; stating that
25  he has not discussed the Pioneer claim with Thielsch Engineering and he has not reviewed the
    Thielsch report; Smith Deposition, p. 17, lines 11-21; stating that "the first time that I had any
26  discussion or meeting or knowledge of" McMullen was when McMullen dropped by the week
27  before the March 3, 1994 Smith Deposition; Smith Deposition, p. 18, lines 3-14; stating that he
    did not know as of the day of his March 3, 1994 deposition whether or not the claim has been
28  denied.  (Exhibit "10").

1    outrageous neglect, it is not surprising that it took nineteen (19) months to deny the claim.[19]

2           2.      *Defendant Breached Its Duty To Respond By Failing to Make A Timely*
                    *Coverage Determination*
3

4           The coverage determination in this case took an astounding nineteen (19) months. It took

5    six (6) full months longer than the second longest determination in the hoary career of Defendant's

     primary claims manager. (Waidler Deposition, p. 156, lines 2-10; stating that he can not think of
6
     any claims during his entire career that took longer than 13 months to consider whether or not to
7
     deny coverage) (Exhibit "4"). The second claims manager also testified that he did not know of
8
     one single claim in the entire United States that took over one year to adjust. (Smith Deposition,
9
     p. 26, lines 15-25) (Exhibit "10"). Defendant concedes at least one month of the delay was caused
10
     by the absence of the adjustor. (Waidler, p. 138, lines 6-11; stating that he knew that McMullin
11
     would be gone the entire month of October 1991) (Exhibit "4"). As set forth above, another year
12
     of the delay was caused by the bungling by National Union concerning whether Waidler or Smith
13
     was handling the claim. Royal made its coverage determination in March 1992. Using this as a
14
     benchmark, Defendant's employees conceded that there was no reason that Royal could make its
15
     determination quicker than Defendant. (Waidler, p. 143, lines 21-25; p. 144, line 1) (Exhibit "4").
16
            3.      *The Lengthy Thielsch Investigation Was Conducted To Prepare For Litigation*
17                  *As Opposed To Being The Linchpin Of An Honest Coverage Investigation*

18          The primary justification offered by Defendant for the nineteen (19) month delay is that

19   Nalbandian of Thielsch Engineering took a long time to finish his report and that "any delays were

20

21       [19] Another startling aspect of the claims handling was the erroneous belief by Waidler that the
     adjustor had in fact received the Nalbandian report and made the determination to deny coverage
22   based upon this report. See Waidler Deposition, p. 94, lines 14-20; stating that McMullin made
     a final determination in October or November of 92 after the test results from Thielsch; Waidler
23   Deposition, p. 95, lines 6-10; stating that McMullin first made a final determination orally and then
     in writing; Waidler Deposition, p. 95, lines 11-21; stating that McMullin made a final
24   determination that the loss was excluded because of the corrosion exclusion and this happened in
     October or November 1992. (Exhibit "4"). The adjustor stated both that he had not seen the final
25   report and that he had not made a final determination. See McMullin Deposition, p. 182, lines 11-
     13; stating that he never saw the final report of Nalbandian regarding whether corrosion caused the
26   loss; McMullin Deposition, p. 232, lines 14-25; p. 233, lines 1-7; stating that as of February 23,
     1994 deposition date that he does not know one way or the other whether or not the insurer has
27   denied coverage under the policy. (Exhibit "6").

28

1   caused by Pioneer's actions or inaction." (Memorandum, p. 10). First, given Defendant's

2   expressed position that "corrosion is corrosion", the testing was not pertinent to its coverage

3   determination. Defendant determined in the first weeks after the accident that corrosion caused the

4   loss.[20] As Dr. Kensicki explained:

5       Mr. Nalbandian was hired by National Union to investigate whether the alleged
        corrosion was long-term or short-term corrosion. Therefore, these material tests that
6       Nalbandian did was <sic> absolutely irrelevant to a decision that National Union
        had to make given that National Union has contended that all forms of corrosion are
7       excluded. (4/7/94 Kensicki Deposition, p. 102) (Exhibit "5")

8   If Defendant truly believed that all corrosion was excluded, its failure to make the coverage

9   determination as soon as it determined that corrosion was involved instead of dragging out the

10  coverage investigation for nineteen (19) more months is bad faith in and of itself. The real reason

11  that Defendant desired that Nalbandian request thousands of pages of documents and then embark

12  on artifact testing was simply to prepare its litigation case on the corrosion issue.[21] Waidler

13  candidly admitted this point. (Waidler Deposition, p. 152, lines 11-16; stating that they did further

14  testing "to be absolutely sure and to make our case stronger") (Exhibit "4").

15      Another indication that the Nalbandian artifact testing was not the cause of the lengthy delay

16  in denying the claim is that Defendant did not even bother to forward the test results or the final

17  Nalbandian report to the person who ordered it and allegedly needed it (McMullen) or forward the

18

19

20

---

21      [20] The record is replete with evidence that Defendant decided that the corrosion exclusion was
22  applicable at the outset of the case yet delayed making a coverage determination. (See McMullin,
    p. 115, lines 4-9; stating that he felt there was no coverage as early as May 22, 1991 because the
23  failure of the 90 degree elbow had been because of corrosion) (Exhibit "6"); (McMullin Deposition,
    p. 185, lines 11-23; states that Nalbandian told him on February 10, 1992 that the loss was one of
24  corrosion and "that he felt that it was corrosion over an extended time frame) (Exhibit "6");

25      [21] It is not disputed that Thielsch was retained to determine whether or not the accident was
26  caused by corrosion. See Waidler Deposition, p. 110, lines 7-13; stating that one of the reasons
    Thielsch was retained was to determine whether or not it was long-term or accelerated corrosion
27  (Exhibit "4"); McMullen Deposition, p. 130, lines 12-18; stating that Thielsch was not retained to
    ascertain whether or not the corrosion was long term or accelerated but instead "It was to determine
28  that it was corrosion, to verify that it was, in fact, corrosion." (Exhibit "6").

1    materials to the assigned claims manager (Smith).[22]  The simple reason that Defendant did not

2    forward the Nalbandian report to either McMullin or Smith is that it had long ago decided to deny

3    coverage on corrosion grounds and had requested the additional testing merely to bolster its position

4    in the anticipated litigation.

5         4.    *Defendant's Claim That The Delay Was Caused By The Confidentiality*
              *Agreement Or Lack Of Cooperation Has No Merit*

6

7         The confidentiality agreement began as a ministerial matter.[23]  (See June 20, 1991 Letter

8    from McMullin to Henning; providing in pertinent part:  "they are willing to provide a secrecy

9    agreement with your company, asking that you submit your choice of agreement to them direct."

10   (Exhibit "11").  The agreement was quickly drafted and forwarded to Defendants on July 24, 1991.

11   (See July 24, 1991 Harrison to Thielsch letter) (Exhibit "12").  Both Nalbandian at Thielsch and

12   McMullen were willing to immediately execute the confidentiality agreement that was initially

13   presented.  In fact, Nalbandian signed it on July 31, 1991.  (3/4/94 Nalbandian Deposition, p. 221)

14   (Exhibit "7").  Similarly, McMullen sent an August 5, 1991 fax to Waidler stating that "I see

15   nothing wrong in my signing the document but I want your review & approval before doing so."

16   (Exhibit "13").

17        A month after the first confidentiality agreement was drafted and after it was executed by

18   Nalbandian, Defendant's attorneys demanded changes to the agreement for its sole benefit if

19

20

---

21   [22]  (See McMullin Deposition, p. 200, lines 21-25; p. 201, lines 1-19; stating that testing was
22   done on September 10-14, 1992" but that "I never got the test results") (Exhibit "6").  It is
     uncontested that McMullen never saw the final Nalbandian report regarding whether corrosion
23   caused the loss.  (McMullen Deposition, p. 182, lines 11-13).  (Exhibit "6").  Smith never looked
     at the Nalbandian report either although he was purportedly the claims manager.  (See Smith
24   Deposition, p. 21, lines 22-25; p. 23, lines 1-3) (Exhibit "10").  Further, McMullen never made
     a final coverage determination and did not even know at the time of his February 23, 1994
25   deposition whether or not Defendant had denied coverage.  (McMullen Deposition, p. 232, lines
26   14-25; p. 233, lines 1-7) (Exhibit "6").

27   [23]  Defendant apparently concedes that a confidentiality agreement was absolutely necessary
     in this case given the class action lawsuit filed against Pioneer and the lengthy attempt by the
28   liability carriers to decline coverage.

1   coverage litigation ensued.[24]  Given that the entire confidentiality agreement dispute was caused

2   by National Union's demand that the agreement its adjustor and its engineer had already signed be

3   changed, Defendant bears the entire responsibility for any delays in its revision and subsequent

4   execution.  This is particularly true when the changes demanded were requested solely to obtain

5   a tactical advantage in potential coverage litigation.

6         Defendant also claims that it was not provided with "access" to documents.  At the outset,

7   contrary to Defendant's claims, the adjustor testified that Pioneer fully cooperated with National

8   Union.  (See McMullin Deposition, p. 156, lines 22-23; stating that Pioneer "gave me the

9   information that I asked for if it was available.").  (Exhibit "6").  Further, it should be emphasized

10  that McMullin made an on-site inspection the day after the accident, Nalbandian was on-site on

11  May 29, 1991 and that Pioneer repeatedly invited McMullin or Nalbandian to attend testing

12  conducted by Pioneer's experts.

13        Although Pioneer strenuously contests that it was responsible for any delay in producing

14  documents, Pioneer notified Defendant by fax transmission on <u>March 5, 1992</u> that the documents

15  requested were available for inspection.  (See March 5, 1992 Rucker to Nalbandian letter) (Exhibit

16  "15").  Defendant erroneously states that it did not receive this document notice until April 1992.

17  (Memorandum, p. 4).  In point of fact, Defendant received the documents themselves in April

18

19
_____

20  [24]  The only change between the first confidentiality agreement and the agreement ultimately
    signed was the addition of the following section that appears as paragraph 4:
21
22        It is further agreed by and between the parties that after National and Thielsch have
          examined and reviewed all information provided by Pioneer, its experts/consultants,
23        or JJC&B, that National and Thielsch shall return and deliver to Pioneer all
          protected documents as defined in paragraphs two (2) and three (3) of this
24        agreement.  Upon the return and delivery of all protected documents to Pioneer, the
          terms of this agreement shall become void and unenforceable by the parties.
25
26        The purported justification offered for this additional language by Defendant was that
    Defendant believed on August 21, 1991 that coverage litigation was imminent.  (See August 21,
27  1991 Letter from McMullin to Harrison; providing in pertinent part that "<t>his particular
    occurrence may well become rather sticky and we feel that the possibility of litigation exists.")
28  (Exhibit "14").

1   1992.[25]

2          Defendant failed to issue a coverage determination after the documents were made available

3   to it because it then decided to do artifact testing (despite the fact that Defendant had witnessed

4   extensive artifact testing previously performed by Failure).  Defendant states that it finished the

5   testing in September 1992.  Defendant fails to advise the Court, however, that it promised Pioneer

6   in a February 12, 1992 letter that it would issue its findings after reviewing the documents and

7   consulting with Pioneer's experts.[26]  The additional artifact tests were simply another stall tactic

8   proposed when it became apparent that Defendant would get all of the voluminous documents that

9   it requested.  Defendant concedes that it did not make a proper request for artifacts for testing until

10  June 4, 1992.[27]  (Memorandum, p. 5; lines 3-4).  The truth of the matter is that Defendant did

11  not provide Pioneer with a proposed test protocol until July 21, 1992.   (See July 21, 1992

12  McMullin to Rucker letter; attaching the protocol) (Exhibit "18").[28]  Defendant attempts to excuse

13  Nalbandian's failure to request these artifacts at an earlier date by claiming that he could not do so

14  until he received an "evidence log."  (Memorandum, p. 5).  Plaintiff respectfully submits that this

15

16     [25]  (See May 7, 1992 Thielsch to McMullin letter; stating "On April 13 and 14, 1992, Thielsch
       Engineering was provided access to selected documents at Failure Analysis Associates.  Pertinent
17     documents were copied and forward <sic> to Thielsch.").  (Exhibit "16").

18     [26]  See February 12, 1992 Letter from McMullin to Rake; stating "I can advise you that after
19     our consultant has reviewed the documentation and has conferred further with Failure Analysis
       Associates, that we will be communicating our findings."  (Exhibit "17")

20
21     [27]  A close examination of Defendant's statement of facts demonstrates that it is attempting to
       commingle its request with documents with its request for artifacts for testing by repeatedly using
22     generic terms such as "access to the materials" (Memorandum, p. 5, line 4) and "requested items"
       (Id., line 17).  Defendant's apparent purpose is to create the false impression that the artifacts were
23     requested on a timely basis and only produced in mid-August 1992.  In fact, Defendant goes so far
       as to make the outrageous proclamation: "More than fifteen months after the chlorine leak, in mid-
24     August 1992, Mr. Rucker finally agreed to allow Thielsch to inspect the requested items."
       (Memorandum, p. 5, lines 15-17).  As stated above, what actually transpired is that Defendant
25     failed to request the artifacts until June 2, 1992 and is attempting to excuse its blatant
26     procrastination by confusing the documents and the artifacts.

27     [28]  It appears that Nalbandian did not even start to develop a test protocol until May 7, 1992,
       at the earliest.  (See May 7, 1992 Nalbandian to McMullin letter; stating "we will develop a
28     protocol for testing . . . .") (Exhibit "19").

1    is not a valid justification for waiting thirteen months to ask for artifacts for testing and fourteen

2    months for describing the proposed tests.   This is particularly true given that Nalbandian was

3    allowed to observe and photograph all of the pertinent artifacts before and during removal[29] and

4    was allowed to observe both the artifacts and testing on the artifacts by the Plaintiff's expert.[30]

5    The real reason that Defendant could not complete artifact testing until September 1992 (sixteen

6    months after the leak) is because Defendant waited until June 1992 (thirteen months after the leak)

7    to request the artifacts and delayed until July 1992 to submit a test protocol.[31]

8            Under the foregoing circumstances, Pioneer believes that the jury could certainly find that

9    the nineteen (19) month delay in making a coverage determination was not caused by either the

10   alleged document production or the artifact testing points that Defendant argues.  Indeed, given the

11   one year void where no claims manager was assigned to the file and the thirteen month delay to

12   properly request artifacts, Plaintiff submits that the jury will be outraged at Defendant's attempt to

13   disclaim any responsibility for the delay.  Regardless, taking all inferences in favor of Pioneer, the

14   timeliness of the coverage determination is an issue of fact.

15   **C.    Punitive Damages Are Available If Defendants' Denial Of Benefits Subjected Pioneer
           to "Cruel and Unjust Hardship"**

17           The Nevada Supreme Court has held that an insurer is liable for punitive damages if its

---

19   [29] Defendant's expert has conceded that when he finally got around to developing a protocol
     that it was based primarily on his on-site observations in June, 1991.  (See May 29, 1991
     Nalbandian to McMullin letter; stating the items for testing "were developed from the Failure
     Analysis Associates Evidence Log and from the testing performed on site on June 1 - 4, 1991.")
     (Exhibit "20").

22   [30] See, e.g., February 26, 1992 Nalbandian to Rucker letter; conceding that on his May 29,
     1991 site visit:  "I had the opportunity to observe and photographically document the failed
     components and section of the piping system.") (Exhibit "21") (May 28, 1991 Rucker to National
     Union letter; notifying it of testing on May 30, May 31 and June 3, 1991 at the offices of Plaintiff's
     experts and stating "<y>ou and/or your experts are invited to witness these tests.") (Exhibit "22")
     (July 8, 1991 Rucker to National Union letter; stating "we have agreed to provide you copies of
     all "hard data" developed by our experts") (Exhibit "23").

27   [31] Compared to the dilly-dallying by Defendant, Pioneer's agreement to the proposed artifact
     testing was near instantaneous.  Pioneer agreed to the July 21, 1992 proposal in three (3) weeks.
28   (See August 13, 1992 Rucker to McMullin letter) (Exhibit "24").

deliberate denial of benefits subjected the insured to "cruel and unjust hardship":

> To recover punitive damages, plaintiff must also show evidence of "oppression, fraud, or malice, express or implied." NRS 42.010. Appellants contend that the record lacks any evidence showing that their conduct constituted oppression, malice or fraud.
>
> We defined oppression as "a conscious disregard for the rights of others which constitutes an act of subjecting plaintiffs to cruel and unjust hardship." Ainsworth v. Combined Ins. Co., 104 Nev. 587, 590, 763 P.2d 673, 675 (1988).

United Fire Ins. Co. v. McClelland, 780 P.2d 1903, 198 (1989).

A review of the cases demonstrates that the standard for punitive liability is less stringent than Defendant suggests.[32] In United, the Court held that the failure of an insurer to disclose to the insured in a letter that the insurer had regulatory difficulties "demonstrated a callous disregard for Kenneth's <the insured's> rights and resulted in his emotional anguish when medical bills accumulated with no means of paying them." 780 P.2d at 199. The Court further concluded that the foregoing constituted "substantial evidence of oppression on the part of appellants" which supported the punitive damages award. Id. Other Nevada cases are comparable. [33]

---

[32] In its punitive damages argument (Memorandum, pp. 28, 19), Defendant cites first a Texas decision, follows with a Nevada case and then quotes an Arizona Supreme Court decision for the standard that it suggests this Court should apply to the punitive damages claim. Despite its vigorous argument earlier in the brief that Texas law applies, Defendant is silent as to why it suggests only pages later that Arizona law applies to the punitive damages portion of the bad faith claim. Plaintiff is unable to discern any rationale support for application of Arizona law to this controversy.

[33] In Ainsworth v. Combined Ins. Co. of America, 763 P.2d 673 (Nev. 1988), the Court held that a refusal to pay a claim with knowledge that the insured was in dire financial need based upon a restrictive definition of a policy term constituted "conscious disregard" supporting punitive damages:

> Combined's obstinate and unjustified refusal to pay, in our opinion, constitutes oppression as contemplated by the statute. The evidence establishes that the Ainsworths were in desperate need of funds, and that Combined had reason to know their dire circumstances. The record clearly supports an inference that Combined consciously disregarded the rights of its insured by clinging to its restrictive definition of "accident" as used in its policy.

In Ainsworth the ambiguous policy term was the word "accident" whereas in the present case it is the exception as applied to the rag. National Union's refusal to pay the claim is no less "obstinate"

1    Applying this standard to the instant case, the facts are uncontroverted that Defendant knew

2  that Pioneer was experiencing "major financial difficulties." Ignoring the obvious need for capital

3  of a manufacturer suffering a major explosion at one of its two plants, Defendant knew that

4  virtually all of Pioneer's insurance carriers had reneged on their insuring commitments. Further,

5  the adjustor knew at the outset that Pioneer needed some up front money. (See McMullin

6  Deposition, p. 133, lines 17-23; stating that he was aware as early as May 1991 that Pioneer was

7  requesting some money up front to cover this loss) (Exhibit "6"). It is uncontroverted that Pioneer

8  requested a $1 Million advance in February, 1992 in an attempt to mitigate damages and that

9  National Union refused to provide any relief.[34] Based upon the foregoing, Plaintiff submits that

10 the jury could properly find that Defendant subjected Plaintiff to "cruel and unjust hardship" by

11 continually exposing it to "major financial difficulties."

12    There was also a sinister motive to Defendant's continued delaying tactics. Insurance expert

13 Dr. Kensicki believes that Defendant's unprecedented delay in making a coverage determination

14 was an attempt to delay until the two-year contractual limitations period for suit had expired.[35]

15

_____

16 than the insurer in <u>Ainsworth</u> and the financial straits of Pioneer are comparable to the <u>Ainsworth</u>
   insured.

17

18    [34] (See McMullin Deposition, p. 222, lines 21-25, p. 223, lines 1-6; stating that he received
   Rake's letter stating that the insured is seriously out-of-pocket as a result of the incident and an
19 advance of $1,000,000 would be most helpful and sent it to Waidler in a fax dated February 10,
   1992) (Exhibit "6"); see also Letter to William Shemberger and Robert J. McMullin from William
20 G. Rake dated January 31, 1992. (Exhibit "25").

21    [35] Dr. Kensicki testified as follows:

22
       If the intention of National Union was to let 24 months expire so that the insured's
23     right to sue the insurer expired, then National Union could have done nothing for
       19 months and an additional five more. If it really made no difference as to whether
24     long-term or short-term corrosion caused the loss, then National Union could have
       avoided the Nalbandian examination and could have instructed McMullin to deny the
25     claim very early. But instead at National Union, no one, at least according to the
       file that I saw, was doing anything. Therefore, it forced Pioneer Chlor Alkali to
26     hire lawyers to file suit. (4/7/94 Kensicki Deposition, pp. 103, 104). (Exhibit "5")

27
   It is uncontested that the policy contains a two-year limitation to file suit which purports to supplant
28 the typical six-year limitations period otherwise applied under Nevada law. Although Defendant's

1   As stated above, Defendant's employees concede that the nineteen (19) month delay to determine

2   coverage was unprecedented in the history of the company.

3          **D.     The Challenge To Certain Categories Of Damages Is Untimely**

4          The consequential damages challenged in the instant motion were first identified in an

5   interrogatory answer and have been addressed in subsequent amendments thereto.  As Defendant's

6   citation to Henning deposition testimony demonstrates, Defendant engaged in extensive discovery

7   regarding these damages items.  The same consequential damages are sought in both the coverage

8   claim and the bad faith claim.[36]  This Court set a deadline that expired before the instant motion

9   was filed for submitting motions for summary judgment and Defendant filed a "Motion For Partial

10  Summary Judgment On The Issue Of Alleged Damages Under The Policy" on May 27, 1994.  A

11  limited exception was carved out for the bad faith claim because that was added by amendment.

12  Plaintiff asserts that although Defendant may challenge the basis of bad faith liability, it should not

13  be allowed to move to dismiss the consequential damages claim because this motion could and

14  should have been earlier brought.  In effect, Defendants are using the bad faith claim as an excuse

15  to file a belated motion challenging the consequential damages.

16  **E.     Plaintiff Has Offered Competent Evidence To Support Its Damages Claims**

17          *1.     A Jury Issue Is Present If There Is A Reasonable Method For Ascertaining
                   The Extent of Damages*

18          The fact that "some uncertainty exists as to the actual amount of damages sustained" is not

19  pertinent if plaintiff offers a "reasonable method for ascertaining the extent of damage through

20  testimony . . . ."  In <u>Bader v. Cerri</u>, 96 Nev. 352, 357, 609 P.2d 314, 318 (1980), the Court stated

21  as follows:

22

23  _____

    ploy did not succeed because Pioneer filed a timely law suit, the Unfair Practices Act prohibits
24  "<m>isleading an insured or claimant concerning any applicable statute of limitations."  N.R.S.
    686A.310(p).
25

26  [36] There is a theoretical difference regarding the total amount of consequential damages
    <u>recoverable</u> under the coverage claim and bad faith claim because the deductible, co-insurance and
27  other insurance reductions applicable to the consequential damages sought under the coverage claim
    would <u>not</u> reduce the consequential damages recoverable under the bad faith claim since the latter
28  is a tort claim.  The consequential damages themselves however, are identical.

1  

> The rule against the recovery of uncertain damages generally is directed against uncertainty as to the existence or cause of damage rather than to measure or extent. However, if there is evidence that damage resulted from the defendant's wrongful action and a reasonable method for ascertaining the extent of damage is offered through testimony, the fact that some uncertainty exists as to the actual amount of damage sustained, does not preclude recovery.  It is sufficient if the evidence adduced will permit the jury to make a fair and reasonable approximation.

Id. 96 Nev. at 357, 609 P.2d at 318 (emphasis added).  Difficulty in measuring damages with exactness does not preclude recovery:

> Where defendant's conduct has rendered difficult the assessment of damages, the defendant cannot escape liability simply because it has become difficult to measure the damage with exactness.  The rule which precludes the recovery of uncertain and speculative damages applies only to situations where the fact of damages is uncertain, not where the amount is uncertain.

Nelson v. Lake Canal Co. of Colorado, 644 P.2d 55 (Colo.App. 1981).

Although Plaintiff does not believe that there is any "uncertainty" regarding any of its proffered damages and that Plaintiff has and can measure the same with reasonable precision, the correct focal point for analysis is whether or not "there is evidence that damage resulted from the defendant's wrongful actions and a reasonable method for ascertaining the extent of damage is offered through testimony."   See also Central Bit Supply v. Waldrop Drilling & Pump, 102 Nev. 139, 717 P.2d 35 (1986) (holding that "Waldrop <plaintiff> need not prove its damages with mathematical precision; it need only establish a reasonable basis for ascertaining those damages.").

The Nevada Supreme Court has expressly held that an insurance company is liable under bad faith principles for consequential damages despite the fact that the insured is already in extreme financial distress.  In United States Fidelity v. Peterson, 91 Nev. 617, 620, 540 P.2d 1070, 1071 (1975), the Court held that knowledge of the financial condition of the insured rendered the insurer liable for consequential damages arising from the failure of the insured to pay the claim:

> It <the insured> had been given notice many times by Peterson of the several valid claims and had knowledge of the effect of its refusal to pay on his financial condition.  The company contributed materially to Peterson's stress by promising to pay him immediately if he would make the necessary repairs that he was not otherwise compelled to make. He performed the work using operating capital which he needed to continue operating his business, nor could he seek business elsewhere since his funds were tied up by the appellant and he was unable, therefore, to obtain performance bonds.  (Emphasis supplied.)

Likewise, where Plaintiff was required by Defendant's refusal to pay to divert operating capital

- 22 -

1   which it needed to continue its business to more immediate needs or to incur significant costs and

2   penalties to obtain more capital, Defendant is liable for such consequential damages regardless of

3   whether or not Plaintiff was in an impaired financial condition.

4         When a tort has been committed, the Defendant is required to take the Plaintiff as it finds

5   Plaintiff.  This doctrine is sometimes referred to by the term "thin skull" or "eggshell skull".[37]

6   "Some scholars have interpreted the thin skull doctrine to encompass the plaintiff's physical mental,

7   or financial condition."  Schafer v. Hoffman, 831 P.2d 897, 899 (Colo. 1992) (holding that "it is

8   fundamental that a tortfeasor must accept his or her victim as the victim is found.").  Others apply

9   it in a different guise as the "true value" or "shabby millionaire" rule; which provides that

10  "foreseeability is not an issue in determining the extent of damages that the injuries cause."  Id.,

11  at 902.  Under either approach, Defendant can not use the financial condition of Plaintiff as an

12  excuse for the damages it caused.

13        Defendant's general damages argument is that Pioneer had other financial difficulties and,

14  therefore, Defendant is not responsible for the financial damage it caused to Pioneer by withholding

15  payment.  The first general answer to this claim is that Defendant must accept the Plaintiff in the

16  economic condition in which it existed at the time of the breach of contract and tortious conduct.

17  It is no defense that Pioneer may not be as prosperous as IBM and Microsoft and thus able to shrug

18  off the loss of millions of dollars worth of property insurance.  In the Nevada bad faith cases cited

19  above, not only was the impaired economic condition of the Plaintiff no defense, it was precisely

20  because of this economic condition that punitive damages were awarded.  The second general

21  answer to this argument is that this is an issue of proof that will be resolved at trial--at which point

22  the Court will be in a much better position to evaluate the evidence and consider whether sufficient

23  evidence supports each damages claim.

24  _____

25  [37]  The term "thin skull," or "eggshell skull," is derived from illustrations appearing in English
    cases wherein a plaintiff with an "eggshell skull" suffers death as a result of a defendant's
26  negligence where a normal person would only suffer a bump on the head.  Dulieu v. White &
    Sons, 2 K.B. 669, 679 (1901); W. Page Keeton et al., Prosser and Keaton on the Law of Torts
27  Sec. 43, at 292 (5th ed 1984); Restatement (Second) of Torts Sec. 461 cmt. a (1965) ("A negligent
    actor must bear the risk that his liability will be increased by reason of the actual physical condition
28  of the other toward whom his act is negligent.

1    As a final preliminary comment, Defendant's argument that Plaintiff should have received

2    more monies from various sources (i.e., other insurers, its subsidiaries, the arbitration award, the

3    marketplace for its products) is an attempt to suggest that collateral sources of revenue exist to

4    which Defendant is entitled a credit in the form of a judicial determination that they were

5    intervening causes.    Plaintiff submits that the collateral source doctrine bars this argument.[38]

6    Causation in this case should and must be judged by the revenues and expenses that actually

7    existed--not Defendant's speculative arguments as to what the arbitration award should have been

8    or how much other insurers should have paid. While various points regarding the specific damages

9    arguments are addressed in more detail below, Plaintiff submits that the basic assertion that these

10

11    [38] The fact that Royal also may be liable in contract for the same consequential damages is no
defense for three (3) different reasons. First, under the contract claim, National Union is liable
12    for 75% of the damages under its "other insurance" clause if Royal is a contributing insurer.
Second, if contributing insurers were excused from paying consequential damages merely by
13    pointing the finger at one another, such damages would never be awarded. Royal could claim as
easily as National Union that Royal is not liable for the consequential damages because they were
14    caused by the National Union failure to pay. This is why the contract sets forth a percentage
allocable to both insurers and both are liable for the damages.
15
     Third, National Union is seeking to use the failure by Royal to pay (and everybody else)
16    to get a credit for what Royal should have paid and apply the credit retroactively and then analyze
the theoretical impact on Pioneer's finances. There are several fallacies with this approach. First,
17    Royal did not pay because it was engaged in coverage litigation. Arguing that Royal should have
paid and therefore that Pioneer would have more money has no more validity than suggesting that
18    Pioneer may theoretically have discovered gold on its property and therefore would have had more
money. Second, under the collateral source doctrine, Defendant is not entitled to any credit on the
19    bad faith claim whatsoever for payments by Royal even if Royal had made such payments. See
Exum v. Ferguson, 97 N.M. 122, 637 P.2d 553 (1981), (holding that an insurance broker was not
20    entitled to a credit for the amount paid by an insurance company under its contractual obligations
because the insurer "was sued only for breach of the insurance contract" and because the insurer
21    and broker claims "were based on different theories of liability, they are not joint tort-feasors and
Ferguson is not entitled to a credit of Occidental's settlement."); Wagner v. Casteel, 663 P.2d
22    1020 (Ariz. 1983) (purchasers of a home sued the seller for misrepresenting that the roof was in
good condition. The trial court refused to allow evidence of payments to Plaintiffs for the damages
23    roof from their insurance company. The Court of Appeals affirmed, holding that payments from
a insurance proceeds were a collateral source that could not be used is a credit in a negligence
24    action for the same damages); D. Dobbs, Handbook on the Law of Remedies Sec. 3.6, at 185
(1973) (providing that "<a>s a general rule, benefits received by the plaintiff from a source
25    collateral to the tort-feasor or contract breacher may not be used to reduce the defendant's liability
for damages. This rule holds even though the benefits are payable to the plaintiff because of the
26    defendant's actionable conduct and even though the benefits are measured by the plaintiff's losses.")

27

28

- 24 -

1    areas are relevant should be rejected.

2              2.    *Competent Testimony Supports Each Damages Item*

3              Applying the rule of law that requires only a "reasonable method for ascertaining the extent

4    of damage through testimony" to create a jury issue to the case at hand, Plaintiff submits that it has

5    offered competent evidence to support all of the challenged items of damages.  One of Plaintiff's

6    primary damages witnesses will be George Henning.  Mr. Henning received an MBA from Harvard

7    in 1965.  (4/13/64 Henning Deposition, p. 9) (Exhibit "26").  Since that date, Mr. Henning served

8    as the controller, vice-president of finance or related financial positions for a number of other

9    corporations before becoming the Chief Financial Officer of Pioneer in 1989.  (Id., pp. 10, 11)

10   (Exhibit "26").   Mr. Henning has offered testimony supporting each and every one of the

11   challenged damages items.[39]

12             a.    *Interest Cost On Property Replacement Expenditures*

13             Defendant's objection to the interest cost is based on a blatant distortion of the Henning

14   testimony and the assertion that Pioneer did not determine what portion of the interest payment is

15   attributable to damages caused by Defendants.  (Memorandum, pp. 22, 23).  The truth of the

16   matter is that Mr. Henning explicitly stated that the $237,297.43 figure was "the interest on the

17   replacement expenditures that the company made during this period of time, using the interest rate

18   that the company pays for its revolving credit line."  (2/8/94 Henning Deposition, Vol. I, p. 75).

19   (Exhibit "27").[40]

20

21       [39]  One glaring deficiency in the motion is the failure by Defendant to offer any testimony in
22   support of any of its arguments.  Plaintiff has previously deposed an accountant that Defendant
     indicated it had retained as an expert witness.  Defendant failed to offer an affidavit from the
23   accountant and is barred from doing so at this time.  Presumably, Defendant decided against
     offering such affidavit because it would emphasize that the majority of Defendant's damages
24   argument is based on contested issues of facts or arguments about how evidence should be
     interpreted.
25

26       [40]  In direct response to a questions about the "Interest Cost On Property Replacement", Mr.
     Henning answered:
27

         A.    Pioneer operates on a -- has a revolving term loan with its banks to fund it when it
28   doesn't have sufficient cash to make payments on its bills properly.  Pioneer at the time of this

1    Defendant has taken an answer out-of-context and created the impression that Henning was

2    stating that he could not calculate the interest on the replacement expenditures (which he in fact

3    did).  The question (which Defendant failed to cite) followed by the answer provided as follows:

4        Q.  But in addition to borrowing to make payments for repairs,    did you borrow for other
     reasons?

5

6        A.  Our dollars are fungible.  I can't tell you on any one day what I'm borrowing for or
     not borrowing for.  (Emphasis supplied) (Id., p. 77) (Exhibit "27").

7    Given that the actual testimony was directly contrary to what Defendant has represented to the

8    Court, there is no valid challenge to this damages item.

9        b.    Bank Waiver Fees

10       Defendant's objection to this damages element is based on its refusal to understand that the

11   words "insurance companies" in the quoted statement is a reference to more than one insurance

12   company.  This precise issue was addressed and explained repeatedly in the Henning deposition.[41]

13

—————————————————

14   accident already borrowed on the revolver and has borrowed on the revolver ever since.  In other
     words, it has not gotten back to zero.  So throughout the entire time since the accident occurred,

15   all dollars expended by Pioneer have been funded through borrowing.  And the company has had

16   to pay interest on that borrowing.   And this particular item represents the interest on the
     replacement expenditures that the company made during this period of time, using the interest rate

17   that the company pays for its revolving credit line.  (2/8/94 Henning Deposition, Vol. I, p. 75)
     (Exhibit "27").

18

19   [41]  Mr Henning addressed this specific argument twice in the pages cited by Defendant
     regarding the interest issue.  (See Memorandum, p. 22, line 8):

20

21       Q.     The top of the document says "Damages Incurred Report Because of the Lack
         of Funding by Royal insurance Company and Other Carriers."  What specific "other
         carriers" are you referring to here?

22       A.     National Union.

23       Q.     Is that the only other carrier?
         A.     Yes.  (2/8/94 Henning Deposition, Vol. I, p. 74).  (Exhibit "27").

24
     Mr. Henning also explained exactly why the Royal reference was included:

25

26       Q.     If you look at Page P00659, it says "Attachment 1 contains the calculation
         of the interest cost to Pioneer because of not being reimbursed by Royal Insurance

27       Company."  Were those costs incurred solely because of not being reimbursed by
         Royal Insurance Company?

28       A.     No.  This should say "by Royal and National Union."

1    Defendant has also been apprised on numerous other occasions that the damages documentation

2    in question reference Royal at times because the documents were also compiled with regards to the

3    Royal claim or litigation.  For the foregoing reasons, Defendant's argument on this point is based

4    on semantics at best and silly at worst.

5        Defendant continues to argue that the bank waiver fees were caused by a number of other

6    factors.  This point is addressed in more detail under the damages item "debt restructure", wherein

7    Plaintiff points to the testimony that refutes this contention.

8        c.    *Increased Maintenance Costs*

9        Through selective quotation and sleight of hand, Defendant has again distorted the applicable

10   facts.  Pioneer was forced to divert monies that would otherwise have been spent for new or

11   replacement parts or equipment to other uses, thereby increasing the maintenance costs from what

12   they otherwise would have been absent the fund diversion.  A simple example from Mr. Henning

13   explains the theoretical basis for the maintenance cost claim:

14       As you know, if you have a car and you don't do -- you don't buy a new car, you're
         going to have increased maintenance on your old car.  You're going to have to
15       replace the tires, change the oil and have the engine adjusted.  And in a chlorine
         plant or any operating plant, if you don't fix a pump or replace a pump, and then
16       the propeller, or whatever, in the pump starts going bad, you're going to have to
         take the pump apart and put a new propeller in it and put it back together again.  It's
17       just the nature of mechanical equipment.  (2/8/94 Henning Deposition, Vol. 1, p.
         124).  (Exhibit "27")
18
     Plaintiff recognizes that the increased maintenance costs can not be determined with mathematical
19
     certainty--but that is not what is required.   Under Nevada law, Plaintiff need only offer a
20
     "reasonable method for ascertaining the extent of damage through testimony" to create a jury issue.
21
     Mr. Henning testified that the 30% figure used was "a figure that our plant people use when they're
22
     determining whether they should replace an item or continue operating it."  Mr. Henning's opinion
23
     testimony satisfies the pre-requisite for a reasonable method.  The other points that Defendant has
24

25

26   _____

27       Q.    And do you know why it just says "Royal"?
         A.    Because it was done at an early date and wasn't revised to include National
         Union.  Or when it was being done, the person who was doing it didn't think in
28       those terms.  (Id., p. 77) (Exhibit "27").

                                         - 27 -

1  raised   regarding   this   damage   item   are   either   argumentative   or   easily   refuted.[42]

2       d.    *Debt Restructure Costs*

3       Defendant argues that the need to restructure was based upon a number of factors.

4  (Memorandum, p. 25).  The evidence produced by Pioneer is directly to the contrary.  Henning

5  states as follows: "It is my opinion that Pioneer would not have been forced to seek the restructure

6  of its debt if it had received prompt and timely reimbursement of damages incurred as a result of

7  the accident which occurred on May 5, 1991, including payment from National Union Fire

8  _____

9       [42] Defendant asserts that maintenance costs actually decreased.  (Memorandum, p. 24).
Henning disputed this contention: "Our maintenance costs have been going up, in spite of various

10  things we've been doing to reduce maintenance costs.  It's our opinion that included in those
maintenance costs are the effects of not having made the capital expenditures that we should have -

11  - that would have been normal."  (2/8/94 Henning Deposition, Vol. 1, p. 125) (Exhibit "27").
Defendant's assertion that "it appears following the loss Pioneer's maintenance costs actually

12  decreased" (Emphasis by Defendant) is based on page 26 of the deposition of Walter McCollum.
Once again, Defendant has distorted the actual testimony.  First, McCollum merely states that

13  "some" maintenance costs have decreased.  Second, McCollom's answer referred to the April 1992

14  time period after he became plant manager.  (McCollum Deposition, p. 4) (Exhibit "28").  The
unedited question and answer read as follows:

15

16       Q.    Since you've become Plant Manager at Henderson, have maintenance costs
             at the plant increased?

17       A.    Have maintenance costs increased?
         Q.    Yes.

18       A.    No, they have not.
         Q.    Have they decreased?

19       A.    Some.  (Id., p. 26) (Exhibit "28").

20
Defendant ignored the statement by McCollum that capital spending decreased in 1992 because of

21  lack of funds.  (Id., p. 28, lines 4-10).  McCollum also stated that the isolated maintenance costs
that did decrease were the result of a re-organization of the maintenance unit.  (Id., p. 26, lines 21-

22  24).  (Exhibit "28").

23       Defendant also argues that there was "an expected capital shortfall of over $9.5 Million, yet

24  Pioneer's claim against NU is only a little over $3.3 million."  First, the expected capital shortfall
figure that Defendant references is for a three year period.  Comparing that figure with Plaintiff's

25  total damages claim at the three year mark; $1,356,630 Business Personal Property Loss;
$2,234,470 Business Interruption and Extra Expense Loss and the $11,360,846 in consequential

26  damages, indicates that Defendant could have funded the entire $9.5 Million capital shortfall and
had many millions left over.  Further, the foregoing figure does not take into account the other $1.1

27  Million of operating capital that would not have been diverted to pay the lenders because of the

28  increased 95% figure from the restructuring.

- 28 -

Insurance Company . . . ." (Henning Affidavit, paragraph 7). (Exhibit "29"). This is exactly what Henning said in his recent deposition.[43] While Defendant has the right to argue to the jury that Henning's position is not credible, there is clearly an issue of fact on this point.

Defendant has also cited a revenue source that assisted Pioneer in minimizing the consequential damages resulting from Defendant's bad faith and attempts to twist it to an additional loss. Pioneer did obtain an $9.2 Million arbitration award from the seller of the company on an unreleased matter. Contrary to the implication left by Defendants, the claim was not booked as a receivable but was instead treated as, extra-ordinary income. (See Henning Affidavit). (Exhibit "29"). Because it was not booked as a receivable, it can not by any stretch of the imagination be considered "a shortfall" as Defendant claims. (Memorandum, p. 21). In actuality, this revenue was a "windfall" to Defendant because it helped Pioneer minimize the consequential damages.[44]

Pioneer paid 95% of the after-tax arbitration award to its banks under the restructuring caused by Defendant's failure to pay whereas only 70% would have had to be paid absent the restructuring. After taxes, Pioneer lost $1,100,000 in working capital as a direct cause of Defendants wrongful acts. When the approximately $3 Million property damage, the $237,297 in interest, the $75,000 in bank waiver fees and the $2,300,000 in working capital is considered together, the uncontradicted facts actually show that Plaintiff had $4,312,297 Million less from

---

[43] Mr. Henning testified as follows two (2) months ago:

Q.    Had National Union paid you in September of 1991 -- excuse me -- in September of 1992 the amount of your claim, would it have been necessary for Pioneer to restructure its debt?
A.    I don't think so. (4/13/94 Henning Deposition, pp. 58, 59). (Exhibit "26").

[44] Defendant's claim that Pioneer "lost" $5.8 Million to $10.8 Million because it did not obtain the full amount that it requested in the arbitration is based upon the premise that Pioneer had some sort of vested right to the amount that Pioneer requested in the arbitration. As the Court is aware, Plaintiffs typically optimistically evaluate their prayers for relief. The fact that the ultimate judgment is almost always less than what is requested in the prayer for relief does not mean that Plaintiff "lost" the difference. If so, Penzoil "lost" money in the famous Texaco litigation because it prayed for less than it received in judgment and settled for even less than the judgment amount. For these reasons, it is a non-sequitur to suggest that the prayed for amount in an arbitration or litigation creates a "loss" if not received.

1  these damages elements alone to pay bills because of Defendants breach after paying 95% of the

2  arbitration award to the lenders.[45]

3         e.      *Black Mountain Power Debt*

4         Plaintiff candidly acknowledges that the arrangement pertaining to the Black Mountain

5  Power debt and has still not been entered.  It is still possible, however, that this arrangement will

6  be consummated prior to the commencement of trial and, if so, it would be a recoverable damage.

7  Plaintiff respectfully requests the Court to defer ruling on this specific damages element until time

8  at trial or resolves this item at the pre-trial conference.

9         *f. Miscellaneous Damages Issues*

10        Defendant has also made numerous factual assertions in the damages section that are either

11 contradicted by the actual facts or are not pertinent.[46]  Some of Defendant's factual assertions are

12 self-contradictory.    For  example,  on  page  Defendant  claims  that  Plaintiff  did  not  suffer

13 consequential damages as a result of its non-payment after the May 6, 1991 loss because it lost

14 sales revenue due to a decrease in the market price for chlorine.  (Memorandum, p. 20, lines 1-7).

15

16

17    [45]  The argument based upon the Schnitzius and Henning testimony regarding the impact of
   losing $3.5 Million in late 1992 (Memorandum, p. 26) is not pertinent to the causation
18    determination for several reasons.  First, as set forth above, the total working capital lost was $4.3
   Million as of late 1992 (excluding maintenance costs and several other consequential damages
19    elements).  Second, Defendant conveniently ignores both the lost interest and the other compensable
   expenditures that accumulated between May 1991 and December 1992 when it focuses on that date
20    and suggests hypothetical payment of the property damage that it should have paid beginning in
   May 1991.
21

22    [46]  Plaintiff submits that the majority of factual assertions set forth on page 20 are simply
   "causation" arguments for the jury.  The majority of the factual assertions are either wrong or
23    subject to debate.  For example, Defendant complains that prior to the accident Pioneer acquired
   the All-Pure and Imperial West subsidiaries and the consequent debt of this purchase.  This is no
24    defense because Defendant takes the Plaintiff as it finds it.  Further, the fact that Plaintiff had
   adequately structured its finances to effectuate this purchase before the accident demonstrates that
25    the failure of Defendant to pay was the cause of the restructuring.  Defendant also complains of
   chlorine price fluctuations.  While this may be a factor in determining lost earnings, in some cases,
26    it is not a factor in the present case because the majority of Pioneers sales were set a pre-
   determined contract price, including the sales to its subsidiaries.   (See Affidavit of George
27    Henning). (Exhibit "29").  In addition, the lost earnings of both All-Pure and Imperial West have
   not been included by Defendant as part of the compensable business interruption loss.
28

1    On the exact same page, Defendant asserts that Defendant had higher sales revenue in May 1991

2    after the loss than before the loss--arguing that "Pioneer's sales actually increased substantially

3    following the incident." Given that Defendant bears the burden of establishing that the pertinent

4    factual allegations are uncontroverted, its own internal inconsistency is fatal.

5        Defendant states in the motion that "at the same time" chlorine prices dropped; implying

6    this occurred in 1991. In reality the decline did not begin until 1992. (4/13/94 Henning

7    Deposition, p. 63, lines 22-25) (Exhibit "26"). Further, chlorine prices began recovering in 1993

8    and in April, May and June 1994 were in the range of $180 to $200 per ton. (Henning Affidavit).

9    Defendant also fails to inform the Court that the price of "caustic" remained constant in 1991 and

10   1992. Id. Chlorine and caustic are co-products that result from the same production price in fixed

11   ratios. Id. For this reason, Pioneer can not simply quit producing chlorine and continue producing

12   caustic of vice versa. Id. This is why the "electro-chemical unit", which is a measure of the

13   combined prices of both chlorine and caustic is a more appropriate measure of prices. Id. While

14   precise figures for the time period May 1, 1991 through August 31, 1994 are not yet available,

15   Pioneer estimates that the decline will be less than 10%. Id. More to the point, the "electro-

16   chemical unit" for 1991 was 344 and for 1992 was 335--an extremely small decrease. Id.

17       Defendant also points to a $2.4 Million write-off of an account receivable. Write-offs are

18   a normal and expected occurrence in any business. (Id.) Defendant has cited no caselaw holding

19   or even suggesting that a tortfeasor can add up the large write-off's in the history of a business and

20   theorize that the loss would not have occurred if those other creditors had paid Plaintiff. As said

21   above, this is an impermissible variation of the collateral source doctrine in that Defendant is

22   seeking to get credit for a payment from another source--despite the fact that the payment was not

23   even made. All that is required is that Plaintiff reasonably mitigate its damages--not that it collect

24   every debt owed to it at face value.

25   .      .      .

26   .      .      .

27   .      .      .

28   .      .      .

1

## II. CONCLUSION

2      Pioneer respectfully requests that the Court deny Defendant's motion for the reasons

3   indicated herein.

4   Respectfully submitted,

5   HARRISON, KEMP & JONES,                    JONES,   JONES,   CLOSE   &   BROWN,
    CHARTERED                                   CHARTERED
6

7   By:_____               By:_____
       J. RANDALL JONES, ESQ.                      KEVIN R. STOLWORTHY, ESQ.
8      WILL KEMP, ESQ.                              700 Bank of America Plaza
       600 Bank of America Plaza                    300 South Fourth Street
9      300 South Fourth Street                      Las Vegas, Nevada 89101-6026
       Las Vegas, Nevada 89101
10

11                          ATTORNEYS FOR PLAINTIFF

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

<u>RECEIPT OF COPY</u>

2      RECEIPT of a true and correct copy of the attached **PLAINTIFF'S OPPOSITION TO**

3   **DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFF'S BAD**

4   **FAITH CLAIMS** is hereby acknowledged this ___5th___ day of July, 1994.

5

6

7      By *Thomas D. Beatty / m.k.*

8      THOMAS D. BEATTY
       601 East Bridger Avenue
       Las Vegas, Nevada 89101

9

       ATTORNEYS FOR DEFENDANT

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 33 -

1

<u>CERTIFICATE OF MAILING</u>

2    I hereby certify that on the ____5____ day of July, 1994, the foregoing **PLAINTIFF'S**

3    **OPPOSITION TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON**

4    **PLAINTIFF'S BAD FAITH CLAIMS** was served by mailing a copy thereof, first class mail,

5    postage prepaid, to:

6        Philip C. Silverberg, Esq.
         MOUND, COTTON & WOLLAN
7        One Battery Park Plaza
         New York, New York 10004

8

9

10        _____
          An employee of JONES, JONES, CLOSE &
11        BROWN, CHARTERED

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT E

# NATIONAL ARCHIVES AND RECORDS ADMINISTRATION

## all to whom these presents shall come. Greeting:

rtue of the authority vested in me by the Archivist of the United States, I certify on his behalf,

seal of the National Archives and Records Administration, that the attached reproduction(s) is

correct copy of documents in his custody.

| SIGNATURE | |
|---|---|
| *Michael J. Kretch, Jr.* | |
| NAME | DATE |
| Michael J. Kretch, Jr. | 0 1 JUL 2008 |
| TITLE | |
| Director, Federal Records Center | |
| NAME AND ADDRESS OF DEPOSITORY | |
| National Archives and Records Administration | |
| 23123 Cajalco Road | |
| Perris, CA  92570-7298 | |

NA FORM 13040 (10-86)

1 J. RANDALL JONES, ESQ.
WILL S. KEMP, ESQ.
2 HARRISON, KEMP & JONES, CHARTERED
Suite 600
3 300 South Fourth Street
Las Vegas, Nevada 89101
4 Telephone:  (702) 385-6000

5 KEVIN R. STOLWORTHY, ESQ.
JOHN W. FIELD, ESQ.
6 KRIS T. BALLARD, ESQ.
JONES, JONES, CLOSE
7 & BROWN, CHARTERED
Seventh Floor - Bank of America Plaza
8 300 South Fourth Street
Las Vegas, Nevada 89101
9 Telephone:  (702) 385-4202

10 ATTORNEYS FOR PLAINTIFF

11                UNITED STATES DISTRICT COURT

12                    DISTRICT OF NEVADA

13 PIONEER CHLOR ALKALI COMPANY,        CASE NO. CV-S-93-276-RLH
   INC.,
14                                      **PLAINTIFF'S COUNTER-
                  Plaintiff,            STATEMENT OF FACTS RELATING
15                                      TO OPPOSITION TO DEFENDANT'S
   vs.                                  MOTION FOR PARTIAL SUMMARY
16                                      JUDGMENT ON THE ISSUE OF BAD
   NATIONAL UNION FIRE INSURANCE        FAITH**
17 COMPANY OF PITTSBURGH,
   PENNSYLVANIA.
18
                  Defendant.
19

20      Plaintiff Pioneer Chlor Alkali Company, Inc. ("Pioneer") files

21 this Counterstatement of Facts Relating to its Opposition to the

22 Motion for Partial Summary Judgment ("Motion") of Defendant National

23 Union Fire Insurance Company of Pittsburgh, Pennsylvania ("National

24 Union") on the Issue of Bad Faith.

25 .    .    .

26 .    .    .

27 .    .    .

28

1                        **COUNTERSTATEMENT OF FACTS**

2    **A.    Statement of Undisputed Material Facts**

3        1.      This is an action in which plaintiff, Pioneer Chlor Alkali

4    Company, Inc. ("Pioneer"), as the named insured, seeks to recover

5    under an All-Risk policy of insurance issued by National Union (the

6    "Policy") for, among other things, property damage and business

7    interruption loss resulting from a chlorine leak that occurred on May

8    6, 1991 at Pioneer's Henderson, Nevada facility ("the chlorine

9    leak").  <u>See</u> Defendant's Statement Pursuant to Local Rule 140-7 in

10   Support of its Motion for Partial Summary Judgment on Plaintiff's Bad

11   Faith Claims filed on or about June 17, 1994 (hereinafter "Statement

12   of Facts") ¶ 1.

13       2.      On May 7, 1991, shortly after receiving notice of the

14   chlorine leak, National Union retained the services of Robert J.

15   McMullin   of   GAB   Business   Services,   Inc.   to   investigate   the

16   circumstances surrounding the chlorine leak.  <u>See</u> Statement of Facts

17   ¶ 2.

18       3.      An inspection was conducted by Mr. McMullin at the loss

19   site the following day on Wednesday, May 8, 1991.  <u>See</u> Statement of

20   Facts ¶ 3.

21       4.      Mr. McMullin subsequently retained the services of Ara

22   Nalbandian,   P.E.   of   Thielsch   Engineering   associates,   Inc.

23   ("Thielsch"), an engineering firm, to conduct an investigation on

24   behalf of National Union.  <u>See</u> Statement of Facts ¶ 4.

25       5.      Shortly after the chlorine leak, Pioneer retained three law

26   firms to represent it in connection with claims arising from the

27   chlorine leak:  Andrews & Kurth; Jones, Jones, Close & Brown; and

28

                                    - 2 -

Rucker, Short & Lopez. Pioneer also retained Failure Analysis Associates ("Failure Analysis") and Rimkus Consulting Group, Inc. ("Rimkus") to investigate the loss and evaluate its cause. <u>See</u> Statement of Facts ¶ 5. Failure Analysis and Rimkus also assisted in getting the plant back into operation as soon as possible. <u>See</u> Opposition and references cited therein.

6.    In or about July 1991, Pioneer retained Adjusters International to assist Pioneer in the preparation and presentation of its insurance claims. <u>See</u> Statement of Facts ¶ 6.

7.    On May 22, 1991, following his initial site inspection, Mr. McMullin sent a letter to Pioneer, acknowledging notice of the loss and reserving National Union's rights pending completion of an investigation. <u>See</u> Statement of Facts ¶ 7.

8.    On May 29, 1991, Mr. McMullin and an engineer from Thielsch inspected the Pioneer Henderson facility. They were accompanied by representatives from Failure Analysis. <u>See</u> Statement of Facts ¶ 8.

9.    By letter dated June 20, 1991, Mr. McMullin requested that Thielsch be provided with certain documents. Attached to his letter was a June 6, 1991 letter from Thielsch setting forth the documents requested. <u>See</u> Statement of Facts ¶ 9.

10.    In order to obtain documents, National Union and its agents volunteered that they would sign a confidentiality agreement. <u>See</u> Statement of Facts ¶ 10.

11.    On August 21, 1991, after the confidentiality agreement was signed by Mr. Nalbandian, a letter was sent by Mr. McMullin to counsel for Pioneer demanding a revision to the confidentiality agreement. <u>See</u> Statement of Facts ¶ 11.

- 3 -

12.    Pioneer's attorneys sent a revised version of the confidentiality agreement to GAB.  The revised agreement was signed by GAB and Thielsch and returned to Pioneer on November 7, 1991.  See Statement of Facts ¶ 12.

13.    Pioneer signed the confidentiality agreement and returned it to GAB in January 1992.  See Statement of Facts ¶ 13.

14.    On January 28, 1992, Mr. Nalbandian sent Mr. Rucker a copy of Thielsch's original document request, which was dated June 6, 1991.  See Statement of Facts ¶ 14.

15.    By letter dated June 4, 1992, Mr. McMullin made a formal request for access to perform artifact testing.  See Statement of Facts ¶ 16.

16.    By letter dated June 9, 1992, William Rucker, counsel for Pioneer, denied Mr. McMullin's request for custody of all artifacts because of Pioneer's need to maintain control of key evidence for its defense of liability lawsuits.  See Statement of Facts ¶ 17.

17.    Mr. Rucker subsequently agreed to allow Thielsch to inspect and test the certain artifacts in mid-August 1992.  See Statement of Facts ¶ 18.

18.    The testing was commenced in mid-September.  See Statement of Facts ¶ 19.

19.    On or about November 10, 1992, Pioneer commenced this action against National Union.  See Statement of Facts ¶ 20.

20.    Pursuant to its bad faith claims, Pioneer is seeking to recover $11,360,846.32 in consequential damages, in addition to punitive damages.  Pioneer's consequential damage claims are comprised of the following elements:

- 4 -

| | | | |
|---|---|---|---|
| a. | Interest cost on property Replacement Expenditures | | $   237,297.43 |
| b. | Bank waiver fees | | 75,303.15 |
| c. | Increased Maintenance Costs | | 2,854,000.00 |
| d. | Debt Restructure Costs: | | |
| | Success Fee | $5,000,000.00 | |
| | Contingent Fee | 1,461,329.00 | |
| | Costs to Restructure | 163,462.74 | |
| | Total | | 6,624,791.74 |
| e. | Black Mountain Power Co. Debt. | | 1,569,454.00 |
| | TOTAL | | $11,360,846.32 |

See Pioneer's Third Amended Supplement to Answers to Defendant's First Set of Interrogatories and Request for Production of Documents.

21.    The interest costs on expenditures related to property replacements consist of interest payments that Pioneer made on money that it borrowed on a revolving line of credit.   See Statement of Facts ¶ 23.

22.    Pioneer would not have incurred these alleged damages if it had received reimbursement from its insurance carriers, including National Union and Royal Indemnity.   See Opposition at 25, Henning Affidavit, and references cited therein.

23.    As a result of its insurers' failure to reimburse it for its losses, Pioneer was forced to request waivers to the covenants in its senior loan agreement from the participating banks.   The banks, in turn, required Pioneer to pay $75,303.15 in fees before agreeing to the waivers.   See Opposition at 26-30 and references cited therein.

.    .    .

24.    Pioneer seeks to recover $2,854,000.00 from National Union for increased maintenance costs.    See Opposition at 27-28 and references cited therein.

25.    To calculate the sum of $2,854,000 Pioneer determined the shortfall in capital spending budgeted for the years 1991, 1992 and 1993 and used 30% of the shortfall as the increased cost of maintenance required.    See Opposition at 27-28 and references cited therein.

26.    Black Mountain Power Company ("Black Mountain") is a subsidiary of Pioneer, which owns an interest in a partnership that operates a cogeneration station.    See Statement of Facts ¶ 34.

27.    Black Mountain Power debt arises from a computation that is based on negotiations with Heller Financial to obtain a loan of approximately $3 million in exchange for guaranteed payments out of the income of Black Mountain of $1.5 million.    This arrangement, had not been entered into as of April 13, 1994.    See Opposition at 30 and references cited therein.

B.    **Statement of Disputed Material Facts**

28.    Peter R. Kensicki, Pioneer's bad faith expert, testified that National Union had exhibited bad faith in handling the Pioneer claim.    See Opposition at 7 n.8 and references cited therein.

29.    Pioneer incurred interest costs that are actually attributable to money borrowed to perform repairs following the chlorine leak.    See Opposition at 25-26 and references cited therein.

30.    When calculating the interest costs, Pioneer did not consider the effect that coinsurance, other insurance, or policy deductibles would have on the amount recoverable because the

- 6 -

1  consequential damage claims are tort claims.  See Opposition at 21
2  n.36 and references cited therein.

3      31.     The maintenance costs element of Pioneer's damages is based
4  on an increase in maintenance costs over what Pioneer expected
5  maintenance costs to be had Pioneer been able to make its budgeted
6  capital improvements.  See Opposition at 27-28 and references cited
7  therein.

8      32.     The restructuring was not a result of the performance of
9  All Pure and Imperial West.  See Opposition at 30-31 and references
10 cited therein.

11     33.     Pioneer wrote-off a $2.4 million account receivable as a
12 result of the bankruptcy of its customers.  The restructuring was not
13 a result of the write-off.  See Opposition at 30-31 and references
14 cited therein.

15     34.     National Union has claimed that Nevada has the most
16 significant relationship to the case.  See Opposition at 2-4 and
17 references cited therein.

18     35.     National Union took 19 months to communicate a coverage
19 determination to Pioneer, and only after Pioneer filed suit against
20 National Union.  See Opposition at 13 and references cited therein.

21     36.     National Union did not adequately investigate Pioneer's
22 claim.  See generally Opposition at 8-13 and references cited
23 therein.

24     37.     National Union's requests for artifact testing were nothing
25 more than a pretense to delay and a strategy to obtain evidence to
26 defend coverage litigation.  See Opposition at 13-15 and references
27 cited therein.

28

- 7 -

38.    National Union did not need to perform artifact testing for short-term versus long-term corrosion because it had already taken the position that corrosion, whether long- or short-term, was not covered by the policy.  See Opposition at 13-15 and references cited therein.

39.    National Union did not consider the pertinent facts of the claim or alternative bases for coverage, such as the rag theory.  See Opposition at 8-11 and references cited therein.

41.    Waidler, the primary claims manager, was not familiar with the rag theory.  See Opposition at 8 and references cited therein.

42.    McMullin, the adjustor, did not make any determination regarding the role of the rag.  See Opposition at 8 and references cited therein.

43.    McMullin, the adjustor, did not discuss the role of the rag with Thielsch.  See Opposition at 9 and references cited therein.

44.    Nalbandian, the expert retained by National Union, conceded that the rag had some impact on the holes found in the secondary liquefier.  See Opposition at 9, n. 11, and references cited therein.

45.    Murphy, the underwriter, did not understand the exception in exclusion F.  See Opposition at 10 and references cited therein.

46.    National Union personnel failed to adequately monitor Pioneer's claim.    See Opposition at 11-13 and references cited therein.

47.    Waidler    erroneously    believed    that    Smith    assumed responsibility for the file in October or November 1992.    See Opposition at 11 and references cited therein.

.    .    .

- 8 -

48.    Smith did not know that the Pioneer claim existed until October or November 1993.  See Opposition at 11 and references cited therein.

49.    National Union did not adopt any procedures to ensure that Waidler reviewed outstanding claims with Smith before Waidler stopped working on them.  See Opposition at 12 and references cited therein.

50.    The coverage determination in this case took at last six (6) months longer than any other determination in United States in the history of National Union.  See Opposition at 13 and references cited therein.

51.    The Nalbandian testing was not forwarded to either McMullin or Smith.  See Opposition at 14 and 15 and references cited therein.

52.    Pioneer notified Defendants Pioneer by fax transmission dated March 5, 1992 that documents requested were available for inspection.  See Opposition at 16 and references cited therein. Defendant erroneously claims that this occurred one month later.  See Defendants Statement of Undisputed Facts.

53.    Defendant notified Pioneer on February 12, 1992 that it would make a coverage determination after reviewing the documents but failed to do so because it then requested artifacts for testing.  See Opposition at 17.

54.    Defendant did not request artifact testing until June 4, 1992.  See Defendant's Memorandum, p. 5; lines 3-4).

55.    Defendant's expert was present on-site immediately after the accident, reviewed the artifacts immediately after the accident, was present at artifact testing conducted by Pioneer after the accident and could have and should have requested artifact testing

- 9 -

1 soon after the accident as opposed to waiting thirteen (13) months.

2 See Opposition at 17 and 18 and references cited therein.

3    56.    Defendant's expert had the opportunity to observe and

4 photographically document the failed components and section of the

5 piping system on his May 19, 1991 site visit. See Opposition at 18,

6 n. 30, and references cited therein.

7

8    57.    National Union adopted an arbitrary and capricious

9 interpretation of the exception on page 6, section F of the policy.

10 See Opposition at 9-11 and references cited therein.

11    58.    Any delay in obtaining a signed confidentiality agreement

12 was due to National Union—not Pioneer.  See Opposition at 15-18 and

13 references cited therein.

14    59.    On numerous occasions from May 1991 through March 1992,

15 Pioneer requested that National Union advance funds against the claim

16 in order to meet expenses that Pioneer incurred as a result of the

17 chlorine leak.  See Opposition at 20-21 and references cited therein.

18 .    .    .

19 .    .    .

20 .    .    .

21 .    .    .

22 .    .    .

23 .    .    .

24 .    .    .

25 .    .    .

26 .    .    .

27 .    .    .

28

1      60.    Defendant's motive for delaying the coverage determination

2   was to induce Pioneer to allow the time period for filing suit to

3   elapse.   See Opposition at 20 and references cited therein.

4        DATED this 12th day of July, 1994.

5

6                                          HARRISON, KEMP & JONES,
                                           CHARTERED
7

8                                          By
                                             J. RANDALL JONES, ESQ.
9                                            WILL S. KEMP, ESQ.
                                             Suite 600
10                                           300 South Fourth Street
                                             Las Vegas, NV 89101
11

12
                                           JONES, JONES, CLOSE
13                                         & BROWN, CHARTERED

14
                                           By
15                                           KEVIN R. STOLWORTHY, ESQ.
                                             JOHN W. FIELD, ESQ.
16                                           KRIS T. BALLARD, ESQ.
                                             Seventh   Floor  -  Bank   of
17                                           America Plaza
                                             300 South Fourth Street
18                                           Las Vegas, Nevada 89101

19                                         ATTORNEYS FOR PLAINTIFF

20

21

22

23

24

25

26

27

28

1

*CERTIFICATE OF MAILING*

2      I hereby certify that on the _12_ day of July, 1994, the

3   foregoing **PLAINTIFF'S COUNTERSTATEMENT OF FACTS RELATING TO ITS**

4   **OPPOSITION TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE**

5   **ISSUE OF BAD FAITH** was served on Defendant by mailing a copy thereof,

6   first class mail, postage prepaid, to:

7              PHILIP C. SILVERBERG, ESQ.
               Mound, Cotton & Wollan
8              One Battery Park Plaza
               New York, New York  10004
9
               Thomas D. Beatty, Esq.
10             601 East Bridger Avenue
               Las Vegas, Nevada 89101
11
               Attorneys for Defendant
12                                          _Deborah A. Hot_
13                                          _____
                                            An employee of JONES, JONES,
                                            CLOSE & BROWN, CHARTERED
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28   krs\pioneer\national\plead\badfaith.fct

# NATIONAL ARCHIVES AND RECORDS ADMINISTRATION

## 𝔄ll to whom these presents shall come, Greeting:

ue of the authority vested in me by the Archivist of the United States, I certify on his behalf,

eal of the National Archives and Records Administration, that the attached reproduction(s) is

a            rrect copy of documents in his custody.

| SIGNATURE | |
|---|---|
| *Michael J. Kretch, Jr.* | |
| NAME<br>Michael J. Kretch, Jr. | DATE<br>0 1 JUL 2008 |
| TITLE<br>Director, Federal Records Center | |
| NAME AND ADDRESS OF DEPOSITORY<br>National Archives and Records Administration<br>23123 Cajalco Road<br>Perris, CA  92570-7298 | |

NA FORM 13040 (10-86)

1  LAW OFFICES OF THOMAS D. BEATTY
   601 East Bridger Avenue
2  Las Vegas, Nevada  89101
   (702) 382-5111
3
         and
4
   MOUND, COTTON & WOLLAN
5  One Battery Park Plaza
   New York, New York  10004
6  (212) 804-4200

7  Attorneys for Defendant

8
              IN THE UNITED STATES DISTRICT COURT
9                     DISTRICT OF NEVADA

10 -------------------------------------x
   PIONEER CHLOR ALKALI COMPANY, INC.
11
                    Plaintiff,           CV-S-93-276-RLH
12
           -against-
13
   NATIONAL UNION FIRE INSURANCE
14 COMPANY OF PITTSBURGH, PA.,

15                  Defendant.
   -------------------------------------x
16
        REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN FURTHER
17         SUPPORT OF DEFENDANT'S MOTION FOR PARTIAL SUMMARY
              JUDGMENT ON PLAINTIFF'S BAD FAITH CLAIMS
18

19

20

21

22

23

24

25

26

27

28

199

TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . .ii

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . 1

POINT I

      TEXAS LAW APPLIES TO PIONEER'S BAD FAITH CLAIMS . . . 1

POINT II

      EVEN UNDER NEVADA LAW, PIONEER HAS FAILED TO MEET ITS
      BURDEN OF PROOF IN OPPOSING NU'S SUMMARY
      JUDGMENT MOTION . . . . . . . . . . . . . . . . . . . 3

    A.    Pioneer Has Not Shown that NU Violated the Act . . . 4

    B.    Pioneer Failed to Raise Any Genuine Issues of
        Material Fact With Respect To Either of its
        Bad Faith Claims . . . . . . . . . . . . . . . . 5

        1.   The Standard for Summary Judgment . . . . . . . 5

        2.   The Standard for Bad Faith . . . . . . . . . . 6

POINT III

      PIONEER HAS NOT SHOWN THAT ANY FACTS EXIST
      THAT ENTITLE IT TO PUNITIVE OR CONSEQUENTIAL DAMAGES . . .16

    A.    Pioneer Has Not Shown Any Conduct By NU That Entitles
        Pioneer to An Award of Punitive Damages. . . . . . 16

    B.    Pioneer Has Not Shown The Amount Of Its
        Damage Or That NU's Conduct Caused Its
        Alleged Consequential Damages . . . . . . . . . . 17

    C.    NU's Motion Properly Addresses Pioneer's
        Consequential Damages Claim . . . . . . . . . . . 19

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . 20

1                          **TABLE OF AUTHORITIES**

2

3    <u>Cases</u>

4    <u>American Excess Ins. Co. v. MGM Grand Hotels, Inc.</u>,
          102 Nev. 601, 729 P.2d 1352 (1986). . . . . . . . .    6
5
     <u>Bader v. Cerri</u>, 96 Nev. 352, 609 P.2d 314 (1980) . . . .
6          17

7    <u>Berg v. First State Ins. Co.</u>, 915 F.2d 460 (9th Cir.
          1990) . . . . . . . . . . . . . . . . . . . . . 6
8
     <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317 (1986). . . . . .    6
9
     <u>Central Bit Supply, Inc. v. Waldrop Drilling & Pump, Inc.</u>,
10         102 Nev. 139, 717 P.2d 35 (1986) . . . . . . . .    17

11   <u>City of Long Beach v. Standard Oil Co. of California</u>,
          872 F.2d 1401 (9th Cir. 1989), <u>amended on other grounds</u>,
12         886 F.2d 246 (1989), <u>cert. denied</u>, 493 U.S. 1076
          (1990) . . . . . . . . . . . . . . . . . . . .    5
13
     <u>Exum v. Ferguson</u>, 637 P.2d 553 (N.M. 1981) . . . . . .    18
14
     <u>Ferdie Sievers & Lake Tahoe Land Co., Inc. v. Diversified</u>
15        <u>Mortg. Investors</u>, 95 Nev. 811, 603 P.2d 270 (1979). .3

16   <u>Ferens v. John Deere Co.</u>, 494 U.S. 516 (1990). . . . . . .    1

17   <u>Hansen v. United States</u>, 7 F.3d 137 (9th Cir. 1993). . . .    18

18   <u>Hunter v. Greene</u>, 734 F.2d 896 (2d Cir. 1984) . . . . . .    3

19   <u>Industrial Indem. Co. v. United States</u>, 757 F.2d 982
          (9th Cir. 1985). . . . . . . . . . . . . . . . . .    3
20
     <u>Nelson v. Lake Canal Co. of Colo.</u>, 644 P.2d 55
21        (Colo. Ct. App. 1981). . . . . . . . . . . . . . .    17

22   <u>Pioneer Chlor Alkali Co., Inc. v. Royal Indem. Co.</u>, No. A14-
          93-00391-CV, 1994 WL 106311 (Tex. Ct. App. 1994). . 2,
23         6,
                                                            7, 14
24
     <u>Republic Ins. Co. v. Hires</u>, 107 Nev. 317, 810 P.2d
25         790 (1991). . . . . . . . . . . . . . . . . . . .    17

26   <u>Transportation Ins. Co. v. Moriel</u>, No. D-1507, 1994 WL 246568
     (Tex.    June 8, 1994). . . . . . . . . . . . . . . . . . 6
27
     <u>Union Pacific R. Co. v. Nevada Power Co.</u>, 950 F.2d 1429
28         (9th Cir. 1991) . . . . . . . . . . . . . . . . .    5

<u>United Fire Ins. Co. v. McClelland</u>, 105 Nev. 504, 780 P.2d
    193 (1989) . . . . . . . . . . . . . . . . . . . . .  17

<u>Wagner v. Casteel</u>, 663 P.2d 1020 (Ariz. 1983) . . . . . . . 18


**Constitutional Provisions and Statutes**

N.R.S. 686A.020 . . . . . . . . . . . . . . . . . .    3


**Other Authorities**

William M. Shernoff, <u>et. al.</u>, <u>Insurance Bad Faith</u>
    <u>Litigation</u> . . . . . . . . . . . . . . . . . .    17

Von Mehren, <u>Special Substantive Rules for Multistate Problems:
Their Role and Significance in Contemporary Choice of Law
Methodology</u>, 88 Harv. L. Rev. 347 (1974). . . . . . .    3

## PRELIMINARY STATEMENT

The defendant, National Union Fire Insurance Company of Pittsburgh, Pa. ("NU"), submits this Reply Memorandum of Points and Authorities, along with the accompanying Affidavit of Philip C. Silverberg, sworn to July 18, 1994 ("Reply Aff."), in further support of its motion for partial summary judgment on the bad faith claims asserted by plaintiff Pioneer Chlor Alkali Company, Inc. ("Pioneer").

## ARGUMENT

### POINT I

### TEXAS LAW APPLIES TO PIONEER'S BAD FAITH CLAIMS

Although Pioneer acknowledges that the law of the state with the "most significant relationship" to the dispute should be applied, it argues that Nevada law should apply here based on an estoppel theory. (Pioneer's Memorandum in Opposition to NU's Motion ("Opp.") at 3.)[1] According to Pioneer, NU is estopped from arguing for the application of Texas law as respects the bad faith claims because NU argued in its motion to transfer this case from federal court in Texas that Nevada law would probably apply to Pioneer's contract claims.[2] Pioneer has cited no cases for the heretofore unheard of choice-of-law principle that a court's determination as to what state's law to apply may be based on estoppel. Indeed, to make a choice-of-law determination on the

---

[1]    That Nevada, too, uses this test is irrelevant because the law is clear that where a transfer of venue occurs, the choice-of-law rules that apply are the rules of the transferring state. Ferens v. John Deere Co., 494 U.S. 516, 530-31 (1990). Hence, an application of Texas choice-of-law rules is required here.

[2]    As Pioneer correctly states, a bad faith claim is not derived from the terms of the insurance contract. Rather, it "is a duty imposed by law, the violation of which is a tort." (Opp. at 4 (citation omitted).)

1   basis of estoppel would be in derogation of the "most significant

2   relationship" test.

3       Pioneer also conveniently neglects to mention to the Court

4   that in opposing NU's transfer motion it argued that Texas law

5   should apply.  According to Pioneer:

> The mere fact that the accident in question occurred in
> Nevada does not mandate the application of Nevada law.
> A cursory review of the[] facts indicates that Texas law
> should be applied . . . .

(Reply Aff., Ex. 1, ¶42.)  It is significant that shortly after the

Texas trial court dismissed Pioneer's claims against Royal

Indemnity Company, including its bad faith claims,  see Pioneer

Chlor Alkali Co., Inc. v. Royal Indem. Co., No. A14-93-00391-CV,

1994 WL 106311 (Tex. Ct. App. 1994) (the "Royal action"), Pioneer

withdrew its opposition to NU's transfer motion and consented to

the transfer.  It would appear that Pioneer did so in the hope that

it would have better luck under Nevada law.[3]

    Pioneer now argues that Nevada law should apply because Nevada

is the principal location of the insured risk.  (Opp. at 3-4.)  In

addition to ignoring its prior position, Pioneer's new argument

also ignores certain indisputable facts.  The NU policy provides

coverage for property at various Pioneer locations, including

Texas, Nevada, Louisiana, and several other states.  If anything,

the principal location of the risk is in Texas, where Pioneer's

headquarters are located.  In addition, while concerns regarding

the principal location of the risk may be relevant for determining

which state's law applies to contract claims, they have no

_____

[3]    Contrary to Pioneer's dubious assertion, Nevada law does
not clearly favor Pioneer's legal position on the bad faith claims.

- 2 -

relevance in determining which state's law should apply to extra-contractual tort claims.[4]

Moreover, arguing that the law of one state should apply to some issues while applying the law of another state to others is in no way inconsistent as Pioneer suggests. "Under the doctrine of depecage . . . 'the rules of one legal system are applied to regulate certain issues arising from a given transaction or occurrence, while those of another system regulate the other issues.'" Hunter v. Greene, 734 F.2d 896, 901 (2d Cir. 1984) (quoting Von Mehren, Special Substantive Rules for Multistate Problems: Their Role and Significance in Contemporary Choice of Law Methodology, 88 Harv. L. Rev. 347, 356 n.24 (1974)). Thus, even if this Court were to consider NU's motion to transfer venue in determining which state's law applies, NU is not estopped from seeking the application of Texas law to Pioneer's bad faith claims.[5]

### POINT II

### EVEN UNDER NEVADA LAW, PIONEER HAS FAILED TO MEET ITS BURDEN OF PROOF IN OPPOSING NU'S SUMMARY JUDGMENT MOTION

Pioneer has asserted bad faith claims under both the common law and the Nevada Unfair Claims Practices Act ("the Act"). As

---

[4]    Accordingly, Pioneer's reliance on Industrial Indem. Co. v. United States, 757 F.2d 982 (9th Cir. 1985), which involved a contract claim, is misplaced. Pioneer's reliance on Ferdie Sievers & Lake Tahoe Land Co., Inc. v. Diversified Mortg. Investors, 95 Nev. 811, 603 P.2d 270 (1979), which involved a choice-of-law provision in the parties agreement, is similarly misplaced.

[5]    Pioneer moved to amend its complaint to allege statutory bad faith on November 8, 1993, and to allege common law bad faith on April 1, 1994, whereas NU moved for change of venue on or about December 23, 1992, before any bad faith claims had been asserted.

- 3 -

1   discussed below, each of these bad faith claims is insufficient as

2   a matter of law.

3   **A.    Pioneer Has Not Shown That NU Violated the Act**

4       Either by mistake or in an effort to confuse the issues,

5   Pioneer has combined the question of which state's law applies to

6   its bad faith claims with the question of whether Pioneer has

7   sufficiently alleged a claim under the Act.  The Act provides that:

8           A person shall not engage <u>in this state</u> in any
            practice which is defined . . . to be an
9           unfair . . . or deceptive act or practice in
            the business of insurance.

10  N.R.S. 686A.020 (emphasis added).  Pursuant to the plain meaning of

11  the above quoted section of the Act, the test for whether the Act

12  applies is whether an unfair or deceptive act or practice took

13  place in Nevada, and not, as Pioneer suggests, "whether . . .

14  Nevada has a significant relationship to the involved claim

15  processing and handling."  (Opp. at 4, n.3.)  If any of the alleged

16  unfair practices that are listed in the Act were committed in

17  Nevada, then, and only then, would the Act apply.

18      In that regard, Pioneer has failed to meet its burden of

19  proving that NU committed any unfair practices in Nevada.  Rather,

20  in an attempt to side-step the issue, Pioneer argues that "the

21  plant (the insured risk) was located in Nevada, the adjuster came

22  to the plant to conduct the investigation and dozens of pieces or

23  [sic] correspondence regarding the claim were sent to and from

24  Nevada."  (Opp. at 4, n.3.)  However, none of these so-called

25  "acts" comprise Pioneer's statutory bad faith claim.  The fact that

26  Pioneer has been unable to identify any unfair or deceptive act or

27  practice that took place in Nevada precludes it from recovering

28

- 4 -

1  under the Act.   Moreover, how Pioneer can argue that the Nevada

2  statute should apply to NU, but that the Texas statute should apply

3  to Royal is something only Pioneer can explain.

4  **B.   Pioneer Failed to Raise Any Genuine Issues of Material Fact**
   **With Respect to Either of its Bad Faith Claims**

5  **1.   The Standard for Summary Judgment**

6  Pioneer's opposition memorandum, while replete with petty

7  remarks and inconsequential prattle, does not contain any specific

8  facts to prevent this Court from granting NU's motion for summary

9  judgment on the issue of bad faith.[6]  It is well established that

10  "[t]o  overcome  summary  judgment  the  non-moving  party  'must

11  establish that there is a genuine issue of material fact' and

12  demonstrate more than 'some metaphysical doubt as to the material

13  facts.'"   Union Pacific R. Co. v. Nevada Power Co., 950 F.2d 1429,

14  1435 (9th Cir. 1991) (quoting City of Long Beach v. Standard Oil

15  Co. of California, 872 F.2d 1401, 1403-4 (9th Cir. 1989), amended

16  on other grounds, 886 F.2d 246 (1989), cert. denied, 493 U.S. 1076

17  (1990)).

18  Only  when  there  are  genuine  issues  of  material  facts  is

19  summary judgment not appropriate.  See Union Pacific, 950 F.2d at

20  1435.  Disputes concerning irrelevant or immaterial facts will not

21  preclude summary judgment.   Id. at 1435-36.   Moreover, summary

22  judgment  is  appropriate  against  a  party  "who  fails  to  make  a

23  showing  sufficient  to  establish  the  existence  of  an  element

24

25  ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
       [6]      Once again, Pioneer elected not to serve a timely Local
26  Rule 140-7 counterstatement of facts.   This time, however, the
     late-filed counterstatement was received approximately three days
27  before briefing was completed.  For the most part, Pioneer accepts
     NU's statement of facts.   Pioneer's purported counterstatement of
28  disputed "facts" consists of references to self-serving statements
     in its opposition brief and not to the actual record of facts.

                              - 5 -

essential to that party's case, and on which that party will bear the burden of proof at trial." <u>Celotex Corp. v Catrett</u>, 477 U.S. 317, 322 (1986); <u>see also</u> <u>Berg v. First State Ins. Co.</u>, 915 F.2d 460, 465-66 (9th Cir. 1990) (citing <u>Celotex</u>, 477 U.S. at 322-23).

### 2.    The Standard for Bad Faith

Pioneer admits that in order to establish common law bad faith, Pioneer must show that NU refused to compensate Pioneer <u>without proper cause</u>.    (Opp. at 4.)    In other words, Pioneer must show that NU had no reasonable basis for not paying its claim. This is so under either Nevada or Texas law.    <u>See</u> <u>American Excess Ins. Co. v. MGM Grand Hotels, Inc.</u>, 102 Nev. 601, 605, 729 P.2d 1352, 1354-55 (1986); <u>Transportation Ins. Co. v. Moriel</u>, No. D-1507, 1994 WL 246568, *5 (Tex. June 8, 1994); <u>Pioneer</u>, 1994 WL 106311.    With respect to its claim under the Act, Pioneer must also show that NU committed at least one of the practices enumerated in the Act in the State of Nevada.

As a preliminary matter, it should be noted that Pioneer's claim that NU's motion does not encompass all of Pioneer's bad faith claims (Opp. at 8, n.10) is without merit.    On the contrary, NU's motion seeks a determination that NU did not act in bad faith. This could not be more plain.    Pioneer, however, seems to have found the threshold elements of bad faith elusive, as it has failed to demonstrate that NU failed to pay its claim without a reasonable basis for doing so.    Instead, Pioneer points to numerous irrelevant or immaterial "facts" it claims constitute bad faith.    Obviously, Pioneer hopes that by pointing to these "facts" it will cause the Court to lose sight of the only relevant inquiry, to wit:  Did NU act unreasonably in not paying Pioneer's claim?  As this Court has

1  previously determined, whether coverage exists under the NU policy

2  is a question of fact, and the jury could rule in either party's

3  favor.  Incredibly, even Pioneer now admits that its claims "were

4  fairly debatable at the time submitted."  (Reply Aff., Ex. 2, at

5  5.)  Therefore, NU submits that as a matter of law, it had a

6  reasonable basis not to pay the claim and is entitled to summary

7  judgment.  See Pioneer, 1994 WL 106311, *19.  ("As long as [the

8  insurer] had some reasonable basis to deny the claim there is no

9  breach [of the duty of good faith and fair dealing].")[7]

10  In addition, NU has addressed each of Pioneer's allegations

11  with respect to its bad faith claims by setting forth a detailed

12  step-by-step account of how the claim was handled by NU from the

13  moment NU was informed of the loss.  (NU's Moving Memorandum

14  ("Moving Mem.") at 1-5.)  Pioneer has not countered with any

15  evidence to show that this account is not true.  Rather, Pioneer

16  has filled its opposition papers with name calling and countless

17  unsubstantiated, conclusory statements.  In so doing, it has

18  completely ignored the existing evidence.  (Moving Mem. at 1-6, 12-

19  14), all of which demonstrates that NU acted in good faith.

20  Pioneer essentially claims that NU committed four "independent

21  acts of bad faith."  (Opp. at 6-17.)  These four "acts" are: 1)

22  failure to make a prompt coverage determination; 2) failure to

23  adequately investigate all possible grounds for coverage, including

24  the "rag theory;" 3) failure to monitor the claim; and 4) adopting

25  _____

26  [7]     Despite finding that Pioneer was entitled to summary
judgment on its claim under the Royal policy, the court still
27  concluded that Royal did not act in bad faith by denying coverage.
NU stands on much firmer ground given the fact that Pioneer's
28  countermotion for summary judgment was denied.

- 7 -

1   an "arbitrary and capricious interpretation" of the corrosion

2   exclusion.   (Opp. at 6-8.)   Each of these "acts" are addressed

3   below.[8]

4        Failure to Make a Prompt Coverage Determination

5        Pioneer argues that NU acted in bad faith because it took

6   nineteen months to make a coverage determination.[9]   Contrary to

7   Pioneer's assertion, the "primary justification" offered by NU for

8   the alleged delay in investigating Pioneer's claim is not that NU's

9   engineer took a long time to complete its investigation.  (Opp. at

10  13-14.)   Rather, the alleged delay was caused by Pioneer's refusal

11  to allow NU's agents access to information they needed to conduct

12  their investigations.   This fact is well supported by the evidence.

13  (Moving Mem. at 1-6, 12-14.)   Pioneer candidly admits in its

14  opposition papers that documents that had been requested by NU in

15

16        [8]   It is also worth noting that the underlying basis for

17  Pioneer's bad faith claims against NU are mutually exclusive. On
    the one hand, Pioneer argues that NU's investigation took too long

18  and that NU should have immediately denied coverage once it
    realized that corrosion was involved in the loss.  (Opp. at 14.)

19  Pioneer then argues that NU acted in bad faith because it failed
    "to adequately investigate all possible grounds for coverage before

20  denying coverage . . . ."  (Opp. at 5.)   Notwithstanding NU's
    issuance of a reservation of rights letter early in the

21  investigation, if NU had immediately denied coverage, Pioneer would
    have argued that NU did not fully investigate.   Indeed, in the

22  Royal action, Pioneer argued that Royal improperly denied coverage
    without having conducted a thorough investigation.  Pioneer, 1994

23  WL 106311, *19-22.   Pioneer now argues that NU should have done
    what Royal did in denying coverage nine months earlier.  (Opp. at

24  6.)

25        [9]   With respect to its claim under the Act, Pioneer
    correctly notes that the Act lists "failing to affirm or deny

26  coverage of claims within a reasonable time after proof of loss
    requirements have been completed and submitted by the insured" as

27  an unfair practice.  (Opp. at 5.)   What Pioneer fails to mention,
    however, is that here, proof of loss requirements were never

28  completed and Pioneer never submitted a proof of loss.

                              - 8 -

June 1991 were not made available for inspection until March 1992, nine months after they were requested. (Opp. at 16-17.) In a transparent attempt to create an "issue," Pioneer argues that NU incorrectly noted in its moving papers that it did not receive notice that the documents would be available until April 1992. According to Pioneer, NU received notice that the documents it had requested, in June 1991, were available in March 1992. The documents were actually received by NU one month later in April 1992. This effort by Pioneer to divert the Court's attention from the indisputable fact that Pioneer made NU wait more than nine months before notifying it that the documents would be made available and then an additional month before actually producing the documents is without merit.

Pioneer has failed to offer any explanation for this delay, choosing instead to ignore it.[10] Pioneer also argues that the "excuses" offered by NU for the length of its investigation "do not withstand scrutiny." (Opp. at 6-7.) However, Pioneer bases this contention solely on what it claims are the "inferences" that can

_____

[10]    Pioneer argues that its ten month delay in producing the requested documents "is not a valid justification for waiting thirteen months to ask for artifacts for testing and fourteen months for describing the proposed tests." (Opp. at 17-18.) What Pioneer ignores is that Thielsch Engineering Associates, Inc. ("Thielsch") requested the "artifacts" approximately one month after it finally received the documents. As Pioneer tacitly acknowledges, it was not until the evidence log was produced that Thielsch learned of the existence of the "artifacts." (Opp. at 17-18.)

With respect to the testing protocol, Thielsch proposed developing a protocol after Pioneer refused to produce certain items because it was allegedly "loathe to lose custody of valuable evidence." (Silverberg June 16, 1994 Aff., Ex. 22 and Ex. 23.) Thus, the protocol was suggested by Thielsch in a good faith attempt to allay Pioneer's fears and move the investigation along.

- 9 -

1    be drawn from the facts.    (Opp. at 6-7.)    Simply stated, Pioneer

2    has not met its burden in opposing NU's motion for summary

3    judgment.

4        Pioneer then argues that "at least one month of the delay was

5    caused by the absence of the adjuster."    (Opp. at 13.)    According

6    to Pioneer, NU's adjuster, Robert McMullin, was on vacation during

7    "the entire month of October 1991."    (Opp. at 13.)    What Pioneer

8    fails to note, however, is that it was in October 1991 that Mr.

9    McMullin sent a signed copy of the confidentiality agreement to

10   Pioneer's attorneys to be signed.    (Moving Mem. at 2-3.)    It was

11   not until January 8, 1992, well after Mr. McMullin had returned,

12   that Pioneer finally returned the signed confidentiality agreement.

13   (Moving Mem. at 2-3.)    Pioneer refused to allow NU to proceed with

14   its investigation until the confidentiality agreement had been

15   signed by all parties.    (Moving Mem. at 2-3.)    What stalled the

16   investigation was the two-month delay by Pioneer's counsel - the

17   very same counsel that is now arguing the delay is NU's fault.

18       Pioneer further contends that NU's position that the loss was

19   caused by corrosion and therefore excluded somehow obviated the

20   need for an investigation.    (Opp. at 13-15.)    This allegation

21   cannot be taken seriously, especially in light of Pioneer's claim

22   that NU had a duty to investigate all possible grounds for

23   coverage.    Even if what Pioneer has alleged is true and NU believed

24   that an investigation would merely confirm NU's belief that

25   corrosion caused the loss, that NU in fact conducted a thorough

26   investigation is, if anything, an act of good faith.    Moreover,

27   Pioneer's opposition/countermotion relating to the corrosion

28   exclusion demonstrates the length to which Pioneer was prepared to



1  go in arguing that what occurred at its plant was anything but

2  corrosion.

3      Although Pioneer has argued that the coverage determination

4  took too long, Pioneer has not offered any explanation for the

5  delays that resulted from its failure to cooperate with the

6  requests for information made by NU's agents.[11]  (Moving Mem. at 1-

7  6, 12-14.)   The record in this case is clear:   NU attempted many

8  times in good faith to proceed with the investigation only to be

9  prevented from doing so by Pioneer.  NU employees' testimony that

10  the investigation was lengthy, and unsubstantiated allegations of

11  improper motives on the part of Thielsch in conducting the

12  investigation, do not raise genuine issues of material fact.  This

13  is all puffery; Pioneer has not submitted one shred of relevant

14  evidence admissible in opposition to NU's motion.  The testimony of

15  plaintiff's designated "bad faith expert," Peter Kensicki, which

16  Pioneer cites in its opposition memorandum, clearly states exactly

17  what NU has maintained all along --   that Pioneer is unable to

18  point to any violation by NU of any single prescribed standard

19

20

21

22

---

23      [11]    As for the delay over the confidentiality agreement,
    Pioneer has alleged that NU acted in bad faith by refusing to sign
24  the original confidentiality agreement absent the advice of
    counsel.   (Opp. at 15.)    This is an outrageous allegation
25  particularly in light of the fact that immediately following the
    loss Pioneer retained three law firms to represent its interests
26  and the initial agreement had been drafted and revised by attorneys
    at two of those law firms.   Surely Pioneer cannot expect such a
27  document simply to be signed by NU without first having it reviewed
    by an attorney acting on NU's behalf.

28

1   "under Nevada law or model code <u>or anything else</u>."  (Opp. at 7,

2   8.)[12]

3        In support of its claim that NU unnecessarily delayed its

4   investigation, Pioneer also argues that the investigation conducted

5   by Thielsch was altogether unnecessary.  In support of this point,

6   Pioneer relies solely on the self-serving testimony of Dr.

7   Kensicki. (Opp. at 14.)  Notably, Dr. Kensicki, who has no personal

8   knowledge regarding the Thielsch investigation, testified that

9   Thielsch was hired by NU to investigate whether the corrosion was

10  long-term or short-term.  (Opp. at 14.)  This misstatement is

11  contrary to the testimony of Ara Nalbandian, P.E., the Thielsch

12  engineer who conducted the investigation. Mr. Nalbandian testified

13  that Thielsch was hired to investigate the possible causes of the

14  loss, not just whether it was short-term or long-term corrosion.

15  Pioneer's counsel deposed Ara Nalbandian at length and questioned

16  him on this precise issue.  (Reply Aff., Ex. 4, pages 48-49.)  Mr.

17  Nalbandian also testified regarding the issue of why an independent

18  investigation was necessary.  (Reply Aff., Ex. 4, pages 98-99.)

19  The fact that Pioneer has ignored Mr. Nalbandian's testimony, as

20  well as his detailed report, and chose instead to rely on the

21

22        [12]    Pioneer also argues that "National Union employees have
23  conceded that the nineteen (19) month delay that occurred before it
    denied coverage in this case is unprecedented in the history of the
24  company."  Pioneer then cites to the deposition testimony of NU's
    claims representative, William Waidler, to support this contention.
25  What Pioneer fails to mention is that Mr. Waidler testified that he
    could not think of any <u>specific</u> instances, but he was sure that
26  there had been some.  (Opp., Ex. 4, page 156, lines 2-6.)
    Moreover, Pioneer's bad faith expert testified that the length of
27  time it takes to investigate a claim varies from case to case
    depending on the circumstances.  (Reply Aff., Ex. 3, pages 308-
28  309.)

- 12 -

1   baseless self-serving conclusory statements of its "bad faith"

2   expert, is telling.

3        Similarly, Pioneer argues that NU committed an act of bad

4   faith when Thielsch refused to rely solely on testing performed and

5   data obtained by Failure Analysis Associates ("FAA").    Pioneer

6   points out that certain testing was witnessed by Thielsch and

7   claims that this should have been sufficient to prepare a report on

8   the cause of the loss.  (Opp. at 18.)   Ironically, in the Royal

9   action Pioneer argued that Royal committed bad faith in not

10  conducting its own investigation, choosing instead to "piggy-back"

11  Pioneer's investigation by relying on the investigation conducted

12  by FAA.  <u>Pioneer</u>, 1994 WL 106331, *21.  Moreover, Pioneer has not

13  cited any authority for the absurd proposition that an insurer is

14  somehow required to rely upon the insured's investigation and is

15  not allowed to undertake its own, independent investigation.

16  Indeed, no such authority could possibly exist.

17       <u>Failure to "Adequately and Seasonably" Investigate the Claim</u>

18       One of the alleged wrongful acts that Pioneer claims

19  constitutes bad faith is that NU allegedly failed to "adequately

20  and seasonably" investigate the claim.    Specifically, Pioneer

21  argues that NU acted in bad faith because it failed to give

22  adequate consideration to the "rag theory."  (Opp. at 8-9.)   What

23  Pioneer fails to mention, however, is that "the potential coverage

24  argument" regarding the rag was first "advanced" in Pioneer's

25  supplemental response to NU's first set of interrogatories dated

26  November 8, 1993.  (Reply Aff., Ex. 5.)  Pioneer's claim that NU

27  "refused" to investigate the "rag theory" implies that NU was

28

- 13 -

1   somehow asked to consider this theory by Pioneer.[13]   However, NU

2   had no knowledge that the rag was considered to be the actual cause

3   of the loss by Pioneer until Pioneer unveiled the so-called "rag

4   theory" in its interrogatory responses long after the action was

5   commenced.   While the presence of the rag in the liquefier was

6   readily apparent upon inspection of the liquefier, NU had no way of

7   knowing that Pioneer's counsel planned to take the position that

8   the loss was caused by the rag.  More importantly, however, even if

9   NU had ignored the rag theory, that would be insufficient to

10  establish bad faith.   "[I]t is not enough for the insured to show

11  that . . . there were other facts suggesting the claim was valid;

12  rather, the insured must show that no reasonable basis existed for

13  denying the claim."  Pioneer, 1994 WL 106311, *18.

14      In addition, Pioneer bases its argument that NU failed to

15  consider the "rag theory" solely on the contention that neither the

16  NU claims representative, William Waidler, nor its adjuster, Bob

17  McMullin, made any determination regarding the impact the rag may

18  have had on the loss.  (Opp. at 8.)  However, NU hired Thielsch for

19  the purpose of investigating the cause of the loss.  Because of the

20  delays caused by Pioneer, Thielsch did not reach its final

21  conclusion regarding the cause of the loss until after this action

22  was commenced.  On instructions from NU, Thielsch sent its report

23  directly to counsel for NU.  Once the action was commenced, there

24

25

26          [13]    As the Court noted in its decision on the corrosion
27  exclusion, Pioneer has yet to proffer any evidence as to how the
    rag negligently found its way into the liquefier (to say nothing of
    the question of causation).   It is this yet to be identified
28  "negligence" that Pioneer contends renders the loss covered.

1   was no longer any reason for Thielsch to send its report to NU's

2   adjuster.

3       Failure to Monitor the Claim

4       Pioneer argues that there was an "incredible gaffe" in

5   handling Pioneer's claim during the period from October or November

6   1992 until October or November 1993. (Opp. at 11-13.) According

7   to Pioneer, no one was handling its claim during this period. What

8   Pioneer does not mention is that during this period the claim was

9   in litigation and the claim was, in fact, being handled by NU's

10  attorneys. Moreover, one of the exhibits annexed to Pioneer's

11  opposition papers demonstrates that this statement is simply false.

12  Along with its opposition papers, Pioneer put before the Court the

13  affidavit of William Waidler, which was submitted by NU in support

14  of its motion to transfer venue. This affidavit dated February 1,

15  1993, evidences that Mr. Waidler was the individual on NU's behalf

16  who was monitoring the claim as late as February 1993 --

17  approximately three months after Pioneer sued NU. (Opp., Ex. 3.)[14]

18

19      Adopting an Arbitrary and Capricious
        Interpretation of the Corrosion Exclusion

20

21      In light of the recent decision of this Court concerning the

22  corrosion exclusion, NU respectfully submits that this alleged act

23  of bad faith has been rendered moot. In its Order dated June 24,

24  1994, this Court found that NU's interpretation of the term

25  corrosion was reasonable and that whether the rag had a role in

26  _____

27  [14]    During his deposition, taken in March 1994, William
    Waidler (who retired in August 1993), testified that he could not
28  recall with a degree of certainty when he ceased handling this
    file. (Reply Aff., Ex. 6, pages 159-160.)

                            - 15 -

1   causing the leak that served to take this loss outside of the

2   corrosion exclusion was a question of fact.   Given the Court's

3   ruling that a question exists as to whether the loss is excluded,

4   the testimony cited by Pioneer dealing with the exception to the

5   exclusion is irrelevant.   Pioneer simply cannot show that NU's

6   conduct was anything but reasonable.

### POINT III

**PIONEER HAS NOT SHOWN THAT ANY FACTS EXIST
THAT ENTITLE IT TO PUNITIVE OR CONSEQUENTIAL DAMAGES**

**A.    Pioneer Has Not Shown Any Conduct By NU That Entitles Pioneer
to An Award of Punitive Damages**

11      On the issue of punitive damages, once again Pioneer has

12  failed to raise any triable fact issues.   Pioneer concedes that it

13  is not entitled to punitive damages unless it proves, by clear and

14  convincing evidence, oppression, fraud or malice.   Pioneer then

15  goes on to make a feeble attempt at showing NU's failure to pay

16  Pioneer despite Pioneer's alleged financial difficulties was

17  somehow oppressive and that NU had a "sinister motive" in not

18  paying the claim.   However, none of the cases cited by Pioneer

19  supports its claim for punitive damages.   In fact, on the whole,

20  they use the same standard that was used in the cases cited by NU

21  in support of its own position.

> Courts which have considered the issue
> generally have drawn a theoretical distinction
> between the state of the insurer's mind
> required for an insured to recover
> compensatory damages for breach of the duty of
> good faith and fair dealing, and the state of
> mind which must be established to recover
> punitive damages.   Generally speaking, a
> higher degree of culpability is required to
> justify an award of punitive damages than that
> necessary for an award of compensatory damages
> for bad faith.

William M. Shernoff, <u>et. al.</u>, <u>Insurance Bad Faith Litigation</u> §
5.02[3] at 5-13.  Here, Pioneer has offered no evidence that the
"higher degree of culpability" is present.  Indeed, no such
evidence exists.[15]

**B.    Pioneer Has Not Shown The Amount Of Its Damage Or That NU's
Conduct Caused Its Alleged Consequential Damages**

The law requires Pioneer to prove that NU's alleged wrongful
acts caused Pioneer's damages and the amount of its damages.
Conjecture does not create a right to recovery.  (Moving Mem. at
17-19.)  Even under the less strenuous standard that only a
reasonable basis for determining damages be established, Pioneer
has not demonstrated that it is entitled to recover.[16]  In fact
Pioneer now "candidly" admits that certain damages were not in fact
sustained and may never be sustained.  Unfortunately, it was not

---

[15]  Pioneer compares its case to that of a dying man who was
unable to pay his medical bills because of his insurer's
unjustifiable failure to pay his claim.  In <u>Republic Ins. Co. v.
Hires</u>, 107 Nev. 317, 810 P.2d 790 (1991), the insurer was found to
have committed bad faith and punitive damages were awarded.  In
that case, unlike this one, the Court found that <u>no question
existed as to coverage</u> because the claim was one that reasonable
people would believe should be paid.  Therefore, Republic had
committed bad faith when it failed to pay the claim.  Similarly, in
<u>United Fire Ins. Co. v. McClelland</u>, 105 Nev. 504, 780 P.2d 193
(1989), the court found that the insurer's denial of the claim on
the grounds that a novation had been made was unreasonable because
the facts showed that defendants did not have sufficient knowledge
to make a novation.  Here, this Court has already found that a
question of fact exists as to the applicability of the corrosion
exclusion.  Therefore, reasonable people could differ on whether
there is coverage.

[16]  To sidestep the ramifications of its inability to prove
its damages, Pioneer relies on the decision in which the alleged
damages were clearly the result of a single tort-feasor's actions
and the damages were provable to a reasonable degree of certainty.
See <u>Bader v. Cerri</u>, 96 Nev. 352, 609 P.2d 314 (1980); <u>Central Bit
Supply, Inc. v. Waldrop Drilling & Pump, Inc.</u>, 102 Nev. 139, 717
P.2d 35 (1986); <u>Nelson v. Lake Canal Co. of Colo.</u>, 644 P.2d 55
(Colo. Ct. App. 1981).

- 17 -

until Pioneer was compelled to respond to this motion that it decided to become so "candid."

NU does not intend to repeat here what has already been set forth in detail in its moving papers. Namely, both the cause and amount of Pioneer's damages are speculative and uncertain. (Moving Mem. at 17-28.) The only "evidence" put forth by Pioneer in opposition to this portion of NU's motion is the self-serving affidavit of Pioneer's Chief Financial Officer, George Henning. It is well settled, however, that "[w]hen the nonmoving party relies only on its own affidavits to oppose summary judgment, it cannot rely on conclusory allegations unsupported by factual data to create an issue of material fact." Hansen v. United States, 7 F.3d 137, 138 (9th Cir. 1993).

Finally, it should be noted that Pioneer's claim that its alleged consequential damages should not be evaluated in light of the monies it was owed by other sources carries no weight. Pioneer's own witnesses testified unequivocally that they could not say that if Pioneer had received money from NU the restructuring would not have been required. (Opp. at 26.) Absent some factual showing that NU did in fact cause the consequential damages alleged by Pioneer, Pioneer is not entitled to recover such damages.[17] In sum, those items that Pioneer submits ought to go to the jury do not raise a question of fact but rather show overwhelmingly that so

---

[17]    The cases of Exum v. Ferguson, 637 P.2d 553 (N.M. 1981), and Wagner v. Casteel, 663 P.2d 1020 (Ariz. 1983), and the collateral source doctrine have no application here. By citing them in its opposition, Pioneer has injected yet another non-issue into this motion and has once again missed the point. NU points to sums owed by others to Pioneer not to reduce any damages owed, but to show that many potential causes for Pioneer's alleged damages exist.

1    many factors were in operation here that this Court can find as a

2    matter of law that Pioneer cannot sustain its burden of proof on

3    the issue of damages.

4    **C.    NU's Motion Properly Addresses Pioneer's**
     **Consequential Damages Claim**

5

6        Pioneer's allegation that NU's motion for partial summary

     judgment on the issue of bad faith somehow should not include a

7    discussion of Pioneer's consequential damages claim is baseless.

8    The issue of consequential damages is clearly tied to plaintiff's

9    bad faith allegations.[18]    Because Pioneer is not entitled to

10   recover any damages that it cannot show were caused by alleged

11   wrongful conduct on the part of NU, any evaluation of the

12   consequential damages question must be accompanied by an evaluation

13   of the conduct claimed to have constituted bad faith.    If the

14   evidence is insufficient to show that any wrongful act occurred,

15   then Pioneer cannot show that any wrongful act caused the alleged

16   damages.    It is, therefore, entirely appropriate to move for

17   summary judgment on the bad faith claims and to include the

18   consequential damages issue.

19

20

21

22       [18]    Pioneer claims that "[t]he same consequential damages
     were sought in both the coverage claim and the bad faith claim."

23   (Opp. at 21.)    This contention is belied by Pioneer's second
     amended complaint, which seeks consequential damages only under its

24   bad faith claims.    (Reply Aff., Ex. 7, ¶¶14, 23, 30.)    Further
     evidence of this fact can be found in Pioneer's most recent

25   responses to NU's first set of interrogatories which provide that
     in addition to its claims under the NU policy "Pioneer also claims

26   damages for breach of insurance agreement for failure to promptly
     reimburse Pioneer for damages it incurred ...." (Reply Aff., Ex.

27   7, at 3.)    Finally, Pioneer cites no caselaw for the proposition
     that it is entitled to extra-contractual damages under its contract

28   claim.

1

2                          **CONCLUSION**

3          For the foregoing reasons, NU respectfully requests that the

4    Court grant partial summary judgment in favor of NU on the issue of

5    Pioneer's bad faith claims.

6    Dated: July 18, 1994

7                                    MOUND, COTTON & WOLLAN

8                                    By:

9                                        PHILIP C. SILVERBERG
                                         WILLIAM W. WILSON
10                                   One Battery Park Plaza
                                     New York, New York 10004
11                                   (212) 804-4200

12                                          - and -

13                                   LAW OFFICES OF THOMAS D. BEATTY
                                     601 East Bridger Avenue
14                                   Las Vegas, Nevada  89101
                                     (702) 382-5111

15                                   ATTORNEYS FOR DEFENDANT

16   Of Counsel:

17   DIANA E. GOLDBERG

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT F

## NATIONAL ARCHIVES AND RECORDS ADMINISTRATION

### ll to whom these presents shall come. Greeting:

...ue of the authority vested in me by the Archivist of the United States, I certify on his behalf,

...eal of the National Archives and Records Administration, that the attached reproduction(s) is

a ...rrect copy of documents in his custody.

| SIGNATURE | |
|---|---|
| *Michael J. Kretch, Jr.* | |
| NAME | DATE |
| Michael J. Kretch, Jr. | 0 1 JUL 2008 |
| TITLE | |
| Director, Federal Records Center | |
| NAME AND ADDRESS OF DEPOSITORY | |
| National Archives and Records Administration<br>23123 Cajalco Road<br>Perris, CA 92570-7298 | |

NA FORM 13040 (10-86)

LAW OFFICES OF THOMAS D. BEATTY
601 East Bridger Avenue
Las Vegas, Nevada  89101
(702) 382-5111

        and

MOUND, COTTON & WOLLAN
One Battery Park Plaza
New York, New York  10004
(212) 804-4200

Attorneys for Defendant

RECEIVED AND FILED
Jul 19 12 00 PM '94
CAROL C. FITZGERALD CLERK
BY ____ DEPUTY

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

----------------------------------x
PIONEER CHLOR ALKALI COMPANY, INC.

                    Plaintiff,          CV-S-93-276-RLH

        -against-

NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, PA.,

                    Defendant.
----------------------------------x

### REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN FURTHER SUPPORT OF DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFF'S BAD FAITH CLAIMS

199

TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . ii

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . 1

POINT I

  TEXAS LAW APPLIES TO PIONEER'S BAD FAITH CLAIMS . . . 1

POINT II

  EVEN UNDER NEVADA LAW, PIONEER HAS FAILED TO MEET ITS
  BURDEN OF PROOF IN OPPOSING NU'S SUMMARY
  JUDGMENT MOTION . . . . . . . . . . . . . . . . . . . 3

  A. Pioneer Has Not Shown that NU Violated the Act . . . 4

  B. Pioneer Failed to Raise Any Genuine Issues of
   Material Fact With Respect To Either of its
   Bad Faith Claims . . . . . . . . . . . . . . . . . 5

   1. The Standard for Summary Judgment . . . . . . . 5

   2. The Standard for Bad Faith . . . . . . . . . . 6

POINT III

  PIONEER HAS NOT SHOWN THAT ANY FACTS EXIST
  THAT ENTITLE IT TO PUNITIVE OR CONSEQUENTIAL DAMAGES . . .16

  A. Pioneer Has Not Shown Any Conduct By NU That Entitles
   Pioneer to An Award of Punitive Damages. . . . . . 16

  B. Pioneer Has Not Shown The Amount Of Its
   Damage Or That NU's Conduct Caused Its
   Alleged Consequential Damages . . . . . . . . . . . 17

  C. NU's Motion Properly Addresses Pioneer's
   Consequential Damages Claim . . . . . . . . . . . . 19

  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . 20

**TABLE OF AUTHORITIES**

<u>Cases</u>

<u>American Excess Ins. Co. v. MGM Grand Hotels, Inc.</u>,
    102 Nev. 601, 729 P.2d 1352 (1986). . . . . . . . .    6

<u>Bader v. Cerri</u>, 96 Nev. 352, 609 P.2d 314 (1980) . . . .
    17

<u>Berg v. First State Ins. Co.</u>, 915 F.2d 460 (9th Cir.
    1990) . . . . . . . . . . . . . . . . . . . . . . .    6

<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317 (1986). . . . . .    6

<u>Central Bit Supply, Inc. v. Waldrop Drilling & Pump, Inc.</u>,
    102 Nev. 139, 717 P.2d 35 (1986) . . . . . . . . .    17

<u>City of Long Beach v. Standard Oil Co. of California</u>,
    872 F.2d 1401 (9th Cir. 1989), <u>amended on other grounds</u>,
    886 F.2d 246 (1989), <u>cert. denied</u>, 493 U.S. 1076
    (1990) . . . . . . . . . . . . . . . . . . . . . .    5

<u>Exum v. Ferguson</u>, 637 P.2d 553 (N.M. 1981) . . . . . .    18

<u>Ferdie Sievers & Lake Tahoe Land Co., Inc. v. Diversified
    Mortg. Investors</u>, 95 Nev. 811, 603 P.2d 270 (1979). .3

<u>Ferens v. John Deere Co.</u>, 494 U.S. 516 (1990). . . . . . .    1

<u>Hansen v. United States</u>, 7 F.3d 137 (9th Cir. 1993). . . .    18

<u>Hunter v. Greene</u>, 734 F.2d 896 (2d Cir. 1984) . . . . . .    3

<u>Industrial Indem. Co. v. United States</u>, 757 F.2d 982
    (9th Cir. 1985). . . . . . . . . . . . . . . . . .    3

<u>Nelson v. Lake Canal Co. of Colo.</u>, 644 P.2d 55
    (Colo. Ct. App. 1981). . . . . . . . . . . . . . .    17

<u>Pioneer Chlor Alkali Co., Inc. v. Royal Indem. Co.</u>, No. A14-
    93-00391-CV, 1994 WL 106311 (Tex. Ct. App. 1994). . 2,
    6,
                                                    7, 14

<u>Republic Ins. Co. v. Hires</u>, 107 Nev. 317, 810 P.2d
    790 (1991). . . . . . . . . . . . . . . . . . . .    17

<u>Transportation Ins. Co. v. Moriel</u>, No. D-1507, 1994 WL 246568
(Tex.    June 8, 1994). . . . . . . . . . . . . . . . . . 6

<u>Union Pacific R. Co. v. Nevada Power Co.</u>, 950 F.2d 1429
    (9th Cir. 1991) . . . . . . . . . . . . . . . . . .    5

1  <u>United Fire Ins. Co. v. McClelland</u>, 105 Nev. 504, 780 P.2d
2       193 (1989) . . . . . . . . . . . . . . . . . . . .  17

3  <u>Wagner v. Casteel</u>, 663 P.2d 1020 (Ariz. 1983) . . . . . . . 18

4  <u>Constitutional Provisions and Statutes</u>

5  N.R.S. 686A.020 . . . . . . . . . . . . . . . . . . .   3

6

7  <u>Other Authorities</u>

8  William M. Shernoff, <u>et. al.</u>, <u>Insurance Bad Faith</u>
       <u>Litigation</u> . . . . . . . . . . . . . . . . .   17

9

10  Von Mehren, <u>Special Substantive Rules for Multistate Problems:</u>
   <u>Their Role and Significance in Contemporary Choice of Law</u>
   <u>Methodology</u>, 88 Harv. L. Rev. 347 (1974). . . . . . .   3

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## PRELIMINARY STATEMENT

The defendant, National Union Fire Insurance Company of Pittsburgh, Pa. ("NU"), submits this Reply Memorandum of Points and Authorities, along with the accompanying Affidavit of Philip C. Silverberg, sworn to July 18, 1994 ("Reply Aff."), in further support of its motion for partial summary judgment on the bad faith claims asserted by plaintiff Pioneer Chlor Alkali Company, Inc. ("Pioneer").

### ARGUMENT

### POINT I

### TEXAS LAW APPLIES TO PIONEER'S BAD FAITH CLAIMS

Although Pioneer acknowledges that the law of the state with the "most significant relationship" to the dispute should be applied, it argues that Nevada law should apply here based on an estoppel theory.  (Pioneer's Memorandum in Opposition to NU's Motion ("Opp.") at 3.)[1]  According to Pioneer, NU is estopped from arguing for the application of Texas law as respects the bad faith claims because NU argued in its motion to transfer this case from federal court in Texas that Nevada law would probably apply to Pioneer's contract claims.[2]  Pioneer has cited no cases for the heretofore unheard of choice-of-law principle that a court's determination as to what state's law to apply may be based on estoppel.  Indeed, to make a choice-of-law determination on the

---

[1]    That Nevada, too, uses this test is irrelevant because the law is clear that where a transfer of venue occurs, the choice-of-law rules that apply are the rules of the transferring state. Ferens v. John Deere Co., 494 U.S. 516, 530-31 (1990).  Hence, an application of Texas choice-of-law rules is required here.

[2]    As Pioneer correctly states, a bad faith claim is not derived from the terms of the insurance contract.  Rather, it "is a duty imposed by law, the violation of which is a tort."  (Opp. at 4 (citation omitted).)

1    basis of estoppel would be in derogation of the "most significant

2    relationship" test.

3        Pioneer also conveniently neglects to mention to the Court

4    that in opposing NU's transfer motion it argued that Texas law

5    should apply.  According to Pioneer:

> The mere fact that the accident in question occurred in
> Nevada does not mandate the application of Nevada law.
> A cursory review of the[] facts indicates that Texas law
> should be applied . . . .

8    (Reply Aff., Ex. 1, ¶42.)  It is significant that shortly after the

9    Texas trial court dismissed Pioneer's claims against Royal

10   Indemnity Company, including its bad faith claims,  see Pioneer

11   Chlor Alkali Co., Inc. v. Royal Indem. Co., No. A14-93-00391-CV,

12   1994 WL 106311 (Tex. Ct. App. 1994) (the "Royal action"), Pioneer

13   withdrew its opposition to NU's transfer motion and consented to

14   the transfer.  It would appear that Pioneer did so in the hope that

15   it would have better luck under Nevada law.[3]

16       Pioneer now argues that Nevada law should apply because Nevada

17   is the principal location of the insured risk.  (Opp. at 3-4.)  In

18   addition to ignoring its prior position, Pioneer's new argument

19   also ignores certain indisputable facts.  The NU policy provides

20   coverage for property at various Pioneer locations, including

21   Texas, Nevada, Louisiana, and several other states.  If anything,

22   the principal location of the risk is in Texas, where Pioneer's

23   headquarters are located.  In addition, while concerns regarding

24   the principal location of the risk may be relevant for determining

25   which state's law applies to contract claims, they have no

---

28   [3]    Contrary to Pioneer's dubious assertion, Nevada law does
not clearly favor Pioneer's legal position on the bad faith claims.

1  relevance in determining which state's law should apply to extra-

2  contractual tort claims.[4]

3      Moreover, arguing that the law of one state should apply to

4  some issues while applying the law of another state to others is in

5  no way inconsistent as Pioneer suggests.  "Under the doctrine of

6  depecage . . . 'the rules of one legal system are applied to

7  regulate certain issues arising from a given transaction or

8  occurrence, while those of another system regulate the other

9  issues.'"  <u>Hunter v. Greene</u>, 734 F.2d 896, 901 (2d Cir. 1984)

10 (quoting Von Mehren, <u>Special Substantive Rules for Multistate</u>

11 <u>Problems: Their Role and Significance in Contemporary Choice of Law</u>

12 <u>Methodology</u>, 88 Harv. L. Rev. 347, 356 n.24 (1974)).  Thus, even if

13 this Court were to consider NU's motion to transfer venue in

14 determining which state's law applies, NU is not estopped from

15 seeking the application of Texas law to Pioneer's bad faith

16 claims.[5]

### POINT II

### EVEN UNDER NEVADA LAW, PIONEER HAS FAILED TO MEET ITS
### BURDEN OF PROOF IN OPPOSING NU'S SUMMARY JUDGMENT MOTION

Pioneer has asserted bad faith claims under both the common

law and the Nevada Unfair Claims Practices Act ("the Act").  As

---

[4]    Accordingly, Pioneer's reliance on <u>Industrial Indem. Co.
v. United States</u>, 757 F.2d 982 (9th Cir. 1985), which involved a
contract claim, is misplaced.  Pioneer's reliance on <u>Ferdie Sievers
& Lake Tahoe Land Co., Inc. v. Diversified Mortg. Investors</u>, 95
Nev. 811, 603 P.2d 270 (1979), which involved a choice-of-law
provision in the parties agreement, is similarly misplaced.

[5]    Pioneer moved to amend its complaint to allege statutory
bad faith on November 8, 1993, and to allege common law bad faith
on April 1, 1994, whereas NU moved for change of venue on or about
December 23, 1992, before any bad faith claims had been asserted.

- 3 -

1    discussed below, each of these bad faith claims is insufficient as

2    a matter of law.

3    **A.    Pioneer Has Not Shown That NU Violated the Act**

4         Either by mistake or in an effort to confuse the issues,

5    Pioneer has combined the question of which state's law applies to

6    its bad faith claims with the question of whether Pioneer has

7    sufficiently alleged a claim under the Act.  The Act provides that:

8              A person shall not engage <u>in this state</u> in any
               practice which is defined . . . to be an
9              unfair . . . or deceptive act or practice in
               the business of insurance.

10   N.R.S. 686A.020 (emphasis added).  Pursuant to the plain meaning of

11   the above quoted section of the Act, the test for whether the Act

12   applies is whether an unfair or deceptive act or practice took

13   place in Nevada, and not, as Pioneer suggests, "whether . . .

14   Nevada has a significant relationship to the involved claim

15   processing and handling."  (Opp. at 4, n.3.)  If any of the alleged

16   unfair practices that are listed in the Act were committed in

17   Nevada, then, and only then, would the Act apply.

18        In that regard, Pioneer has failed to meet its burden of

19   proving that NU committed any unfair practices in Nevada.  Rather,

20   in an attempt to side-step the issue, Pioneer argues that "the

21   plant (the insured risk) was located in Nevada, the adjuster came

22   to the plant to conduct the investigation and dozens of pieces or

23   [sic] correspondence regarding the claim were sent to and from

24   Nevada."  (Opp. at 4, n.3.)  However, none of these so-called

25   "acts" comprise Pioneer's statutory bad faith claim.  The fact that

26   Pioneer has been unable to identify any unfair or deceptive act or

27   practice that took place in Nevada precludes it from recovering

28

                                    - 4 -

under the Act.  Moreover, how Pioneer can argue that the Nevada statute should apply to NU, but that the Texas statute should apply to Royal is something only Pioneer can explain.

**B.    Pioneer Failed to Raise Any Genuine Issues of Material Fact With Respect to Either of its Bad Faith Claims**

**1.    The Standard for Summary Judgment**

Pioneer's opposition memorandum, while replete with petty remarks and inconsequential prattle, does not contain any specific facts to prevent this Court from granting NU's motion for summary judgment on the issue of bad faith.[6]  It is well established that "[t]o overcome summary judgment the non-moving party 'must establish that there is a genuine issue of material fact' and demonstrate more than 'some metaphysical doubt as to the material facts.'"  Union Pacific R. Co. v. Nevada Power Co., 950 F.2d 1429, 1435 (9th Cir. 1991) (quoting City of Long Beach v. Standard Oil Co. of California, 872 F.2d 1401, 1403-4 (9th Cir. 1989), amended on other grounds, 886 F.2d 246 (1989), cert. denied, 493 U.S. 1076 (1990)).

Only when there are genuine issues of material facts is summary judgment not appropriate.  See Union Pacific, 950 F.2d at 1435.  Disputes concerning irrelevant or immaterial facts will not preclude summary judgment.  Id. at 1435-36.  Moreover, summary judgment is appropriate against a party "who fails to make a showing sufficient to establish the existence of an element

---

[6]    Once again, Pioneer elected not to serve a timely Local Rule 140-7 counterstatement of facts.  This time, however, the late-filed counterstatement was received approximately three days before briefing was completed.  For the most part, Pioneer accepts NU's statement of facts.  Pioneer's purported counterstatement of disputed "facts" consists of references to self-serving statements in its opposition brief and not to the actual record of facts.

- 5 -

1  essential to that party's case, and on which that party will bear

2  the burden of proof at trial." Celotex Corp. v Catrett, 477 U.S.

3  317, 322 (1986); see also Berg v. First State Ins. Co., 915 F.2d

4  460, 465-66 (9th Cir. 1990) (citing Celotex, 477 U.S. at 322-23).

5      **2.    The Standard for Bad Faith**

6      Pioneer admits that in order to establish common law bad

7  faith, Pioneer must show that NU refused to compensate Pioneer

8  without proper cause.  (Opp. at 4.)  In other words, Pioneer must

9  show that NU had no reasonable basis for not paying its claim.

10 This is so under either Nevada or Texas law.  See American Excess

11 Ins. Co. v. MGM Grand Hotels, Inc., 102 Nev. 601, 605, 729 P.2d

12 1352, 1354-55 (1986); Transportation Ins. Co. v. Moriel, No. D-

13 1507, 1994 WL 246568, *5 (Tex. June 8, 1994); Pioneer, 1994 WL

14 106311.  With respect to its claim under the Act, Pioneer must also

15 show that NU committed at least one of the practices enumerated in

16 the Act in the State of Nevada.

17     As a preliminary matter, it should be noted that Pioneer's

18 claim that NU's motion does not encompass all of Pioneer's bad

19 faith claims (Opp. at 8, n.10) is without merit.  On the contrary,

20 NU's motion seeks a determination that NU did not act in bad faith.

21 This could not be more plain.  Pioneer, however, seems to have

22 found the threshold elements of bad faith elusive, as it has failed

23 to demonstrate that NU failed to pay its claim without a reasonable

24 basis for doing so.  Instead, Pioneer points to numerous irrelevant

25 or immaterial "facts" it claims constitute bad faith.  Obviously,

26 Pioneer hopes that by pointing to these "facts" it will cause the

27 Court to lose sight of the only relevant inquiry, to wit:  Did NU

28 act unreasonably in not paying Pioneer's claim?  As this Court has

- 6 -

previously determined, whether coverage exists under the NU policy is a question of fact, and the jury could rule in either party's favor.   Incredibly, even Pioneer now admits that its claims "were fairly debatable at the time submitted." (Reply Aff., Ex. 2, at 5.)   Therefore, NU submits that as a matter of law, it had a reasonable basis not to pay the claim and is entitled to summary judgment.   See Pioneer, 1994 WL 106311, *19.   ("As long as [the insurer] had some reasonable basis to deny the claim there is no breach [of the duty of good faith and fair dealing].")[7]

In addition, NU has addressed each of Pioneer's allegations with respect to its bad faith claims by setting forth a detailed step-by-step account of how the claim was handled by NU from the moment NU was informed of the loss.   (NU's Moving Memorandum ("Moving Mem.") at 1-5.)   Pioneer has not countered with any evidence to show that this account is not true.   Rather, Pioneer has filled its opposition papers with name calling and countless unsubstantiated, conclusory statements.   In so doing, it has completely ignored the existing evidence. (Moving Mem. at 1-6, 12-14), all of which demonstrates that NU acted in good faith.

Pioneer essentially claims that NU committed four "independent acts of bad faith."   (Opp. at 6-17.)   These four "acts" are: 1) failure to make a prompt coverage determination; 2) failure to adequately investigate all possible grounds for coverage, including the "rag theory;" 3) failure to monitor the claim; and 4) adopting

---

[7]   Despite finding that Pioneer was entitled to summary judgment on its claim under the Royal policy, the court still concluded that Royal did not act in bad faith by denying coverage. NU stands on much firmer ground given the fact that Pioneer's countermotion for summary judgment was denied.

1   an "arbitrary and capricious interpretation" of the corrosion

2   exclusion.  (Opp. at 6-8.)  Each of these "acts" are addressed

3   below.[8]

4        Failure to Make a Prompt Coverage Determination

5        Pioneer argues that NU acted in bad faith because it took

6   nineteen months to make a coverage determination.[9]  Contrary to

7   Pioneer's assertion, the "primary justification" offered by NU for

8   the alleged delay in investigating Pioneer's claim is not that NU's

9   engineer took a long time to complete its investigation.  (Opp. at

10  13-14.)  Rather, the alleged delay was caused by Pioneer's refusal

11  to allow NU's agents access to information they needed to conduct

12  their investigations.  This fact is well supported by the evidence.

13  (Moving Mem. at 1-6, 12-14.)  Pioneer candidly admits in its

14  opposition papers that documents that had been requested by NU in

15

---

16       [8]   It is also worth noting that the underlying basis for
17  Pioneer's bad faith claims against NU are mutually exclusive.  On
    the one hand, Pioneer argues that NU's investigation took too long
18  and that NU should have immediately denied coverage once it
    realized that corrosion was involved in the loss.  (Opp. at 14.)
19  Pioneer then argues that NU acted in bad faith because it failed
    "to adequately investigate all possible grounds for coverage before
20  denying coverage . . . ."  (Opp. at 5.)  Notwithstanding the
    issuance of a reservation of rights letter early in the
21  investigation, if NU had immediately denied coverage, Pioneer would
    have argued that NU did not fully investigate.  Indeed, in the
22  Royal action, Pioneer argued that Royal improperly denied coverage
    without having conducted a thorough investigation.  Pioneer, 1994
23  WL 106311, *19-22.  Pioneer now argues that NU should have done
    what Royal did in denying coverage nine months earlier.  (Opp. at
24  6.)

25       [9]   With respect to its claim under the Act, Pioneer
    correctly notes that the Act lists "failing to affirm or deny
26  coverage of claims within a reasonable time after proof of loss
    requirements have been completed and submitted by the insured" as
27  an unfair practice.  (Opp. at 5.)  What Pioneer fails to mention,
    however, is that here, proof of loss requirements were never
28  completed and Pioneer never submitted a proof of loss.

- 8 -

1   June 1991 were not made available for inspection until March 1992,

2   nine months after they were requested. (Opp. at 16-17.)   In a

3   transparent attempt to create an "issue," Pioneer argues that NU

4   incorrectly noted in its moving papers that it did not receive

5   notice that the documents would be available until April 1992.

6   According to Pioneer, NU received notice that the documents it had

7   requested, in June 1991, were available in March 1992.   The

8   documents were actually received by NU one month later in April

9   1992.   This effort by Pioneer to divert the Court's attention from

10  the indisputable fact that Pioneer made NU wait more than nine

11  months before notifying it that the documents would be made

12  available and then an additional month before actually producing

13  the documents is without merit.

14      Pioneer has failed to offer any explanation for this delay,

15  choosing instead to ignore it.[10]   Pioneer also argues that the

16  "excuses" offered by NU for the length of its investigation "do not

17  withstand scrutiny." (Opp. at 6-7.)   However, Pioneer bases this

18  contention solely on what it claims are the "inferences" that can

19

20      [10]   Pioneer argues that its ten month delay in producing the
21  requested documents "is not a valid justification for waiting
    thirteen months to ask for artifacts for testing and fourteen
22  months for describing the proposed tests." (Opp. at 17-18.)   What
    Pioneer ignores is that Thielsch Engineering Associates, Inc.
23  ("Thielsch") requested the "artifacts" approximately one month
    after it finally received the documents.   As Pioneer tacitly
24  acknowledges, it was not until the evidence log was produced that
    Thielsch learned of the existence of the "artifacts." (Opp. at 17-
25  18.)
        With respect to the testing protocol, Thielsch proposed
26  developing a protocol after Pioneer refused to produce certain
    items because it was allegedly "loathe to lose custody of valuable
27  evidence." (Silverberg June 16, 1994 Aff., Ex. 22 and Ex. 23.)
    Thus, the protocol was suggested by Thielsch in a good faith
28  attempt to allay Pioneer's fears and move the investigation along.

- 9 -

be drawn from the facts.    (Opp. at 6-7.)    Simply stated, Pioneer has not met its burden in opposing NU's motion for summary judgment.

Pioneer then argues that "at least one month of the delay was caused by the absence of the adjuster." (Opp. at 13.)    According to Pioneer, NU's adjuster, Robert McMullin, was on vacation during "the entire month of October 1991." (Opp. at 13.)    What Pioneer fails to note, however, is that it was in October 1991 that Mr. McMullin sent a signed copy of the confidentiality agreement to Pioneer's attorneys to be signed.    (Moving Mem. at 2-3.)    It was not until January 8, 1992, well after Mr. McMullin had returned, that Pioneer finally returned the signed confidentiality agreement. (Moving Mem. at 2-3.)    Pioneer refused to allow NU to proceed with its investigation until the confidentiality agreement had been signed by all parties.    (Moving Mem. at 2-3.)    What stalled the investigation was the two-month delay by Pioneer's counsel - the very same counsel that is now arguing the delay is NU's fault.

Pioneer further contends that NU's position that the loss was caused by corrosion and therefore excluded somehow obviated the need for an investigation.    (Opp. at 13-15.)    This allegation cannot be taken seriously, especially in light of Pioneer's claim that NU had a duty to investigate all possible grounds for coverage.    Even if what Pioneer has alleged is true and NU believed that an investigation would merely confirm NU's belief that corrosion caused the loss, that NU in fact conducted a thorough investigation is, if anything, an act of good faith.    Moreover, Pioneer's opposition/countermotion relating to the corrosion exclusion demonstrates the length to which Pioneer was prepared to

- 10 -

go in arguing that what occurred at its plant was anything but corrosion.

Although Pioneer has argued that the coverage determination took too long, Pioneer has not offered any explanation for the delays that resulted from its failure to cooperate with the requests for information made by NU's agents.[11] (Moving Mem. at 1-6, 12-14.)  The record in this case is clear:  NU attempted many times in good faith to proceed with the investigation only to be prevented from doing so by Pioneer.  NU employees' testimony that the investigation was lengthy, and unsubstantiated allegations of improper motives on the part of Thielsch in conducting the investigation, do not raise genuine issues of material fact.  This is all puffery; Pioneer has not submitted one shred of relevant evidence admissible in opposition to NU's motion.  The testimony of plaintiff's designated "bad faith expert," Peter Kensicki, which Pioneer cites in its opposition memorandum, clearly states exactly what NU has maintained all along --  that Pioneer is unable to point to any violation by NU of any single prescribed standard

---

[11]    As for the delay over the confidentiality agreement, Pioneer has alleged that NU acted in bad faith by refusing to sign the original confidentiality agreement absent the advice of counsel.  (Opp. at 15.)   This is an outrageous allegation particularly in light of the fact that immediately following the loss Pioneer retained three law firms to represent its interests and the initial agreement had been drafted and revised by attorneys at two of those law firms.  Surely Pioneer cannot expect such a document simply to be signed by NU without first having it reviewed by an attorney acting on NU's behalf.

- 11 -

1   "under Nevada law or model code <u>or anything else</u>."  (Opp. at 7,

2   8.)[12]

3       In support of its claim that NU unnecessarily delayed its

4   investigation, Pioneer also argues that the investigation conducted

5   by Thielsch was altogether unnecessary.  In support of this point,

6   Pioneer relies solely on the self-serving testimony of Dr.

7   Kensicki. (Opp. at 14.)  Notably, Dr. Kensicki, who has no personal

8   knowledge regarding the Thielsch investigation, testified that

9   Thielsch was hired by NU to investigate whether the corrosion was

10  long-term or short-term.   (Opp. at 14.)   This misstatement is

11  contrary to the testimony of Ara Nalbandian, P.E., the Thielsch

12  engineer who conducted the investigation.  Mr. Nalbandian testified

13  that Thielsch was hired to investigate the possible causes of the

14  loss, not just whether it was short-term or long-term corrosion.

15  Pioneer's counsel deposed Ara Nalbandian at length and questioned

16  him on this precise issue. (Reply Aff., Ex. 4, pages 48-49.)  Mr.

17  Nalbandian also testified regarding the issue of why an independent

18  investigation was necessary.  (Reply Aff., Ex. 4, pages 98-99.)

19  The fact that Pioneer has ignored Mr. Nalbandian's testimony, as

20  well as his detailed report, and chose instead to rely on the

21

22      [12]   Pioneer also argues that "National Union employees have
23  conceded that the nineteen (19) month delay that occurred before it
    denied coverage in this case is unprecedented in the history of the
24  company."  Pioneer then cites to the deposition testimony of NU's
    claims representative, William Waidler, to support this contention.
25  What Pioneer fails to mention is that Mr. Waidler testified that he
    could not think of any <u>specific</u> instances, but he was sure that
26  there had been some.   (Opp., Ex. 4, page 156, lines 2-6.)
    Moreover, Pioneer's bad faith expert testified that the length of
27  time it takes to investigate a claim varies from case to case
    depending on the circumstances.  (Reply Aff., Ex. 3, pages 308-
28  309.)

1    baseless self-serving conclusory statements of its "bad faith"

2    expert, is telling.

3        Similarly, Pioneer argues that NU committed an act of bad

4    faith when Thielsch refused to rely solely on testing performed and

5    data obtained by Failure Analysis Associates ("FAA").    Pioneer

6    points out that certain testing was witnessed by Thielsch and

7    claims that this should have been sufficient to prepare a report on

8    the cause of the loss.    (Opp. at 18.)    Ironically, in the Royal

9    action Pioneer argued that Royal committed bad faith in not

10   conducting its own investigation, choosing instead to "piggy-back"

11   Pioneer's investigation by relying on the investigation conducted

12   by FAA.    Pioneer, 1994 WL 106331, *21.    Moreover, Pioneer has not

13   cited any authority for the absurd proposition that an insurer is

14   somehow required to rely upon the insured's investigation and is

15   not allowed to undertake its own, independent investigation.

16   Indeed, no such authority could possibly exist.

17       Failure to "Adequately and Seasonably" Investigate the Claim

18       One of the alleged wrongful acts that Pioneer claims

19   constitutes bad faith is that NU allegedly failed to "adequately

20   and seasonably" investigate the claim.    Specifically, Pioneer

21   argues that NU acted in bad faith because it failed to give

22   adequate consideration to the "rag theory." (Opp. at 8-9.) What

23   Pioneer fails to mention, however, is that "the potential coverage

24   argument" regarding the rag was first "advanced" in Pioneer's

25   supplemental response to NU's first set of interrogatories dated

26   November 8, 1993.    (Reply Aff., Ex. 5.)    Pioneer's claim that NU

27   "refused" to investigate the "rag theory" implies that NU was

28

- 13 -

1    somehow asked to consider this theory by Pioneer.[13]    However, NU

2    had no knowledge that the rag was considered to be the actual cause

3    of the loss by Pioneer until Pioneer unveiled the so-called "rag

4    theory" in its interrogatory responses long after the action was

5    commenced.    While the presence of the rag in the liquefier was

6    readily apparent upon inspection of the liquefier, NU had no way of

7    knowing that Pioneer's counsel planned to take the position that

8    the loss was caused by the rag.    More importantly, however, even if

9    NU had ignored the rag theory, that would be insufficient to

10    establish bad faith.    "[I]t is not enough for the insured to show

11    that . . . there were other facts suggesting the claim was valid;

12    rather, the insured must show that no reasonable basis existed for

13    denying the claim."    Pioneer, 1994 WL 106311, *18.

14    In addition, Pioneer bases its argument that NU failed to

15    consider the "rag theory" solely on the contention that neither the

16    NU claims representative, William Waidler, nor its adjuster, Bob

17    McMullin, made any determination regarding the impact the rag may

18    have had on the loss.    (Opp. at 8.)    However, NU hired Thielsch for

19    the purpose of investigating the cause of the loss.    Because of the

20    delays caused by Pioneer, Thielsch did not reach its final

21    conclusion regarding the cause of the loss until after this action

22    was commenced.    On instructions from NU, Thielsch sent its report

23    directly to counsel for NU.    Once the action was commenced, there

24

25

26    [13]    As the Court noted in its decision on the corrosion
27    exclusion, Pioneer has yet to proffer any evidence as to how the
      rag negligently found its way into the liquefier (to say nothing of
      the question of causation).    It is this yet to be identified
28    "negligence" that Pioneer contends renders the loss covered.

1   was no longer any reason for Thielsch to send its report to NU's

2   adjuster.

3       Failure to Monitor the Claim

4       Pioneer argues that there was an "incredible gaffe" in

5   handling Pioneer's claim during the period from October or November

6   1992 until October or November 1993.  (Opp. at 11-13.)  According

7   to Pioneer, no one was handling its claim during this period.  What

8   Pioneer does not mention is that during this period the claim was

9   in litigation and the claim was, in fact, being handled by NU's

10  attorneys.  Moreover, one of the exhibits annexed to Pioneer's

11  opposition papers demonstrates that this statement is simply false.

12  Along with its opposition papers, Pioneer put before the Court the

13  affidavit of William Waidler, which was submitted by NU in support

14  of its motion to transfer venue.  This affidavit dated February 1,

15  1993, evidences that Mr. Waidler was the individual on NU's behalf

16  who was monitoring the claim as late as February 1993 --

17  approximately three months after Pioneer sued NU.  (Opp., Ex. 3.)[14]

18

19       Adopting an Arbitrary and Capricious
         Interpretation of the Corrosion Exclusion

20

21       In light of the recent decision of this Court concerning the

22  corrosion exclusion, NU respectfully submits that this alleged act

23  of bad faith has been rendered moot.  In its Order dated June 24,

24  1994, this Court found that NU's interpretation of the term

25  corrosion was reasonable and that whether the rag had a role in

26  _____

27      [14]   During his deposition, taken in March 1994, William
        Waidler (who retired in August 1993), testified that he could not
28  recall with a degree of certainty when he ceased handling this
        file.  (Reply Aff., Ex. 6, pages 159-160.)

- 15 -

1  causing the leak that served to take this loss outside of the

2  corrosion exclusion was a question of fact.    Given the Court's

3  ruling that a question exists as to whether the loss is excluded,

4  the testimony cited by Pioneer dealing with the exception to the

5  exclusion is irrelevant.    Pioneer simply cannot show that NU's

6  conduct was anything but reasonable.

### POINT III

### PIONEER HAS NOT SHOWN THAT ANY FACTS EXIST
### THAT ENTITLE IT TO PUNITIVE OR CONSEQUENTIAL DAMAGES

**A.    Pioneer Has Not Shown Any Conduct By NU That Entitles Pioneer
to An Award of Punitive Damages**

11          On the issue of punitive damages, once again Pioneer has

12  failed to raise any triable fact issues.    Pioneer concedes that it

13  is not entitled to punitive damages unless it proves, by clear and

14  convincing evidence, oppression, fraud or malice.    Pioneer then

15  goes on to make a feeble attempt at showing NU's failure to pay

16  Pioneer despite Pioneer's alleged financial difficulties was

17  somehow oppressive and that NU had a "sinister motive" in not

18  paying the claim.    However, none of the cases cited by Pioneer

19  supports its claim for punitive damages.    In fact, on the whole,

20  they use the same standard that was used in the cases cited by NU

21  in support of its own position.

> Courts which have considered the issue
> generally have drawn a theoretical distinction
> between the state of the insurer's mind
> required for an insured to recover
> compensatory damages for breach of the duty of
> good faith and fair dealing, and the state of
> mind which must be established to recover
> punitive damages.    Generally speaking, a
> higher degree of culpability is required to
> justify an award of punitive damages than that
> necessary for an award of compensatory damages
> for bad faith.

William M. Shernoff, et. al., Insurance Bad Faith Litigation §
5.02[3] at 5-13.  Here, Pioneer has offered no evidence that the
"higher degree of culpability" is present.  Indeed, no such
evidence exists.[15]

**B.   Pioneer Has Not Shown The Amount Of Its Damage Or That NU's Conduct Caused Its Alleged Consequential Damages**

The law requires Pioneer to prove that NU's alleged wrongful
acts caused Pioneer's damages and the amount of its damages.
Conjecture does not create a right to recovery.  (Moving Mem. at
17-19.)  Even under the less strenuous standard that only a
reasonable basis for determining damages be established, Pioneer
has not demonstrated that it is entitled to recover.[16]  In fact
Pioneer now "candidly" admits that certain damages were not in fact
sustained and may never be sustained.  Unfortunately, it was not

---

[15]  Pioneer compares its case to that of a dying man who was
unable to pay his medical bills because of his insurer's
unjustifiable failure to pay his claim.  In Republic Ins. Co. v.
Hires, 107 Nev. 317, 810 P.2d 790 (1991), the insurer was found to
have committed bad faith and punitive damages were awarded.  In
that case, unlike this one, the Court found that no question
existed as to coverage because the claim was one that reasonable
people would believe should be paid.  Therefore, Republic had
committed bad faith when it failed to pay the claim.  Similarly, in
United Fire Ins. Co. v. McClelland, 105 Nev. 504, 780 P.2d 193
(1989), the court found that the insurer's denial of the claim on
the grounds that a novation had been made was unreasonable because
the facts showed that defendants did not have sufficient knowledge
to make a novation.  Here, this Court has already found that a
question of fact exists as to the applicability of the corrosion
exclusion.  Therefore, reasonable people could differ on whether
there is coverage.

[16]  To sidestep the ramifications of its inability to prove
its damages, Pioneer relies on the decision in which the alleged
damages were clearly the result of a single tort-feasor's actions
and the damages were provable to a reasonable degree of certainty.
See Bader v. Cerri, 96 Nev. 352, 609 P.2d 314 (1980); Central Bit
Supply, Inc. v. Waldrop Drilling & Pump, Inc., 102 Nev. 139, 717
P.2d 35 (1986); Nelson v. Lake Canal Co. of Colo., 644 P.2d 55
(Colo. Ct. App. 1981).

- 17 -

1  until Pioneer was compelled to respond to this motion that it

2  decided to become so "candid."

3      NU does not intend to repeat here what has already been set

4  forth in detail in its moving papers.  Namely, both the cause and

5  amount of Pioneer's damages are speculative and uncertain.  (Moving

6  Mem. at 17-28.)    The only "evidence" put forth by Pioneer in

7  opposition to this portion of NU's motion is the self-serving

8  affidavit of Pioneer's Chief Financial Officer, George Henning.  It

9  is well settled, however, that "[w]hen the nonmoving party relies

10  only on its own affidavits to oppose summary judgment, it cannot

11  rely on conclusory allegations unsupported by factual data to

12  create an issue of material fact."  Hansen v. United States, 7 F.3d

13  137, 138 (9th Cir. 1993).

14      Finally, it should be noted that Pioneer's claim that its

15  alleged consequential damages should not be evaluated in light of

16  the monies it was owed by other sources carries no weight.

17  Pioneer's own witnesses testified unequivocally that they could not

18  say that if Pioneer had received money from NU the restructuring

19  would not have been required.  (Opp. at 26.)  Absent some factual

20  showing that NU did in fact cause the consequential damages alleged

21  by Pioneer, Pioneer is not entitled to recover such damages.[17]  In

22  sum, those items that Pioneer submits ought to go to the jury do

23  not raise a question of fact but rather show overwhelmingly that so

24

25  [17]      The cases of Exum v. Ferguson, 637 P.2d 553 (N.M. 1981),
   and Wagner v. Casteel, 663 P.2d 1020 (Ariz. 1983), and the
26  collateral source doctrine have no application here.  By citing
   them in its opposition, Pioneer has injected yet another non-issue
27  into this motion and has once again missed the point.  NU points to
   sums owed by others to Pioneer not to reduce any damages owed, but
28  to show that many potential causes for Pioneer's alleged damages
   exist.

- 18 -

many factors were in operation here that this Court can find as a matter of law that Pioneer cannot sustain its burden of proof on the issue of damages.

## C.    NU's Motion Properly Addresses Pioneer's Consequential Damages Claim

Pioneer's allegation that NU's motion for partial summary judgment on the issue of bad faith somehow should not include a discussion of Pioneer's consequential damages claim is baseless. The issue of consequential damages is clearly tied to plaintiff's bad faith allegations.[18]    Because Pioneer is not entitled to recover any damages that it cannot show were caused by alleged wrongful conduct on the part of NU, any evaluation of the consequential damages question must be accompanied by an evaluation of the conduct claimed to have constituted bad faith.    If the evidence is insufficient to show that any wrongful act occurred, then Pioneer cannot show that any wrongful act caused the alleged damages.    It is, therefore, entirely appropriate to move for summary judgment on the bad faith claims and to include the consequential damages issue.

---

[18]    Pioneer claims that "[t]he same consequential damages were sought in both the coverage claim and the bad faith claim." (Opp. at 21.)    This contention is belied by Pioneer's second amended complaint, which seeks consequential damages only under its bad faith claims.    (Reply Aff., Ex. 7, ¶¶14, 23, 30.)    Further evidence of this fact can be found in Pioneer's most recent responses to NU's first set of interrogatories which provide that in addition to its claims under the NU policy "Pioneer also claims damages for breach of insurance agreement for failure to promptly reimburse Pioneer for damages it incurred ...." (Reply Aff., Ex. 7, at 3.)    Finally, Pioneer cites no caselaw for the proposition that it is entitled to extra-contractual damages under its contract claim.

1

2                              **CONCLUSION**

3         For the foregoing reasons, NU respectfully requests that the

4    Court grant partial summary judgment in favor of NU on the issue of

5    Pioneer's bad faith claims.

6    Dated: July 18, 1994

7                                        MOUND, COTTON & WOLLAN

8                                        By:

9                                           PHILIP C. SILVERBERG
                                            WILLIAM D. WILSON
10                                       One Battery Park Plaza
                                         New York, New York 10004
11                                       (212) 804-4200

12                                            - and -

13                                       LAW OFFICES OF THOMAS D. BEATTY
                                         601 East Bridger Avenue
14                                       Las Vegas, Nevada  89101
                                         (702) 382-5111

15                                       ATTORNEYS FOR DEFENDANT

16   Of Counsel:

17   DIANA E. GOLDBERG

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT G

# NATIONAL ARCHIVES AND RECORDS ADMINISTRATION



all to whom these presents shall come. Greeting:

...tue of the authority vested in me by the Archivist of the United States, I certify on his behalf,

...r ...al of the National Archives and Records Administration, that the attached reproduction(s) is

...e an...rect copy of documents in his custody.

| SIGNATURE | |
|---|---|
| *Michael J. Kretch, Jr.* | |
| NAME | DATE |
| Michael J. Kretch, Jr. | 15 JUL 2008 |
| TITLE | |
| Director, Federal Records Center | |
| NAME AND ADDRESS OF DEPOSITORY | |
| National Archives and Records Administration 23123 Cajalco Road Perris, CA  92570-7298 | |

NA FORM 13040 (10-86)

| COMMISSION RATE(S) | | | | | |
|---|---|---|---|---|---|
| S.P.U. | COMPANY BRANCH | PRODUCER | PRODUCER'S CITY | RENEWAL PS NUMBER | |
| | TX | ALLIED INSURANCE | HOUSTON | 9547 | |

**No. ST 260 20 78**

ST-260 11 79
RENEWAL OF NUMBER

COVERAGE IS PROVIDED IN THE
COMPANY DESIGNATED BY NUMBER

[ 1 ]

A STOCK INSURANCE COMPANY
(HEREIN CALLED THE COMPANY)

**Insured's Name and Mailing Address**

PIONEER CHLOR ALKALI INVESTMENTS, INC., AND ITS
AFFILIATES, PIONEER CHLOR ALKALI COMPANY, INC.
4200 BCHB CENTER, 700 LOUISIANA STREET
HOUSTON, TEXAS 77002

POLICY PERIOD: FROM **10-25-90** TO **10-25-91** 1201 AM STANDARD TIME

AT PLACE OF ISSUANCE **HOUSTON, TEXAS** Years **1**

| AUDIT | (JST) | APPROVAL TO FILL DAILY (UNDERWRITER'S INITIAL & DATE) | |
|---|---|---|---|
| YES ☐ | NO ☐ | | |
| MAP YES ☐ | NO ☐ | REINSURANCE | PERCENT |
| | | NET | |
| DONE | | | |
| DIV.  DEPT. | | | |
| ACCOUNT FILE | | | |
| YES | NO | BUREAU I.PT | INSP. FREQ | TYPE INSP |
| — | — | EARTHQUAKE SCHEDULE MADE YES ☐ NO ☐ | | |

N.U. 1
A.H. 2
S.O.P. 3

| | TOTAL PREMIUM | | | PREMIUM PAYABLE | | |
|---|---|---|---|---|---|---|
| AMOUNT | RATE | PREMIUM (IF PAID IN FULL AT INCEPTION) | TOTAL PREMIUM IF PAID ANNUALLY | AT INCEPTION | AT FIRST ANNIVERSARY | AT SECOND ANNIVERSARY |
| $ (LIMIT) 75,000,000. | $ VARIOUS | $ 299,857.00 | $ | $ | $ | $ |

In consideration of the stipulations herein named and of the premium above specified the Company does Insure the Insured name above, hereinafter called the Insured, whose address is shown above from the inception date shown above, at 12:01 a.m. (Standard time), to the expiration date shown above, at 12:01 a.m. (standard time), at place of Issuance to an amount not exceeding the amount(s) above specified, or as described in forms and / or endorsements attached hereto.

| 109-110 UNIT | 111-112 FORM OR PROG | 113-114 115 OCC. CLASS CODE | COVERAGE | | | | | | | | | 116-11 HAZAR GRADI |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | BUILDINGS | 1 | CONTENTS | 2 | BLKT PROP DAM | 3 | USE AND OCC. | 4 | PROP DAM & U/O | 5 |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |

FOR PREMIUM PURPOSES, INSURED VALUES ARE $209,400,000.00

Countersigned by _____

Authorized Representative

OKD 27...

Ptd. in U.S.A.

NAME OF INSURED:

> PIONEER CHLOR ALKALI INVESTMENTS, INC., AND ITS
> AFFILIATES, PIONEER CHLOR ALKALI COMPANY, INC.
> 4200 NCNB CENTER, 700 LOUISIANA STREET
> HOUSTON, TEXAS 77002

LOSS PAYABLE CLAUSE:

Loss, if any, to be adjusted with and payable to Insured, whose receipt shall constitute a release in full of all liability under this policy as regards such loss.

INTEREST AND PROPERTY INSURED:

This Company agrees to insure (subject to all the terms, conditions, limitations, exceptions, exclusions, provisions and stipulations of this Policy):

ITEM NO. ONE

| $ 186,000,000.00 | $ .1258 | $ 233,988.00 |
|---|---|---|
| Value | Rate | Premium |

(Except as hereinafter excluded and excluding all property named in Item No. Two below) all buildings, tanks and structures of every description and on all contents therein and/or property of every description upon the premises as now or hereafter constituted; all whether the Insured's own or held in trust or on consignment or on commission or held in storage or for repairs or sold but not delivered or removed or property for which the Insured may be legally liable, or has assumed liability; all comprising a part of and/or appertaining to the operation of their chlor alkali plant at St. Gabriel, Iberville Parish, Louisiana and a chlor alkali plant at Henderson, Clark County, Nevada.

ITEM NO. TWO

| $ 5,000,000.00 | $ .1258 | $ 6,290.00 |
|---|---|---|
| Value - Provisional | Rate | Premium |

Provisional (excepting as hereinafter specifically excluded), on __caustic soda, chlorine, hydrogen, sodium chloride__; all other products held for sale; (including products used in the manufacturing and packaging thereof); being property owned by the Insured, or held by the Insured in trust or on commission or on consignment or on joint account with others; or sold but not delivered; for which the Insured may be legally liable or has assumed liability; all while at the locations described above in Item No. One and various other locations as reported.

-1-

STD-3-ITEM 4/88

UF 0000003

## ITEM NO. THREE

$ __12,000,000.00__          $__3238__          $__38,856.00__
Value                        Rate               Premium

Against loss directly resulting from necessary interruption of business caused by destruction of or damage to real or personal property, covered under Item No. One, except finished stock, and arising from a peril covered hereunder and occurring during the term of this Policy; all while located at St. Gabriel, Iberville Parish, Louisiana and at Henderson, Clark County, Nevada.

## ITEM NO. THREE-A

$ __6,400,000.00__          $__3238__          $__20,723.00__
Value                       Rate               Premium

Contingent Business Interruption on chlorine being sold to Ciba-Geigy by the insured's plant at St. Gabriel, Louisiana. The product is piped to the Siba-Geigy plant located approximately one-half mile east of the insured's St. Gabriel, Louisiana Plant.

## COVERAGE: PERILS INSURED AGAINST:

This Policy covers the property insured hereunder against all risks of direct physical loss or damage occurring during the period of this Policy from any external cause, except as hereinafter excluded.

## LIMITS OF LIABILITY:

a.    Policy Limit:

      The combined limit of liability under this Policy shall in no event exceed $__75,000,000.00__ any one accident or disaster and/or any one series of accidents arising out of any one occurrence.

b.    Sublimits:

      This Company shall not be liable for more than:

      1.    $__5,000,000.00__ * in the aggregate in any one Policy year resulting from earthquake or volcanic action except in the State of California where liability for earthquake is excluded.

      2.    $__5,000,000.00__ in the aggregate in any one Policy year resulting from flood.

      3.    $__25,000.00__ in the aggregate in any one Policy year with respect to the limitation described in the Business Interruption Pollution Conditions.

-2-

STD-3-ITEM 4/88

UF  0000004

    s.    Crude oil, natural gas or other minerals prior to recovery above ground;

    t.    Underground tanks, caverns, subterranean strata and their contents;

    u.    Drilling and producing platforms, including rigs, derricks and equipment;

    v.    Property located offshore or beyond the shoreline (in Gulf of Mexico off Texas and Louisiana, "offshore and beyond the shoreline" is to seaward of the inland edge of the Lease Block of the Plane Coordinate System, as defined on United States Department of the Interior, Bureau of Land Management Offshore Leasing Maps. Elsewhere, offshore shall mean the sea coasts of United States including Alaska), except that structures (and their contents) extending from land or shore are not to be considered as offshore.

## PERILS EXCLUDED:

This Policy does not insure against loss, damage or expense caused by or resulting from:

    a.    Infidelity or dishonesty of the Insured or any of his employees, or others to whom the insured property may be entrusted; nor loss or damage resulting from the Insured voluntarily parting with title or possession of any property if induced to do so by any fraudulent scheme, trick, device or false pretense; nor any unexplained loss, mysterious disappearance, or loss or shortage disclosed on taking inventory; burglary and/or theft by an employee;

    b.    Faulty or defective material, faulty workmanship, errors or omissions in design, errors in processing, unless loss by a peril not otherwise excluded ensues, and then only for the ensuing loss;

    c.    Mechanical or machinery breakdown or derangement, including rupture or bursting caused by centrifugal force, nor rupture, bursting or operation of pressure relief devices;

    d.    Electrical failure, electrical injury or disturbance to electrical appliances, devices, fixtures, or wiring caused by electrical currents artificially generated; unless fire or explosion ensues and, then only for the actual loss or damage directly caused by such ensuing fire or explosion;

    e.    Explosion, bulging, rupture, cracking or bursting of steam boilers, or steam pipes, or steam turbines, or steam engines, or flywheels, if owned by, leased by or operated under the control of the Insured; and bulging or cracking of fired and unfired pressure vessels, except that this Company shall be liable for direct explosion loss caused by internal pressure of steam in processing machinery, equipment or apparatus, and direct loss resulting from the explosion of accumulated gases or unconsumed fuel within the firebox (or combustion chamber) of any fired vessel or within the flues or passages which conduct the gases of combustion therefrom;

    f.    Gradual deterioration, depletion, inherent vice, latent defect, termites, moth, vermin, ordinary wear and tear, dampness or dryness of atmosphere, extremes or changes of temperature, smog, shrinkage, evaporation, loss of weight, rust, corrosion, erosion, wet or dry rot, change in flavor or color or texture or finish; unless such loss is caused directly by physical damage not otherwise excluded in this Policy to the property covered;

    g.    Settling, cracking, shrinkage, bulging or expansion in foundations, walls, floors or ceilings;

    h.    Delay or loss of use or market except as may be provided under Business Interruption coverage if provided herein;

-6-

STD-3-ITEM 4/88

UF 0000008

i.    Conversion, embezzlement or secretion by any person in lawful possession of the property or failure of such persons to return property loaned, rented or placed in their care;

j.    Enforcement of any ordinance or law regulating the construction, repair or demolition of any real property insured hereunder; except as specifically stated herein or by endorsement;

k.    Evaporation, mixing, shortage, seepage, spillage or leakage unless resulting from direct physical loss or damage to the tanks, taps or pipes by an insured peril, except as insured under standard vandalism provisions;

l.    1.    Hostile or warlike action in time of peace or war, including action in hindering, combating or defending against an actual, impending or expected attack, a) by any government or sovereign power (de jure or de facto), or by any authority maintaining or using military, naval or air forces; b) by military, naval or air forces; c) by an agent of any such government, power, authority or forces;

        2.    Any weapon of war employing atomic fission or radioactive force whether in time of peace or war;

        3.    Insurrection, rebellion, revolution, civil war, usurped power, or action taken in hindering, combating or defending against such an occurrence, seizure or destruction under quarantine or Customs regulations, confiscation by order of any government or public authority, or risks of contraband or illegal transportation or trade;

m.    Nuclear reaction or nuclear radiation or radioactive contamination, all whether controlled or uncontrolled, and whether such loss be direct or indirect, proximate or remote, or be in whole or in part caused by, contributed to, or aggravated by the peril(s) insured against in this Policy; however, subject to the foregoing and all provisions of this Policy, direct loss by fire resulting from nuclear reaction or nuclear radiation or radioactive contamination is insured against by this Policy;

n.    Freezing of plumbing, heating or fire protection systems in vacant properties;

o.    Backing up of sewers or drains;

p.    Damage sustained to insured property directly resulting from maintenance, repairs, or alterations; unless loss by a peril not otherwise excluded ensues, and then only for the ensuing loss;

## VALUATION:

In case of loss, the basis of adjustment unless otherwise endorsed hereon, shall be as follows (Actual Cash Value as used in this Policy shall be replacement cost new less depreciation):

a.    Finished goods sold but not delivered, at the Insured's net selling price of such property at the time and place of such loss less all discounts and unincurred expenses to which such property would have been subject had no loss occurred. Finished goods not sold, at replacement cost. (Finished goods shall be those goods on which the Insured, and/or others for the account of the Insured, shall have completed work to the extent that such goods are in a state ready for sale, normal to the business of the Insured). Raw stock and stock in process, at replacement cost with like kind and quality, at the time and place of loss;

-7-

STD-3-ITEM 4/88

UF  0000009